## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

ERIC BENSON SKEENS,
        *Petitioner*,

    v.

WARDEN,
        *Respondent*.

No. 3:21-cv-692-DRL-MGG

## RETURN TO ORDER TO SHOW CAUSE

The Court should deny Petitioner Eric Skeens's petition for a writ of habeas corpus because his claims are procedurally defaulted, meritless, or both.

## JURISDICTION

Skeens, identified by offender number 196051, is in Respondent Warden's custody for his 2009 Huntington County, Indiana, convictions for child molesting. He is serving a 90-year sentence and could be released on December 9, 2052. He seeks a writ of habeas corpus under 28 U.S.C. § 2254.

## STATEMENT OF THE FACTS

The Court of Appeals of Indiana described Skeens's convictions on direct appeal:

> K.W. was born to R.W. ("Mother") in April 2000. Skeens, who was born on June 22, 1980, met Mother in 2003 and married Mother in December 2004. Skeens and Mother were divorced in June 2006, but they, along with K.W., continued to live together. K.W. thought of Skeens as her "dad." Transcript at 510. In September 2007, Skeens, Mother, and K.W. moved into a home on Williams Street in Huntington, Indiana. Skeens's son also lived at the home "on and off." *Id.* at 456. Skeens would care for K.W. while Mother was at work.

In June 2008, Mother moved with K.W. to another home on Wabash Circle in Huntington. However, even after moving to Wabash Circle, Mother continued to allow Skeens to visit with and care for K.W. because K.W. "thought of him as her dad." *Id.* at 464. K.W. would spend, on average, three nights per week at Skeens's house. In September 2008, Skeens moved to Warsaw, Indiana, but Mother would still make arrangements for Skeens to have K.W. on some weekends.

During the period of time between September 2007, when Skeens, Mother, and K.W. moved to Williams Street, and November 2008, Skeens subjected K.W. to a variety of sexual encounters. Mother would be "either at the grocery store, some type of store or [ ] she was at work." *Id.* at 544. Skeens removed both his and K.W.'s clothing and placed her on top of a bathroom sink, and he had sexual intercourse with K.W. which "hurt" K.W. *Id.* at 521. Skeens placed a towel underneath K.W. "to wipe up white stuff that came out" of her vagina. *Id.* at 518. Afterwards, Skeens would ask K.W. to go to the bathroom, and her vagina "kind of burned." *Id.* at 523.

Also, Skeens would remove his and K.W.'s clothing in either the living room, Mother's bedroom, or the bathroom and "put his tongue" on K.W.'s vagina. *Id.* at 525. When in either the living room or bedroom, Skeens would remove both his and K.W.'s clothing, and K.W. would be "laying down" on her back and Skeens was "[l]ike under [her] ... like under [her] legs sort of," which were "separated." *Id.* at 526. Skeens would use his tongue to "lick[ ]" K.W.'s vagina which felt "[w]et" and "[w]eird" to K.W. *Id.* at 527. When Skeens would put his tongue on K.W.'s vagina in the bathroom, K.W. would be "in the same position" on top of the sink as when Skeens had sexual intercourse with her. *Id.* at 528. Skeens would be "kind of squatting." *Id.*

Further, Skeens would touch K.W.'s vagina with his fingers in the living room, the bathroom, and the bedroom. Skeens would remove his and K.W.'s clothes and "rub" her vagina "in circles" using one finger on each hand. *Id.* at 531. Skeens would also rub "the part of [K.W.'s vagina] where [she goes] potty" using one finger "on both hands and then sometimes two fingers." *Id.* at 531–532.

Skeens would also make K.W. put his penis in her mouth in the living room and the bedroom. Skeens would remove his and K.W.'s clothes, and K.W. would [lie] on the floor on her back and Skeens would be "laying on top of [her] with his hands like sort of pushing up." *Id.* at 534. Skeens would then put his "private" in K.W.'s mouth and "[h]e would sort of push." *Id.* at 536. His "private" was "[s]ort of like a long type of mushroom shape," with "a triangle at the top with the top corner kind of curved" and a "hole." *Id.* at 538–539. His penis felt "[w]eird" and "[k]ind of smooth." *Id.* at 536.

Skeens would also touch K.W.'s "boobs" with his finger and his tongue. *Id.* at 537. Skeens would remove K.W.'s and his own clothing and lick "sometimes one, sometimes both" of K.W.'s breasts. *Id.* at 538. He would similarly "rub" either one or both of K.W.'s breasts with his finger. *Id.*

During some of the incidents in the living room when Skeens would touch K.W.'s "privates" with "[h]is tongue, his finger and ... his private," Skeens would show K.W. movies "that had people touching each other." *Id.* at 539, 542. He would show K.W. the movies, including one called "real sex," on a "flat screen" television by "download[ing] [them] from his computer ...." *Id.* at 541. The movie would depict "three or four people and they were touching each other[']s privates." *Id.* at 543.

There was one incident when Skeens tried to touch K.W., and K.W. told Skeens "no," and she attempted to "go downstairs and [she] was like on the first step and then [Skeens] said if you don't come back here and do this with me, I'll call the police on you and they'll tell your mom." *Id.* at 544. K.W. "went back [because she] was scared." Skeens then "touch[ed] [K.W.'s] privates." *Id.*

If Skeens's son was home during these encounters, Skeens would "get him to go out of the room." *Id.* at 545. Once, Skeens told his son to "go play with your cars, I just bought those for you." *Id.* Skeens's son told Skeens that "no I want to go play with [K.W.]," and Skeens went with his son to play with the cars for "a few minutes and then [Skeens] would say, oh, I'll be right back and then he would go and touch [K.W.'s] privates." *Id.* Skeens would also lock the bedroom door to keep his son out of the room. Skeens's son "would knock on the door .... [and] would say dad, let [me] in there." *Id.* at 546. Skeens would say "yeah," but then he would not go to the door. *Id.*

Skeens told K.W. to not tell anyone about the touching, and that if she did K.W. would "get in big trouble." *Id.* at 550. K.W. once tried to tell Mother about Skeens but K.W. "got scared" because she "thought that [Mother] wouldn't believe [her] and then like [K.W. would] get in big trouble." *Id.* at 549.

On December 5, 2008, the school counselor at K.W.'s elementary school showed a video to the class titled "Breaking the Silence, Children Against Child Abuse" and the video included "two segments ... one on physical abuse and one on sexual abuse." *Id.* at 411. After the sexual abuse segment of the video, the counselor directed the class to write in their "reflection journals," and to "write the word help on their paper" if they needed help. *Id.* at 413. While the counselor was "walking around the different table clusters," K.W. "raised her hand and whispered [']this happened to me.[']" *Id.* at 414. The counselor told K.W. that she would speak to her about it later, but when the children

3

were leaving for lunch K.W. "asked again, [']can I talk to you about this, this happened to me,[']" and the counselor "told [K.W.] [she] would come get her after lunch." *Id.* Again, however, K.W. "found [the counselor] first," when K.W. "was walking from lunch towards recess and stopped by [the counselor's] room and said [']can I please talk to you right now?[']" *Id.* at 414–415. After their conversation, the counselor called the Department of Child Services and repeated what K.W. had reported to her.

Later that day, Nicole Allen, a family case manager at the Department of Child Services, met with Mother to "discuss ... the nature of the report that [she] had received." *Id.* at 435. Mother was "shocked, in disbelief [ ], immediately just started crying and just wasn't sure what to think about the whole situation ...." *Id.* Mother agreed to take K.W. out of school and bring her to a child advocacy center in Huntington for an interview. At the interview, conducted by Allen, K.W. used age appropriate language and descriptions of the events that took place between K.W. and Skeens, and K.W. "gave a lot of information, very detailed information about the abuse." *Id.* at 440. Mother also reported that it had been two weeks since Skeens had seen K.W.

On December 8, 2008, Mother, Allen, and Detective Mel Hunnicut[t] transported K.W. to the Fort Wayne Sexual Assault Treatment Center for a physical examination. K.W. was seen by Sharon Robison, a sexual assault nurse examiner. Robison conducted a genital examination and concluded that her genitals were "normal," meaning that "her hymen was perfect .... [T]here was no [ ] injury to her hymen and her anus was perfect also." *Id.* at 590.

On December 16, 2008, K.W. began seeing Lynn Baker, a counselor at the Bowen center in Huntington. K.W. continued to see Baker once a week to help her deal with "behavioral issues," including K.W.'s nightmares and bed-wetting. *Id.* at 482. Most of the sessions were in the play therapy room, which "is used to allow a child to use any of the therapeutic toys available ... in a way that they need in order to work through why they're there." *Id.* at 625.

On December 10, 2008, the State charged Skeens with Count I, child molesting as a class A felony which alleged that Skeens performed or submitted to sexual intercourse with K.W.; Count II, child molesting as a class A felony which alleged that Skeens performed oral sex on K.W.; Count III, child molesting as a class A felony which alleged that Skeens submitted to oral sex from K.W.; Count IV, child molesting as a class A felony which alleged that Skeens penetrated K.W.'s female sex organ with an object; and Count V, child molesting as a class C felony which alleged that Skeens touched or

fondled K.W. with the intent to arouse or satisfy his own or K.W.'s sexual desires.

On July 21, 2009, the trial court held a jury trial. At trial, Sharon Robison testified that, for victims of sexual abuse ages zero to thirteen, there is a seventy-two hour window after vaginal penetration and a twenty-four hour window after an "oral ... or anal assault" to collect DNA samples. *Id.* at 568. Robison also testified that K.W. told her that Skeens "would put his fingers inside [her] private and would suck [her] boobs." *Id.* at 584. Robison testified that it is not common to find evidence of penetration in a young child "[b]ecause the hymen is elastic tissue that expands and goes back ...." *Id.* at 591. Robison also testified that recent studies have concluded that eighty-five to ninety-five percent "of pre-pubertal [female] children [who have been molested] ... do not have any type of genital injury." *Id.* at 592. Robison testified that this is so because "the internal female sex organ is [ ] very vascular, which means there's a lot of blood flow .... [A]ny injury to that area would heal very quickly," and that based upon the information provided by K.W. "and the time lapse between ... the last time it happened and the time that she came to see [her]," she did not expect to find any injuries to K.W.'s genitalia. *Id.* at 593–594. Robison also testified that she did not do any DNA collection because "[i]t was past the time frame." *Id.* at 596.

Baker testified at trial that it is "common for younger children to delay or wait to tell about sexual abuse." *Id.* at 622. When asked whether K.W. was prone to exaggerate in sexual matters, Baker testified that "quite the opposite, it's been very, very uncomfortable for her to talk about anything that's happened." *Id.* at 627. Baker also testified that K.W.'s behavior at "her play therapy reflects [ ] a child as extremely in emotional pain. The farther we move in to what's actually happened in the abuse the more painful she feels." *Id.* at 630.

On July 23, 2009, the jury found Skeens guilty as charged. On August 31, 2009, the trial court held a sentencing hearing, identified the aggravating and mitigating circumstances, and found that the aggravators outweighed the mitigators. The court sentenced Skeens to forty-five years each for Counts I–IV, and to seven years for Count V. The sentences were ordered to be served consecutively in the Department of Correction. Thus, Skeens's aggregate sentence was for 187 years.

(Ex. 5 at 2–9).[1]

---

[1] For all exhibits, Respondent cites the PDF page numbers.

On appeal, Skeens argued that the evidence was insufficient and challenged his sentence (Ex. 3). The Court of Appeals of Indiana determined that K.W.'s testimony, which was corroborated in part by Robison, was sufficient to support his convictions (Ex. 5 at 10–14). But the court agreed with Skeens that his sentence was inappropriate and revised it to 90 years (Ex. 5 at 27–28). Skeens raised both issues in a petition to transfer to the Indiana Supreme Court (Ex. 6), and the court denied transfer on November 3, 2010 (Ex. 2 at 5).

On January 27, 2011, Skeens filed a petition for post-conviction relief, which the he later amended with counsel and the post-conviction court denied after a hearing (Ex. 7 at 2–15).[2] On appeal, Skeens alleged a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), and argued that he received ineffective assistance from his trial and appellate counsel (Ex. 9). The Court of Appeals of Indiana summarized Skeens's trial-counsel claims:

> (1) failing to preserve issues related to Mother's computers; (2) failing to obtain police disciplinary records; (3) failing to lodge a vigorous defense, which should have included exculpatory witnesses and cross-examination of K.W.; (4) failing to properly prepare for and object to expert witness testimony; and (5) bolstering the prosecution's argument in closing.

(Ex. 12 at 4–5). As for appellate counsel, Skeens argued that he should have "raised the issues that were preserved at trial" and pursued an early post-conviction proceeding (Ex. 9 at 42, 46; *see also* Ex. 12 at 13).

---

[2] The Chronological Case Summary shows that Skeens's post-conviction proceedings were dismissed on May 16, 2016 (Ex. 7 at 6), but the State conceded below that the dismissal was erroneous (PCR App. Vol. II 127–28).

The court affirmed the denial of Skeens's petition for post-conviction relief (Ex. 12 at 15). It first concluded that Skeens had waived his *Brady* claim because it was known and available on direct appeal, but he did not raise it then (Ex. 12 at 3–4). The court held that Skeens's claims that the prosecutor committed misconduct and that Skeens's trial counsel was ineffective for failing to obtain a police officer's disciplinary record were waived for lack of cogency under the Indiana Appellate Rules (Ex. 12 at 5 n.1, 7 n.2). The court then considered Skeens's remaining trial-counsel claims and concluded that his counsel was not ineffective (Ex. 12 at 5–13). Finally, the court analyzed Skeens's appellate-counsel claims and held that his counsel was not ineffective (Ex. 12 at 14–15). Skeens raised the same issues in a petition to transfer to the Indiana Supreme Court, which the court denied on July 19, 2021 (Exs. 8 at 12; 13).

Skeens petitioned to file a successive petition for post-conviction relief, which the Court of Appeals of Indiana and Indiana Supreme Court denied (Ex. 14).

On September 29, 2021, Skeens filed an amended petition for a writ of habeas corpus (Doc. 7). The Court ordered Respondent to answer the petition by January 7, 2022 (Doc. 9).

## ARGUMENT

### Skeens is not entitled to a writ of habeas corpus.

Skeens is not entitled to a writ of habeas corpus because he cannot meet the procedural and substantive requirements of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). He raises

nine grounds for relief. Grounds One, Two, and Three are procedurally defaulted. Grounds Four and Five are partly procedurally defaulted and entirely meritless. Grounds Six, Eight, and Nine are not cognizable. And Ground Seven is meritless.

## I.
## Grounds One, Two, and Three are procedurally defaulted.

Skeens's claims in Grounds One, Two, and Three are procedurally defaulted. He cannot present a claim in federal court before fairly presenting it "through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). He had to "raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* (citing *Boerckel*, 526 U.S. at 845). That means presenting his arguments in a petition to transfer to the Indiana Supreme Court. *See Hough v. Anderson*, 272 F.3d 878, 892 (7th Cir. 2001). And he had to present to the state courts "both the operative facts and controlling law." *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) (citing *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)). Even if he fairly presented a claim in state court, it is still procedurally defaulted if the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted).

**A.  Skeens did not fairly present Ground One.**

In Ground One, Skeens appears to argue that his jury was tainted by a prospective juror during jury selection.[3] Skeens raised a claim like this in his petition for post-conviction relief, arguing that "one of the fifty possible jurors announced to the entire court that she had a previous job in a sex related medical field and that she knows for sure that I'm guilty" (PCR App. Vol. II 20, ¶ 31). He clarified in his amended petition that the prospective juror was Brenda Armbruster (Waite at the time of post-conviction proceedings) and maintained that part of her voir dire "is inaudible or missing from the audio recording of Skeens's trial" (PCR App. Vol. II 119). At the post-conviction hearing, he proffered an alleged affidavit from Waite, which the post-conviction court did not admit (PCR Tr. Vol. III 243–47). But he abandoned his claim in his proposed findings of fact and conclusions of law (*see* PCR App. Vol. III 37–60). And even though the post-conviction court denied his claim (App. Vol. III 79–80, ¶ 28), he did not raise it on appeal in the Court of Appeals of Indiana or the Indiana Supreme Court (*see* Exs. 9, 13).

Skeens suggests that he fairly presented his claim by raising it in his petition to file a successive petition for post-conviction relief (Doc. 7 at 15), but the Court of Appeals of Indiana did not authorize a successive petition (Ex. 14 at 2). "A state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time—as state rules define those courts, ways,

---

[3] This gives his argument the benefit of the doubt because it is not clear how any "tampering" with the audio recording of his trial would make his custody unconstitutional.

and times." *Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)). A petitioner's "[f]ailure to comply with the state's procedural rules furnishes an independent and adequate state ground of decision that blocks federal collateral review." *Id.* (citing *Harris v. Reed*, 489 U.S. 255 (1989)). An Indiana petitioner has one free shot at post-conviction relief to raise all of his claims. Ind. Post-Conviction R. 1(8). After his original petition, he can only file another one with permission from an appellate court, *id.* at (12),[4] but he cannot raise claims that he has already raised, *id.* at (8). If he does not pass the screening procedure, then he is procedurally barred from presenting his claims. *See, e.g.*, *Baird v. State*, 831 N.E.2d 109, 115 (Ind. 2005). Skeens's claim was available during his first post-conviction proceeding, and he raised it, but then he abandoned it. So he could not pass Indiana's screening procedure to file a successive petition for post-conviction relief. His claim was procedurally defaulted in state court and is procedurally defaulted in federal court. He does not acknowledge his procedural default or try to excuse it.[5]

Even if Skeens had not procedurally defaulted this claim, it is plainly meritless. The record does not show that he received anything but an impartial jury

---

[4] The Indiana Supreme Court reviews petitions in death penalty cases, and the Court of Appeals of Indiana reviews the rest. *See* Form for Successive Post-Conviction Relief R. 1 Pet., App. to P-C.R. 1.

[5] At times, Skeens seems to blame his post-conviction counsel for his failure to fairly present this claim, but ineffective assistance of post-conviction counsel can only excuse procedurally defaulted claims of ineffective assistance of trial counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2065–70 (2017).

free from extraneous influences. *See generally Dietz v. Bouldin*, 579 U.S. 40, 48–49 (2016) (collecting cases). The first round of voir dire contained a panel of 12 prospective jurors; four were selected to serve on the jury (DA Tr. 141, 247). The second round of voir dire contained a panel of eight prospective jurors, including Armbruster, who was Potential Juror #19 (DA Tr. 251, 257). She first stated that she would not be able to presume that Skeens was innocent (DA Tr. 257). Then when defense counsel asked about listening to the evidence and finding Skeens guilty beyond a reasonable doubt, the following exchange occurred:

> POTENTIAL JUROR #19:  Um, I was married to a police officer about, for about ten years. I worked security at Marshall Fields for twelve years. Ninety-nine percent …

> DEFENSE:  Well, wait, wait, wait, ma'am and I apologize, uh, but let me just come to you or we might have …

> POTENTIAL JUROR #19:  Okay.

(DA Tr. 259–60). Defense counsel questioned a different prospective juror and then asked to approach the bench (DA Tr. 260–61). Defense counsel's comments and part of the court's comments were inaudible, but they discussed a female (DA Tr. 261). During the State's voir dire, Armbruster answered that she had testified before and "wanted to see a guilty verdict" at that trial, answered "Hm, mm" when the prosecutor asked if testifying made her "nervous or anything like that," and did not say anything else (DA Tr. 277–88).

During a bench conference to discuss the prospective jurors, the following exchange occurred:

> COURT: I'm, unless there's an objection, I've got to ask her the questions, I'm going to let her go.
>
> STATE: (Inaudible.)
>
> COURT: I know, but she also started to go in to what he was arguing to begin with. I'm not going to take a chance on asking her something and then we have her screw up, we've spent too much time already so I'm going to take her out for cause.
>
> STATE: Okay. (Inaudible.)
>
> COURT: What I really want to do is set her in (inaudible) for the rest of the afternoon but I won't do that.

(DA Tr. 289–90). The court released six of the eight prospective jurors from the second panel, including Armbruster (DA Tr. 291). No one mentioned Ambruster's comments again, and the jury and two alternates were selected after the seventh round of voir dire (DA Tr. 291–371).

During post-conviction proceedings, Skeens alleged that some of Armbruster's comments were not transcribed, so the parties and the court listened to the audio recording (PCR Tr. Vol. III 243–47). No one, including Skeens's counsel, heard any comments from her that were not transcribed (PCR Tr. Vol. III 246–47; PCR App. Vol. III 79–80). Although Skeens proffered an alleged affidavit from Armbruster, which he apparently quotes in his habeas petition (Doc. 7 at 8–9), the post-conviction court did not admit the affidavit into evidence, so it is not part of the record (PCR Tr. Vol. III 247; *see* PCR Exs.). The post-conviction court concluded that Skeens failed to establish that any comments were omitted from the transcript:

> The voir dire process, including the bench conferences conducted during voir dire, were recorded and transcribed accurately. There is no evidence that audible portions of voir dire for Brenda Armbruster were

> erroneously indicated as "inaudible" in the trial transcript, nor is there
> any evidence that a portion of Brenda Armbruster's voir dire is missing
> from the trial court's audio recording.

(PCR App. Vol. III 79–80).

The record therefore does not show that any extraneous information could have influenced the jury. If Skeens's quotation of Armbruster's affidavit is accurate, then it is possible that she misremembered voir dire; she might have believed that she finished her thought even though defense counsel quickly cut her off before she could say anything damaging. Or she might have completed her statement but done so so quietly that no one heard it. Skeens's argument is speculative at best. He is not entitled to habeas relief for Ground One.

## B. The state court decided Ground Two on independent and adequate state-law grounds.

In Ground Two, Skeens alleges a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and prosecutorial misconduct (Doc. 7 at 16–27). Although he raised these claims on post-conviction appeal (Exs. 9 at 12–24; 13 at 6–8), the Court of Appeals of Indiana held that they were waived (Ex. 12 at 3, 5 n.1). The court held that the *Brady* claim was waived because it was known and available on direct appeal, but Skeens did not raise it (Ex. 12 at 3). In Indiana, issues that were known and available on direct appeal, but not raised, are procedurally defaulted in post-conviction proceedings. *See, e.g.*, *Williams v. State*, 808 N.E.2d 652, 659 (Ind. 2004) (citing *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999)). This is an independent

and adequate state-law ground.[6] The court also held that any prosecutorial misconduct claim was waived because Skeens did not follow the Indiana Rule of Appellate Procedure 46(A)(8)(a) by making a cogent argument with relevant citations (Ex. 12 at 5 n.1). The court regularly applies that rule. *See, e.g.*, *O'Keefe v. State*, 139 N.E.3d 263, 267 n.6 (Ind. Ct. App. 2019); *Johnson v. State*, 137 N.E.3d 1038, 1040 n.2 (Ind. Ct. App. 2019); *Tavake v. State*, 131 N.E.3d 696, 702 n.3 (Ind. Ct. App. 2019). Because the state court decided Skeens's claims in Ground Two on independent and adequate state-law grounds, they are procedurally defaulted. He does not acknowledge his procedural default or offer an excuse.

## C.  Skeens did not fairly present Ground Three.

In Ground Three, Skeens alleges a discovery violation under Indiana Rule of Trial Procedure 26 (Doc. 7 at 29–35). Although he raised this issue in the context of ineffective assistance of counsel (Exs. 9 at 25, 36–41; 13 at 8–9), he never raised it as a freestanding claim. Accordingly, he did not fairly present it, and it is procedurally defaulted. He does not acknowledge his procedural default or offer an excuse. Even if he had not procedurally defaulted Ground Three, it is not cognizable on federal habeas review. He must be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Violations of state law cannot be remedied in federal court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Ground Three is based on state law.

---

[6] Respondent will address *Brady* in the ineffective-assistance section, as the state court did (*see* Ex. 12 at 3–4).

## II.
## Grounds Four and Five are partly procedurally defaulted and entirely meritless.

In Grounds Four and Five, Skeens alleges ineffective assistance of trial and appellate counsel, but he did not fairly present all of his claims. Although he raised ineffective assistance of trial and appellate counsel on post-conviction appeal, he did not fairly present his claims that his counsel were ineffective for failing to challenge prospective juror Armbruster's comments (*see* Doc. 7 at 36, 45–46). *See Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)) ("A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [the petitioner] must have 'identif[ied] the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'"). Skeens does not acknowledge that these claims are procedurally defaulted, so he does not try to excuse his procedural default.

Although Skeens apparently raises ineffective assistance of post-conviction counsel as a freestanding claim in Ground Six, he does not argue that he can use it to excuse his procedurally defaulted ineffective-assistance-of-trial-counsel claim. *See Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012); *Brown v. Brown*, 847 F.3d 502, 512–13 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1547 (2018). Even so, *Martinez* only applies to procedural defaults "in an initial-review collateral proceeding." 566 U.S. at 17. Skeens's post-conviction counsel did not cause his procedural default because she raised the Armbruster issue; he procedurally

defaulted the claim on appeal.[7] And even if these claims were not procedurally defaulted or Skeens could excuse the default, they are meritless for the reasons explained above. In short, Armbruster did not taint his jury, so there was no reason for his trial or appellate counsel to raise the issue, and they would have been unsuccessful had they done so. *See Strickland v. Washington*, 466 U.S. 668, 688–89, 694 (1984) (requiring deficient performance and prejudice).

For his remaining ineffectiveness claims, Skeens cannot show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because the state court adjudicated his claims on the merits, he must show that the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). He cannot meet his burden.

A decision is contrary to federal law if "the state court arrives at a conclusion opposite that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and" reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A decision is also contrary to "clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court]

---

[7] It makes no difference that his counsel in the post-conviction trial court and on appeal were the same. Only her performance in the "initial-review collateral proceeding" matters under *Martinez*. 566 U.S. at 9–14.

cases." *Id.* at 405. But "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case" is not. *Id.* at 406. For example, if "a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim[,] … the state-court decision would be in accord with … *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim." *Id.*

When a state court "correctly identifies the governing legal rule," the petitioner must prove that the court "applie[d] it unreasonably to the facts of [his] case." *Williams*, 529 U.S. at 407–09. It is not enough for him to show that the court applied federal law incorrectly because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011) (citing *Williams*, 529 U.S. at 410; *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). He must demonstrate that all "fairminded jurists" would agree "that the state court's decision conflicts with [Supreme Court] precedents." *Id.* at 102. That means the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Id.* at 103. It is a difficult standard to meet "because it was meant to be." *Id.* at 102.

The clearly established law that governs claims of ineffective assistance of counsel is *Strickland*, which requires a petitioner to show that his "counsel's representation fell below an objective standard of reasonableness" and "that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688–89, 694. The state court recognized and recited the *Strickland* test (Ex. 12 at 4, 13). Its decision was "a run-of-the-mill" application of *Strickland*, so it was not contrary to clearly established law. *See Williams*, 529 U.S. at 406.

Skeens's burden is higher in federal court than it was in state court. On its own, the *Strickland* standard is "highly deferential." 466 U.S. at 689. But the standard is "doubly deferential" under AEDPA because "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. The *Strickland* standard is general, "so the range of reasonable applications is substantial." *Id.* (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The state court's decision that Skeens's trial and appellate counsel were not ineffective is well within the reasonable range.

## A. The state court reasonably applied *Strickland* to determine that Skeens's trial counsel was not ineffective.

The Court of Appeals of Indiana reasonably rejected Skeens's trial-counsel claims, which it summarized:

> (1) failing to preserve issues related to Mother's computers; (2) failing to obtain police disciplinary records; (3) failing to lodge a vigorous defense, which should have included exculpatory witnesses and cross-examination of K.W.; (4) failing to properly prepare for and object to expert witness testimony; and (5) bolstering the prosecution's argument in closing.

(Ex. 12 at 4–5).

### 1. Mother's Computers

Skeens argued that his trial counsel should have done more to obtain Mother's computers and preserve an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Ex. 9 at 26–27). In her forensic interview, K.W. said Skeens showed her pornography at their old house (in Huntington) but not normally at their new house (PCR Tr. Vol. III 72–73). Skeens's counsel wanted to access Mother's "computer to see if there was anything there" to show "essentially that if [K.W.] saw this stuff, it had to be on somebody's computer" (PCR Tr. 89–90). But he admitted that it was "a fishing expedition" because he did not have any specific knowledge that Mother's computers contained pornography (PCR Tr. Vol. III 89). Counsel requested access to Mother's computers (DA App. 51–52). At a pretrial hearing, Detective Mel Hunnicutt testified that he had watched K.W.'s forensic interview and she "did not disclose anything about computers in Huntington" (DA Tr. 95, 103–05, 115–17). The trial court relied on Detective Hunnicutt's testimony to deny Skeens's motion to access Mother's computers (DA App. 86). Detective Hunnicutt admitted at the post-conviction hearing that his testimony "was a mistake of fact," but he "wasn't trying to … lie or deceive anyone or prevent evidence or anything like that" (PCR Tr. Vol. III 151–54, 157).

The state court reasonably determined that Skeens's counsel did not perform deficiently or prejudice him. The court reasoned that "Skeens offers no evidence that the State ever possessed or searched Mother's computers. Nor is there anything in the record, other than Skeens's conjecture, to indicate Mother's

computers contained pornography" (Ex. 12 at 6) (citation omitted). And the court concluded that Skeens was not prejudiced because even if there was evidence that Mother's computers contained pornography, Skeens would still have to show that K.W. saw the pornography on Mother's computers and that the pornography provided the details for K.W.'s graphic trial testimony (Ex. 12 at 6). According to the court, Skeens's argument was based on "speculation that Mother's computer possessed exculpatory evidence which had been suppressed by the State" (Ex. 12 at 6).

This determination was reasonable. In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution suppresses evidence only when it "fail[s] to disclose evidence not otherwise available to a reasonably diligent defendant." *Jardine v. Dittmann*, 658 F.3d 772, 776 (7th Cir. 2011) (citing *United States v. Gray*, 648 F.3d 562, 566–67 (7th Cir. 2011); *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007)). And "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The State could not suppress evidence that it never possessed, and the record shows that the State never possessed Mother's computers (PCR Tr. Vol. III 146,

154–55, 212). Skeens's counsel could not have proved a *Brady* violation based on speculation. *See, e.g.*, *Wood v. Barthalow*, 516 U.S. 1, 6 (1995). And Skeens cannot prove ineffective assistance without evidence because "the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689).

The state court could have also reasoned that Skeens's counsel would not have been entitled to Mother's computers even if he had challenged Detective Hunnicutt's testimony about K.W.'s interview. Indiana's discovery rules prevent "fishing expeditions," *Crawford v. State*, 948 N.E.2d 1165, 1168 (Ind. 2011), which Skeens's counsel admitted he was on when he requested Mother's computers (PCR Tr. Vol. III 89). And the court could have reasoned that Skeens was not prejudiced by not being able to access Mother's computers because she ultimately admitted at trial that she had watched pornography with Skeens on a computer that K.W. used (DA Tr. 485–87). So counsel could have made the same argument—that K.W. might have seen pornography on Mother's computers—without access to Mother's computers. Skeens's trial counsel did not perform deficiently or prejudice Skeens by mishandling Mother's computers.

## 2. Police Disciplinary Records

Skeens also argued that his trial counsel should have obtained Detective Mel Hunnicutt's disciplinary record, but he was not clear about what his counsel could have done with it (Ex. 9 at 27–28). Detective Hunnicutt was disciplined for viewing

unrelated pornography at work around the time of Skeens's trial, so he did not testify (PCR Tr. Vol. III 145, 156). The state court reasoned that "Skeens fails to establish any connection between his charges and Officer[8] Hunnicutt's discipline other than they both involved pornography," and "if trial counsel had obtained this information, it is unclear what he would have done with it. Neither party called Officer Hunnicutt as a witness at Skeens's trial, and he does not challenge that omission" (Ex. 12 at 7–8).

This is a reasonable determination because Skeens could not meet either *Strickland* prong without showing how his counsel could have used Detective Hunnicutt's disciplinary record. It was merely a coincidence that Detective Hunnicutt was disciplined for watching pornography and Skeens also showed K.W. pornography when he molested her. But there is no evidence that Detective Hunnicutt's misconduct was at all related to Skeens's case. And he did not testify at trial, so Skeens could not have used his disciplinary record to impeach him. Skeens's trial counsel did not perform deficiently or prejudice Skeens when he did not obtain Detective Hunnicutt's disciplinary record.

### 3. Vigorous Defense

Skeens additionally argued that his trial counsel should have cross-examined K.W. and presented his son and ex-fiancée as witnesses (Ex. 9 at 29–35). But he did not say what his counsel should have asked K.W. or what he could have accomplished by cross-examining her (Ex. 9 at 31). He argued that his counsel

---

[8] After the pornography incident, he became a patrolman (PCR Tr. Vol. III 155).

should have called Skeens's son, who was four years old at the time of the molestations and six years old at the time of trial, to testify that Skeens never locked the doors in their house (Ex. 9 at 31–32). And he argued that his counsel should have called Skeens's ex-fiancée to testify that she did not see Skeens do anything "weird or disturbing" with K.W. and that she trusted Skeens with her children (Ex. 9 at 31–35).

The state court reasonably rejected Skeens's arguments. Rather than conclude that he had failed to present a cogent argument about cross-examining K.W., the court addressed the argument that he had raised below in the post-conviction court: "Skeens argues that trial counsel should have asked K.W. about the unusual markings on his penis" (Ex. 12 at 8). The court determined that counsel made a reasonable strategic decision not to do that "for fear of corroborating K.W.'s story" (Ex. 9 at 8). The court also held that counsel made reasonable strategic decisions to not call Skeens's son or ex-fiancée (Ex. 9 at 8–9). According to the court, the ex-fiancée's testimony was "of limited usefulness" because she "was not present when the alleged abuse occurred and could not contradict directly K.W.'s account" (Ex. 9 at 8). Similarly, Skeens's son "was not in the room when the sex acts occurred, and he was a small child," and counsel reasonably decided that it was "risky" to call him (Ex. 9 at 9).

The state court's determination was reasonable. In *Strickland*, the Supreme Court explained that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at

690. Skeens's counsel "interviewed and spoke with every witness [Skeens] identified" (PCR Tr. Vol. III 67–68, 75, 78). Counsel was "ready to present witnesses in the event that there were holes in the State's case" (PCR Tr. Vol. III 76). But his "trial strategy at the conclusion of the case was that the evidence was insufficient for that jury to conclude beyond a reasonable doubt if these things happened. So it was for that reason that [Skeens] didn't testify and [they] called no witnesses and [they] rested" (PCR Tr. Vol. III 78). Counsel considered cross-examining K.W. and discussed it with Skeens, but he decided not to ask about Skeens's unusual penis because, if K.W. would have accurately described it, "that would be the nail in his coffin" (PCR Tr. Vol. III 102–04). Counsel did not want Skeens's son "called because the information we had was he was there. So without his testimony, all we had was the child and we had [Skeens]" (PCR Tr. Vol. III 77). And Skeens's fiancée had "nothing significant that would've added to the defense" (PCR Tr. Vol. III 82–83). Counsel reasonably decided not to present witnesses whose testimony would have been inconsistent with or unhelpful to his defense.

Skeens also failed to establish a reasonable probability that cross-examining K.W. or presenting his son and ex-fiancée would have resulted in an acquittal. Skeens did not call K.W. as a witness at the post-conviction hearing, so his argument about cross-examining her was speculative. Although Skeens's son testified at the post-conviction hearing that his father never locked the doors in their house (PCR Tr. Vol. III 175), he was only six years old at the time of trial and four years old when Skeens molested K.W. (PCR Tr. Vol. III 175–76). Even if the

jury would have trusted his memory on that minor detail, there is no reasonable probability that it would have undermined K.W.'s detailed testimony about the repeated molestations. The same is true for Skeens's ex-fiancée: she did not live in the house where Skeens molested K.W. (Ex. 5 at 2–3; PCR Tr. Vol. III 162–63). The fact that she did not see anything "weird or disturbing" at another house and trusted Skeens with her children did nothing to weaken K.W.'s testimony (PCR Tr. Vol. III 184). Skeens's counsel did not perform deficiently or prejudice Skeens by failing to cross-examine K.W. or present witnesses.

### 4. Expert Witness Testimony

Skeens next argued that his trial counsel should have done more to prepare for and object to the testimony of sexual assault nurse examiner Sharon Robison and therapist Lynn Baker (Ex. 9 at 36–41). Counsel had seen Robison and other sexual assault nurse examiners testify before, and possibly even cross-examined Robison before, so he was familiar with the statistics that she would rely on and was prepared to object when she testified (PCR Tr. Vol. III 85–86). Robison testified about examining K.W. and that it was uncommon to find evidence of penetration in children, citing studies (DA Tr. 574–77, 580, 582–86, 590–96). Skeens's counsel repeatedly objected to her testimony, which the trial court granted in part, moved for a mistrial, and specifically objected to the studies that she cited because they had "not been produced to the defense" or "identified in discovery" (DA Tr. 576–84, 591, 593–95, 607–08). And he cross-examined her (DA Tr. 596–607). Baker testified that it is normal for children to delay disclosing sexual abuse and about K.W.'s

therapy (DA Tr. 622–30). Skeens's counsel repeatedly objected to her testimony (DA Tr. 619–21, 625–30, 632). And he cross-examined her (DA Tr. 631).

The state court reasonably determined that Skeens's counsel was not ineffective. The court reasoned that counsel "frequently objected to [Robison's] testimony and subjected her to vigorous cross-examination" and "moved for her testimony to be stricken and for a mistrial" (Ex. 12 at 10). The court noted that counsel was prepared for Robison's testimony based on her prior testimony (Ex. 12 at 10). And the court concluded that "[h]ad trial counsel deposed Robison or accessed the studies she referenced in her testimony, his objections and cross-examination likely would have been largely the same" (Ex. 12 at 10–11). The court also determined that counsel "cast doubt on [Baker's] veracity and highlighted inconsistencies in K.W.'s statements to Baker" (Ex. 12 at 11). This was a reasonable conclusion because it was supported by the record and consistent with *Strickland*. Skeens did not prove that the constitution required his counsel to do anything differently to prepare for Robison's and Baker's testimony.

The state court framed its conclusion in terms of deficient performance (Ex. 12 at 11), but its reasoning just as easily applies to a prejudice analysis. Because Skeens did not show what else his counsel could have done with Robison's and Baker's testimony, he did not demonstrate a reasonable probability that counsel could have changed the outcome of trial by performing differently. Skeens's counsel did not perform deficiently or prejudice Skeens by inadequately preparing for or objecting to Robison's and Baker's testimony.

26

### 5. Closing Argument

Finally, Skeens argued that his trial counsel was ineffective during closing argument (Ex. 9 at 35–36). Counsel reminded the jury that the State had to prove Skeens's guilt beyond a reasonable doubt, which he contrasted with the lower standard for civil cases (DA Tr. 660–63). In the context of that argument, he said, "Now you can believe her for example, that it's more likely than not, or clearly and convincingly, or probably you can believe her. But to go to the point of a Class A felony beyond a reasonable doubt, it's not enough for you to return a verdict in a criminal court" (DA Tr. 664). He continued on this theme:

> There is nothing to corroborate what she said. There is nothing to substantiate. Now, it doesn't mean that you cannot believe her, if you were in a civil court, you certainly could. I believe her, it's more likely than not, but clearly under the standard of clear and convincing evidence, or probably. But in a criminal court, we're submitting that as a juror you should require some, you should require corroboration to exclude any reasonable doubt. That degree of certainty of guilt beyond a reasonable doubt.

(DA Tr. 673). According to Skeens, his counsel conceded his guilt (Ex. 9 at 35–36).

The state court assumed without deciding that counsel's statement—"I believe her"—was unreasonable (Ex. 12 at 12 & n.3). But it determined that "the evidence of Skeens's guilt was so substantial that it is not reasonably likely that trial counsel's ill-advised statement affected the result" (Ex. 12 at 12). The court summarized K.W.'s "specific and detailed" testimony (Ex. 12 at 12–13). And it compared her testimony to counsel's entire closing argument, in which he "repeatedly emphasized that the State had not proved Skeens guilty beyond a reasonable doubt" (Ex. 12 at 13). The court concluded that "Skeens has not shown a

27

reasonable probability that but for counsel's isolated ambiguous sentence in an eleven-page closing argument, the outcome would have been different" (Ex. 12 at 13).

This was a reasonable determination. As the state court concluded on direct appeal, the State's case was overwhelming because "the testimony of K.W. produced detailed descriptions of various episodes of child molesting performed by Skeens" (Ex. 5 at 13). This conclusion is supported by the record (DA Tr. 515–18, 520–23, 527–38). And counsel's statement was at worst ambiguous. In the context of his discussion about burdens of proof, the jury could have reasonably understood him to be saying that even if they believed K.W.'s testimony, they could still have reasonable doubt. And based on his inflection, his live statement was likely less ambiguous than it is in a cold record. Skeens did not prove that his counsel performed deficiently during closing argument or that without his ambiguous statement about believing K.W. there is a reasonable probability that the jury would have acquitted him. Because the state court reasonably applied *Strickland* to Skeens's claims that his trial counsel was ineffective, he is not entitled to habeas relief.

## B.  The state court reasonably applied *Strickland* to determine that Skeens's appellate counsel was not ineffective.

The Court of Appeals of Indiana also reasonably rejected Skeens's claims that his appellate counsel was ineffective. Skeens argued that his appellate counsel "fail[ed] to raise issues preserved at trial" and "fail[ed] to pursue an early post-conviction proceeding" (Ex. 12 at 13). Regarding Skeens's first argument, the court

reasoned that, "[t]hough he lists alternate bases for appeal, Skeens neglects to identify which of those appellate counsel should have pursued, let alone what the arguments might be. In fact, appellate counsel aptly identified an error which convinced this Court to reduce Skeens's sentence by *half*—from 187 to 90 years" (Ex. 12 at 14). This was a reasonable reading of Skeens's brief and a reasonable application of *Strickland*. In his brief, Skeens ticked off issues that he believed his counsel should have raised instead of challenging the sufficiency of the evidence, but he did not offer any specific arguments that his counsel should have made or explain why they had a reasonable probability of success (Ex. 9 at 43–45). And he barely mentioned the fact that his counsel succeeded in cutting his sentence in half, even though he had to show that his counsel's overall performance was incompetent. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690).

Even so, none of the claims that Skeens listed had merit, so he could not prove that his appellate counsel performed deficiently or prejudiced him. He suggested that his counsel should have "raise[d] the problems with the State's preventing discovery of the computers Trial Counsel sought through pre-trial motions" (Ex. 9 at 43). But trial counsel did not object on this basis during trial, so appellate counsel would have had to raise this issue under the onerous fundamental error standard. *See Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). He could not have met that standard because there was no error, as explained above, let alone fundamental error. In short, there is no evidence in the record about what Mother's

computers contained, so he could not have shown reversible error under any standard.

Skeens also suggested that his counsel should have argued that his "right to confrontation was denied during the SANE's testimony" because she relied on studies (Ex. 9 at 44). But the Confrontation Clause only applies to "testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 43–54 (2004); *Davis v. Washington*, 547 U.S. 813, 821 (2006). A statement is testimonial when, "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). A study prepared for publication is not testimonial. *Cf. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009) (holding that a scientific report prepared for trial is testimonial). Counsel did not perform deficiently or prejudice Skeens when he did not raise another losing issue.

In response to Skeens's argument that his appellate counsel should have pursued post-conviction relief earlier under *Davis v. State*, 368 N.E.2d 1149 (Ind. 1977), and *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993), the state court concluded that it "had no reason to believe that his arguments … would have been any more successful than they are now" (Ex. 12 at 14–15). This is a reasonable determination. Under what is known as the *Davis* procedure or the *Davis-Hatton* procedure, a defendant can stay his direct appeal, file a petition for post-conviction relief, and "present[ ] both the issues which would have been addressed in the original appeal

30

and those concerning the post-conviction proceeding" in one appeal if the post-conviction court denies relief. *Hatton*, 626 N.E.2d at 442. Skeens had to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the *result of the proceeding* would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). There is zero probability that speeding up Skeens's post-conviction proceedings would have affected the outcome of his direct appeal. Skeens's counsel could not have used new evidence produced in the post-conviction proceedings to support any of his direct-appeal claims; he still would have been limited to the trial record. *See Jewell v. State*, 887 N.E.2d 939, 941–42 (Ind. 2008). Plus, Skeens's appellate counsel was not appointed to pursue post-conviction proceedings (PCR Tr. Vol. III 119). The state court reasonably determined that Skeens's appellate counsel was not ineffective, so Skeens is not entitled to habeas relief.

## III.
### Grounds Six, Eight, and Nine are not cognizable.

Habeas relief is unavailable for Grounds Six, Eight, and Nine. Skeens must be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Violations of state law cannot be remedied in federal court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). In Ground Six, Skeens contends that he received ineffective assistance from his post-conviction counsel (Doc. 7 at 48–49). But "[t]here is no constitutional right to an attorney in state post-conviction proceedings," so "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752

(1991) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989); *Wainwright v. Torna*, 455 U.S. 586 (1982)). In Ground Eight, Skeens challenges his sentence under Indiana law (Doc. 7 at 54–59). And in Ground Nine, Skeens alleges "cumulative error," but there is no clearly established cumulative-error doctrine. *See Bryant v. Brown*, 873 F.3d 988, 999 (7th Cir. 2017) (summarily rejecting a cumulative-error claim based on different alleged constitutional violations). Because these claims are not based on clearly established federal law, they could not entitle Skeens to habeas relief.

## IV.
## Ground Seven is meritless.

In Ground Seven, Skeens argues that the evidence was insufficient to support his convictions for five counts of child molesting (Doc. 7 at 51–53). Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court correctly identified and applied the *Jackson* standard (Ex. 5 at 9), so its decision is not contrary to clearly established law, *see Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court applied *Jackson* reasonably. Petitioners challenging the sufficiency of the evidence "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). First, on direct appeal, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier

of fact could have agreed with the jury." *Id.* (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)) (quotation marks omitted). "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Id.* (citing *Cavazos*, 565 U.S. at 2) (quotation marks omitted).

The state court's decision that a rational trier of fact could have agreed with the jury that Skeens committed child molesting was objectively reasonable. The state court summarized the state's burden:

> The offense of child molesting as a class A felony is governed by Ind. Code § 35-42-4-3(a), which provides: "A person who, with a child under fourteen (14) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits child molesting, a Class B felony. However, the offense is a Class A felony if: (1) it is committed by a person at least twenty-one (21) years of age ...." Under Count I, the State was required to prove that Skeens, who was at least twenty-one years of age, performed sexual intercourse with K.W., who was under fourteen years of age. Under Counts II–IV, the State was required to prove that Skeens, who was at least twenty-one years of age, performed deviate sexual conduct with K.W., who was under fourteen years of age. "Deviate sexual conduct" means "an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-41-1-9.
>
> Furthermore, the offense of child molesting as a class C felony is governed by Ind. Code § 35-42-4-3(b), which provides that "[a] person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Class C felony." Thus, to convict Skeens of child molesting as a class C felony, the State needed to prove that: Skeens performed or submitted to any fondling or touching of either K.W., a child under fourteen years of age, or Skeens, with the intent to arouse either K.W. or Skeens.

(Ex. 5 at 9–10).

Skeens challenged his conviction for Count IV on the ground that the State failed to prove that he penetrated K.W.'s sex organ with his finger (Ex. 3 at 14–15). In Indiana, "proof of the slightest penetration is enough to support a conviction." *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996) (citing *Dinger v. State*, 540 N.E.2d 39, 40 (Ind. 1989)). And a female sex organ includes "external genitalia." *Smith v. State*, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002) (citing *Short v. State*, 564 N.E.2d 553, 559 (Ind. Ct. App. 1991)). The state court reasonably determined that K.W.'s testimony was sufficient to meet this definition (Ex. 5 at 11–12). K.W., who was eight years old and referred to her vagina as her "private" (DA Tr. 513), testified that Skeens would "[r]ub my private … [s]ort of in circles" (DA Tr. 531). She also answered "Yes" when the prosecutor asked if Skeens "ever touch[ed] the … part of your private where you go potty or anything like that" (DA Tr. 531–32). The sexual assault nurse examiner, Sharon Robison, also testified that K.W. reported "that he would put his fingers inside my private" (DA Tr. 584). Based on this evidence, a rational trier of fact could have agreed with the jury that Skeens penetrated K.W.'s genitalia with his finger.

Skeens also contended that K.W.'s testimony could not support any of his convictions because it was incredible (Ex. 3 at 16–17). The state court reasonably rejected his claim because he was "merely request[ing] that [the court] reweigh the evidence or judge the credibility of witnesses, which [it] cannot do" (Ex. 5 at 13). The court reasoned that "the testimony of K.W. produced detailed descriptions of various

episodes of child molesting performed by Skeens" (Ex. 5 at 13). This conclusion is supported by the record (DA Tr. 515–18, 520–23, 527–38). Although Robison testified that K.W.'s "hymen was perfect," she also testified that this is not uncommon and was not surprising for K.W. based on the timing of Skeens's most recent molestation (DA Tr. 590–95). The state court reasonably found sufficient evidence to support Skeens's convictions. He is not entitled to habeas relief for this claim.

## CONCLUSION

The Court should deny Skeens's petition.

Respectfully submitted,

By: <u>Jesse R. Drum</u>
Jesse R. Drum
Assistant Section Chief, Criminal Appeals
Attorney No. 31283-53

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, Indiana 46204-2770
317-234-7018 (telephone)
Jesse.Drum@atg.in.gov

*Attorney for Respondent*

**EXHIBITS TO RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE**

Respondent submits the following as Exhibits to his Return to Order to Show Cause:

Exhibit 1:   Chronological Case Summary, *State v. Skeens*, No. 35C01-0812-FA-73;

Exhibit 2:   Docket, *Skeens v. State*, No. 35A05-0909-CR-515;

Exhibit 3:   Brief of Appellant, *Skeens v. State*, No. 35A05-0909-CR-515;

Exhibit 4:   Brief of Appellee, *Skeens v. State*, No. 35A05-0909-CR-515;

Exhibit 5:   Memorandum Decision, *Skeens v. State*, No. 35A05-0909-CR-515;

Exhibit 6:   Petition to Transfer, *Skeens v. State*, No. 35A05-0909-CR-515;

Exhibit 7:   Chronological Case Summary, *Skeens v. State*, No. 35C01-1101-PC-4;

Exhibit 8:   Docket, *Skeens v. State*, No. 20A-PC-686;

Exhibit 9:   Brief of Appellant, *Skeens v. State*, No. 20A-PC-686;

Exhibit 10:   Brief of Appellee, *Skeens v. State*, No. 20A-PC-686;

Exhibit 11:   Reply Brief, *Skeens v. State*, No. 20A-PC-686;

Exhibit 12:   Memorandum Decision, *Skeens v. State*, No. 20A-PC-686;

Exhibit 13:   Petition to Transfer, *Skeens v. State*, No. 20A-PC-686; and

Exhibit 14:   Docket, *Skeens v. State*, No. 21A-SP-1659.

## CERTIFICATE OF SERVICE

I certify that on January 7, 2022, I served the foregoing document upon the following person by first-class U.S. Mail, postage prepaid:

Eric Skeens
196051
Indiana State Prison
One Park Row
Michigan City, Indiana 46360

/s/ Jesse R. Drum
Jesse R. Drum