

Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**JEREMY K. NIX**
Matheny, Hahn, Denman & Nix, L.L.P.
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANN L. GOODWIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ERIC SKEENS, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 35A05-0909-CR-515 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE HUNTINGTON CIRCUIT COURT
The Honorable Thomas M. Hakes, Judge
Cause No. 35C01-0812-FA-73

**August 25, 2010**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Eric Skeens appeals his convictions and sentence for four counts of child molesting as class A felonies[1] and child molesting as a class C felony.[2] Skeens raises three issues, which we revise and restate as:

I. Whether the evidence is sufficient to sustain his convictions;

II. Whether the trial court abused its discretion in sentencing him; and

III. Whether Skeens's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm in part, reverse in part, and remand.

The facts most favorable to the conviction follow. K.W. was born to R.W. ("Mother") in April 2000. Skeens, who was born on June 22, 1980, met Mother in 2003 and married Mother in December 2004. Skeens and Mother were divorced in June 2006, but they, along with K.W., continued to live together. K.W. thought of Skeens as her "dad." Transcript at 510. In September 2007, Skeens, Mother, and K.W. moved into a home on Williams Street in Huntington, Indiana. Skeens's son also lived at the home "on and off." Id. at 456. Skeens would care for K.W. while Mother was at work. In June 2008, Mother moved with K.W. to another home on Wabash Circle in Huntington. However, even after moving to Wabash Circle, Mother continued to allow Skeens to visit with and care for K.W. because K.W. "thought of him as her dad." Id. at 464. K.W. would spend, on average, three nights per week at Skeens's house. In September 2008,

---

[1] Ind. Code § 35-42-4-3(a)(1) (Supp. 2007).

[2] Ind. Code § 35-42-4-3(b) (Supp. 2007).

2

Skeens moved to Warsaw, Indiana, but Mother would still make arrangements for Skeens to have K.W. on some weekends.

During the period of time between September 2007, when Skeens, Mother, and K.W. moved to Williams Street, and November 2008, Skeens subjected K.W. to a variety of sexual encounters. Mother would be "either at the grocery store, some type of store or [] she was at work." Id. at 544. Skeens removed both his and K.W.'s clothing and placed her on top of a bathroom sink, and he had sexual intercourse with K.W. which "hurt" K.W. Id. at 521. Skeens placed a towel underneath K.W. "to wipe up white stuff that came out" of her vagina. Id. at 518. Afterwards, Skeens would ask K.W. to go to the bathroom, and her vagina "kind of burned." Id. at 523.

Also, Skeens would remove his and K.W.'s clothing in either the living room, Mother's bedroom, or the bathroom and "put his tongue" on K.W.'s vagina. Id. at 525. When in either the living room or bedroom, Skeens would remove both his and K.W.'s clothing, and K.W. would be "laying down" on her back and Skeens was "[l]ike under [her] . . . . like under [her] legs sort of," which were "separated." Id. at 526. Skeens would use his tongue to "lick[]" K.W.'s vagina which felt "[w]et" and "[w]eird" to K.W. Id. at 527. When Skeens would put his tongue on K.W.'s vagina in the bathroom, K.W. would be "in the same position" on top of the sink as when Skeens had sexual intercourse with her. Id. at 528. Skeens would be "kind of squatting." Id.

Further, Skeens would touch K.W.'s vagina with his fingers in the living room, the bathroom, and the bedroom. Skeens would remove his and K.W.'s clothes and "rub" her

3

vagina "in circles" using one finger on each hand. Id. at 531. Skeens would also rub "the part of [K.W.'s vagina] where [she goes] potty" using one finger "on both hands and then sometimes two fingers." Id. at 531-532.

Skeens would also make K.W. put his penis in her mouth in the living room and the bedroom. Skeens would remove his and K.W.'s clothes, and K.W. would lay on the floor on her back and Skeens would be "laying on top of [her] with his hands like sort of pushing up." Id. at 534. Skeens would then put his "private" in K.W.'s mouth and "[h]e would sort of push." Id. at 536. His "private" was "[s]ort of like a long type of mushroom shape," with "a triangle at the top with the top corner kind of curved" and a "hole." Id. at 538-539. His penis felt "[w]eird" and "[k]ind of smooth." Id. at 536.

Skeens would also touch K.W.'s "boobs" with his finger and his tongue. Id. at 537. Skeens would remove K.W.'s and his own clothing and lick "sometimes one, sometimes both" of K.W.'s breasts. Id. at 538. He would similarly "rub" either one or both of K.W.'s breasts with his finger. Id.

During some of the incidents in the living room when Skeens would touch K.W.'s "privates" with "[h]is tongue, his finger and . . . his private," Skeens would show K.W. movies "that had people touching each other." Id. at 539, 542. He would show K.W. the movies, including one called "real sex," on a "flat screen" television by "download[ing] [them] from his computer . . . ." Id. at 541. The movie would depict "three or four people and they were touching each other[']s privates." Id. at 543.

4

There was one incident when Skeens tried to touch K.W., and K.W. told Skeens "no," and she attempted to "go downstairs and [she] was like on the first step and then [Skeens] said if you don't come back here and do this with me, I'll call the police on you and they'll tell your mom." Id. at 544. K.W. "went back [because she] was scared." Id. Skeens then "touch[ed] [K.W.'s] privates." Id.

If Skeens's son was home during these encounters, Skeens would "get him to go out of the room." Id. at 545. Once, Skeens told his son to "go play with your cars, I just bought those for you." Id. Skeens's son told Skeens that "no I want to go play with [K.W.]," and Skeens went with his son to play with the cars for "a few minutes and then [Skeens] would say, oh, I'll be right back and then he would go and touch [K.W.'s] privates." Id. Skeens would also lock the bedroom door to keep his son out of the room. Skeens's son "would knock on the door . . . . [and] would say dad, let [me] in there." Id. at 546. Skeens would say "yeah," but then he would not go to the door. Id.

Skeens told K.W. to not tell anyone about the touching, and that if she did K.W. would "get in big trouble." Id. at 550. K.W. once tried to tell Mother about Skeens but K.W. "got scared" because she "thought that [Mother] wouldn't believe [her] and then like [K.W. would] get in big trouble." Id. at 549.

On December 5, 2008, the school counselor at K.W.'s elementary school showed a video to the class titled "Breaking the Silence, Children Against Child Abuse" and the video included "two segments . . . one on physical abuse and one on sexual abuse." Id. at 411. After the sexual abuse segment of the video, the counselor directed the class to

5

write in their "reflection journals," and to "write the word help on their paper" if they needed help. Id. at 413. While the counselor was "walking around the different table clusters," K.W. "raised her hand and whispered [']this happened to me.[']" Id. at 414. The counselor told K.W. that she would speak to her about it later, but when the children were leaving for lunch K.W. "asked again, [']can I talk to you about this, this happened to me,[']" and the counselor "told [K.W.] [she] would come get her after lunch." Id. Again, however, K.W. "found [the counselor] first," when K.W. "was walking from lunch towards recess and stopped by [the counselor's] room and said [']can I please talk to you right now?[']" Id. at 414-415. After their conversation, the counselor called the Department of Child Services and repeated what K.W. had reported to her.

Later that day, Nicole Allen, a family case manager at the Department of Child Services, met with Mother to "discuss . . . the nature of the report that [she] had received." Id. at 435. Mother was "shocked, in disbelief [], immediately just started crying and just wasn't sure what to think about the whole situation . . . ." Id. Mother agreed to take K.W. out of school and bring her to a child advocacy center in Huntington for an interview. At the interview, conducted by Allen, K.W. used age appropriate language and descriptions of the events that took place between K.W. and Skeens, and K.W. "gave a lot of information, very detailed information about the abuse." Id. at 440. Mother also reported that it had been two weeks since Skeens had seen K.W.

On December 8, 2008, Mother, Allen, and Detective Mel Hunnicut transported K.W. to the Fort Wayne Sexual Assault Treatment Center for a physical examination.

6

K.W. was seen by Sharon Robison, a sexual assault nurse examiner. Robison conducted a genital examination and concluded that her genitals were "normal," meaning that "her hymen was perfect . . . . [T]here was no [] injury to her hymen and her anus was perfect also." Id. at 590.

On December 16, 2008, K.W. began seeing Lynn Baker, a counselor at the Bowen center in Huntington. K.W. continued to see Baker once a week to help her deal with "behavioral issues," including K.W.'s nightmares and bed-wetting. Id. at 482. Most of the sessions were in the play therapy room, which "is used to allow a child to use any of the therapeutic toys available . . . in a way that they need in order to work through why they're there." Id. at 625.

On December 10, 2008, the State charged Skeens with Count I, child molesting as a class A felony which alleged that Skeens performed or submitted to sexual intercourse with K.W.; Count II, child molesting as a class A felony which alleged that Skeens performed oral sex on K.W.; Count III, child molesting as a class A felony which alleged that Skeens submitted to oral sex from K.W.; Count IV, child molesting as a class A felony which alleged that Skeens penetrated K.W.'s female sex organ with an object; and Count V, child molesting as a class C felony which alleged that Skeens touched or fondled K.W. with the intent to arouse or satisfy his own or K.W.'s sexual desires.

On July 21, 2009, the trial court held a jury trial. At trial, Sharon Robison testified that, for victims of sexual abuse ages zero to thirteen, there is a seventy-two hour window after vaginal penetration and a twenty-four hour window after an "oral . . . or anal

7

assault" to collect DNA samples. Id. at 568. Robison also testified that K.W. told her that Skeens "would put his fingers inside [her] private and would suck [her] boobs." Id. at 584. Robison testified that it is not common to find evidence of penetration in a young child "[b]ecause the hymen is elastic tissue that expands and goes back . . . ." Id. at 591. Robison also testified that recent studies have concluded that eighty-five to ninety-five percent "of pre-pubertal [female] children [who have been molested] . . . do not have any type of genital injury." Id. at 592. Robison testified that this is so because "the internal female sex organ is [] very vascular, which means there's a lot of blood flow . . . . [A]ny injury to that area would heal very quickly," and that based upon the information provided by K.W. "and the time lapse between . . . the last time it happened and the time that she came to see [her]," she did not expect to find any injuries to K.W.'s genitalia. Id. at 593-594. Robison also testified that she did not do any DNA collection because "[i]t was past the time frame." Id. at 596.

Baker testified at trial that it is "common for younger children to delay or wait to tell about sexual abuse." Id. at 622. When asked whether K.W. was prone to exaggerate in sexual matters, Baker testified that "quite the opposite, it's been very, very uncomfortable for her to talk about anything that's happened." Id. at 627. Baker also testified that K.W.'s behavior at "her play therapy reflects [] a child as extremely in emotional pain. The farther we move in to what's actually happened in the abuse the more painful she feels." Id. at 630.

On July 23, 2009, the jury found Skeens guilty as charged. On August 31, 2009, the trial court held a sentencing hearing, identified the aggravating and mitigating circumstances, and found that the aggravators outweighed the mitigators. The court sentenced Skeens to forty-five years each for Counts I-IV, and to seven years for Count V. The sentences were ordered to be served consecutively in the Department of Correction. Thus, Skeens's aggregate sentence was for 187 years.

I.

The first issue is whether the evidence is sufficient to sustain Skeens's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. <u>Jordan v. State</u>, 656 N.E.2d 816, 817 (Ind. 1995), <u>reh'g</u> <u>denied</u>. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. <u>Id.</u> We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. <u>Id.</u>

The offense of child molesting as a class A felony is governed by Ind. Code § 35-42-4-3(a), which provides: "A person who, with a child under fourteen (14) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits child molesting, a Class B felony. However, the offense is a Class A felony if: (1) it is committed by a person at least twenty-one (21) years of age . . . ." Under Count I, the State was required to prove that Skeens, who was at least twenty-one years of age, performed sexual intercourse with K.W., who was under fourteen years of age. Under

9

Counts II-IV, the State was required to prove that Skeens, who was at least twenty-one years of age, performed deviate sexual conduct with K.W., who was under fourteen years of age. "Deviate sexual conduct" means "an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-41-1-9.

Furthermore, the offense of child molesting as a class C felony is governed by Ind. Code § 35-42-4-3(b), which provides that "[a] person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Class C felony." Thus, to convict Skeens of child molesting as a class C felony, the State needed to prove that: Skeens performed or submitted to any fondling or touching of either K.W., a child under fourteen years of age, or Skeens, with the intent to arouse either K.W. or Skeens.

Skeens argues that: (A) "[t]here was no evidence that Skeens penetrated the sex organ of K.W. with an object;" and (B) although "[i]t is well settled that the uncorroborated testimony of the prosecuting witness is sufficient to sustain a conviction for child molesting . . . . in this case, the testimony of K.W. was wholly incredible and unsupported by any physical evidence." Appellant's Brief at 9, 11. We address each of Skeens's arguments separately.

A.    Evidence of Digital Penetration

10

First, Skeens argues that "there was no physical evidence that K.W. was the victim of sexual abuse," and that K.W.'s testimony regarding Skeens's conduct touching K.W. with his finger only established "that Skeens 'touched the outside of it (her private).'" Id. at 10.   Initially, we recognize that the Indiana Supreme Court has held that proof of even the slightest penetration is sufficient to sustain convictions for child molesting. Spurlock v. State, 675 N.E.2d 312, 315 (Ind. 1996), aff'd in relevant part on reh'g (1997).   There is no requirement that the vagina be penetrated, only that the female sex organ, including the external genitalia, be penetrated. Smith v. State, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), trans. denied; see also Scott v. State, 771 N.E.2d 718, 724 (Ind. Ct. App. 2002), trans. denied.   The definition of the term "object" for the purposes of deviate sexual conduct includes a finger. D'Paffo v. State, 778 N.E.2d 798, 802 (Ind. 2002). Whether penetration occurred is a question of fact to be determined by the jury. Borkholder v. State, 544 N.E.2d 571, 577 (Ind. Ct. App. 1989)

In Scott, the court examined the meaning of "sex organ." Scott, 771 N.E.2d at 724. The court noted that "[t]he female external genitalia is defined as 'the vulva in the female,'" and that the vulva includes "the *opening of the urethra* and of the vagina." Id. (citing STEDMAN'S MEDICAL DICTIONARY 641, 1729-1730 (25th ed. 1990)). The court concluded that "it is clear that the opening to the urethra is located within the anatomy of a female which is referred to as the external genitalia," and that "[t]herefore, any reference to the part of the female anatomy which is used to urinate also refers to the external genitalia, and consequently, to the 'sex organ.'" Id. at 725.

Applying the above definition to the testimony of K.W., the evidence is sufficient to sustain a conviction for child molesting based upon deviate sexual conduct. K.W. was eight years old when she testified. Although K.W.'s sexual vocabulary was limited, she nevertheless testified that Skeens would remove his and K.W.'s clothes and "rub" her "private," which she identified as her female sex organ, "sort of in circles" using one finger on each hand. Transcript at 513, 531. Skeens would also rub "the part of [K.W.'s] private where [she goes] potty" using one finger "on both hands and then sometimes two fingers." Id. at 531-532. Robison testified that K.W. told her during her examination that Skeens "would put his fingers inside [her] private and would suck [her] boobs." Thus, we cannot say that there was insufficient evidence presented at trial that Skeens penetrated K.W.'s female sex organ using an object, in this case his finger.

B.   K.W.'s Testimony

Regarding the probative value of K.W.'s testimony at trial, Skeens argues that "[i]t was wholly incredible that Skeens, a twenty-seven-year-old man, could engage in sexual intercourse as described by K.W., an eight-year-old girl, without more injury than a few drops of blood and burning during urination." Appellant's Brief at 11. Skeens also argues that "K.W. also testified that she has watched pornography," and that "[t]he most plausible explanation for what K.W. described was what she saw on the pornographic movies." Id. Finally, Skeens argues that "[i]t is wholly incredible that Skeens would alternate between playing with his five-year-old son and molesting his eight-year-old

12

stepdaughter."[3] Id. at 12.  Skeens merely requests that we reweigh the evidence or judge the credibility of the witnesses, which we cannot do.[4]  Jordan, 656 N.E.2d at 817.

Here, the record reveals that the testimony of K.W. produced detailed descriptions of various episodes of child molesting performed by Skeens, who was at least twenty-six at the time, on K.W.  K.W. testified that Skeens would place her on top of a sink and have sexual intercourse with her, and that he would use a towel "to wipe up white stuff that came out" of her vagina.  Transcript at 518.  Skeens would also lick K.W.'s vagina while she was "laying down" on her back and Skeens was "[l]ike under [her] . . . . like under [her] legs sort of," which were "separated."  Id. at 526.  Skeens would place his penis in K.W.'s mouth by "laying on top of [her] with his hands like sort of pushing up." Id. at 534.  Skeens's penis felt "[w]eird" and "[k]ind of smooth" to K.W.  Id. at 536. Skeens would also fondle K.W.'s "boobs" using his finger and his tongue.  Id. at 537.

---

[3] Skeens also argues that "[j]ust placing his private in K.W.'s mouth without more does not indicate any intent to satisfy the sexual desires of either party."  Id.  However, as noted by the State, "an intent to satisfy sexual desire is not an element of the offense of child molesting by deviate sexual conduct."  Appellee's Brief at 12 n.4 (citing Ind. Code § 35-42-4-3(a)).  See also D'Paffo, 778 N.E.2d at 801 (holding that the "'intent to arouse or satisfy sexual desires' is not an element of Ind. Code § 35-42-4-3(a)").

[4] The State argues that "Skeens apparently seeks to apply the 'incredible dubiosity' rule to K.W.'s testimony."  Appellee's Brief at 10.  To the extent that Skeens argues that K.W.'s testimony is incredibly dubious, we note that "[u]nder the 'incredible dubiosity' rule [] a reviewing court may impinge on the fact-finder's responsibility to judge witness credibility when 'a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt."  Corbett v. State, 764 N.E.2d 622, 626 (Ind. 2002) (quoting Tillman v. State, 642 N.E.2d 221, 223 (Ind. 1994)).  K.W.'s testimony does not fit into the incredible dubiosity rule.  Although Skeens argues that there is a lack of circumstantial evidence, he makes no argument that K.W.'s testimony regarding the molestations was inherently contradictory, equivocal, or the result of coercion.  It is well settled that "the uncorroborated testimony of one witness may be sufficient by itself to sustain a conviction on appeal."  Pinkston v. State, 821 N.E.2d 830, 842 (Ind. Ct. App. 2004), trans. denied.

During some of these acts, Skeens would show K.W. pornographic movies on the living room television.  Since K.W. has reported Skeens's repeated acts of touching, she has recurring nightmares and wets the bed.

Based upon the record, we conclude that the State presented evidence of probative value from which a reasonable jury could have found Skeens guilty of child molesting as a class A felony and child molesting as a class C felony.  <u>See</u>, <u>e.g.</u>, <u>Surber v. State</u>, 884 N.E.2d 856, 868 (Ind. Ct. App. 2008) (holding that the evidence was sufficient to sustain defendant's conviction for child molesting as a class A felony based primarily on the testimony of the child victim), <u>trans.</u> <u>denied</u>.

II.

The next issue is whether the trial court abused its discretion in sentencing Skeens. We note that Skeens's offenses were committed after the April 25, 2005, revisions of the sentencing scheme.  In clarifying these revisions, the Indiana Supreme Court has held that "the trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence." <u>Anglemyer v. State</u>, 868 N.E.2d 482, 490 (Ind. 2007), <u>clarified</u> <u>on</u> <u>reh'g</u>, 875 N.E.2d 218 (Ind. 2007).  We review the sentence for an abuse of discretion.  <u>Id.</u>  An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances before the court."  <u>Id.</u>  A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence-including a finding of aggravating and mitigating factors if any-but the record does not support the reasons;"

14

(3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." Id. at 490-491. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." Id. at 491. However, the relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. Id.

The trial court found the following aggravators: "Position of trust; position of care; custody and control; repeated acts; age of victim being 7 & 8 years old; threats to the victim." Appellant's Appendix at 301. The trial court identified Skeens's lack of criminal history as the sole mitigator and found that "the aggravating factors outweigh the mitigating factors for the following reasons: Aggravator of position of trust is given great weight." Id. Skeens argues that: (A) the trial court considered improper aggravating circumstances; and (B) the trial court "failed to consider mitigating circumstances clearly supported by the record." Appellant's Brief at 13. We address each of Skeens's arguments separately.

A.    Aggravators

Skeens argues that "[i]t is well settled that a trial court may not use elements of a crime to enhance a sentence," and that "the age of K.W., being less than fourteen years of age, was an element of each count of child molesting." Id. at 15. Thus, Skeens argues

15

that K.W.'s age was used as an improper aggravating circumstance. Skeens also argues that, regarding the "position of trust" aggravator and the "position of care, custody, and control" aggravator, the two "are synonymous and should not have been considered as two separate aggravating circumstances." Id. at 16.

1.    K.W.'s Age

Generally, when a victim's age is a material element of the crime, it may not also support an enhanced sentence. Reynolds v. State, 575 N.E.2d 28, 32 (Ind. Ct. App. 1991), trans. denied.    The age of the victim is an element of the offense of child molesting. Skeens was charged under Ind. Code § 35-42-4-3(a), which applies to victims under fourteen years old. However, and as Skeens acknowledges, "in some instances the 'tender age' of a victim in a child molesting case may be considered an aggravating factor as a particularized circumstance of the crime." Edrington v. State, 909 N.E.2d 1093, 1097 (Ind. Ct. App. 2009) (citing Kien v. State, 782 N.E.2d 398, 414 (Ind. Ct. App. 2003) (citing Buchanan v. State, 767 N.E.2d 967, 971 (Ind. 2002)), reh'g denied, trans. denied), trans. denied; see also Reyes v. State, 909 N.E.2d 1124, 1128 (Ind. Ct. App. 2009) ("[A] trial court may consider age as an aggravator only if the youth of the victim is extreme.").

Here, the trial court, in reciting the aggravators, stated in relevant part: "There were repeated acts.  Um, the victim was less than twelve years of age that the statute speaks of, but in fact in this case the victim was between seven and eight years old, which is very young.  Uh, much younger than the statute even requires." Transcript at 715. Just

16

as in <u>Reyes</u>, the trial court spoke to of the victim's age "in conjunction with molestation that occurred over a period of years." <u>Reyes</u>, 909 N.E.2d at 1128. We cannot agree with Skeens that the trial court abused its discretion in concluding that the molestation of a seven- or eight-year-old, over a period of fourteen months, constitutes an aggravator. "The violation, over a period of years, of a pre-pubescent child who is living in an understandably naive innocence that an older child might not experience is a valid aggravator, and the trial court did not abuse its discretion in so determining." <u>Id.</u>

       2.    <u>Position of Trust and Position of Care, Custody, and Control</u>

Skeens argues that the trial court "listed both factors and indicated, multiple times, that it gave both aggravating circumstances 'great weight.'" <u>Id.</u> Skeens argues, however, that "[t]his Court has reviewed the 'position of care' aggravator under the same decisions reviewing the 'position of trust' aggravator." <u>Id.</u> (citing <u>Edrington</u>, 909 N.E.2d at 1100 (citing <u>Edgecomb v. State</u>, 673 N.E.2d 1185, 1198 (Ind. 1996), <u>reh'g denied</u>)).

The State argues that "although there may often be overlap between those two factors, they are not necessarily the same." Appellee's Brief at 18 (citing <u>McCoy v. State</u>, 856 N.E.2d 1259, 1262 (Ind. Ct. App. 2006) (noting that the fact that the victim of child molesting had known defendant since she was three years old and called him "Dad" constituted "one of the very highest positions of trust," which was violated by the defendant)). The State argues that "[h]ere, the evidence showed that K.W. considered Skeens to be her father and called him 'Dad,'" and that therefore the trial court "properly concluded that Skeens was in a position of trust with K.W." <u>Id.</u> at 19. The State also

17

argues that "[i]n addition, the molestation took place while K.W.'s mother was not at home and while she had placed K.W. in Skeens' sole care," and thus "[t]his separate evidence established the care, custody, and control aggravator . . . ." Id.

We need not determine whether position of trust and position of care, custody and control are separate and distinct aggravators, however, as the record is clear that the trial court considered the two as a single aggravator. As the State initially argues in its brief: "[A]lthough the trial court listed the two factors separately in its written order, it stated at Skeens' sentencing hearing that the position of care, custody, and control 'goes along' with the position of trust aggravator." Id. at 18 (internal citation omitted). Indeed, at sentencing, the trial court stated in its recitation of the aggravators: "I find that there were aggravators and those include the position of trust, which I give great weight. Position of care, control and custody *which goes along with the trust*, I give great weight." Transcript at 715 (emphasis added). The trial court, after noting that the aggravators outweighed the mitigators, stated:

> Great weight is given to position of trust. When I heard the evidence the child had no place to go. She described waking up in the mornings and mom would be at work and dad, albeit stepdad would get her up so she could go to school. And the testimony was that he would engage in sexual acts with her prior to her going to school. And he was the one that she looked to protect her. Position of trust carries great weight.

Id. at 716. Thus, the trial court spoke about the care, custody, and control of K.W. in assigning "great weight" to the position of trust aggravator.

18

Furthermore, in the sentencing order, the trial court in balancing the aggravators and mitigators noted that "[a]ggravator of position of trust is given great weight." Appellant's Appendix at 301.   Had the trial court assigned independent "great weight" to the position of care, custody, and control aggravator, it presumably would have noted as such in the sentencing order.   We therefore cannot say that the trial court abused its discretion in identifying "position of trust" and "position of care, custody, and control" in its recitation of aggravators.

B.     Mitigators

Skeens next argues that the trial court erred by failing to consider most of his proposed mitigators.   "The finding of mitigating factors is not mandatory and rests within the discretion of the trial court."   O'Neill v. State, 719 N.E.2d 1243, 1244 (Ind. 1999). The trial court is not obligated to accept the defendant's arguments as to what constitutes a mitigating factor.   Gross v. State, 769 N.E.2d 1136, 1140 (Ind. 2002).   "Nor is the court required to give the same weight to proffered mitigating factors as the defendant does." Id.   Further, the trial court is not obligated to explain why it did not find a factor to be significantly mitigating.   Sherwood v. State, 749 N.E.2d 36, 38 (Ind. 2001), reh'g denied. However, the trial court may "not ignore facts in the record that would mitigate an offense, and a failure to find mitigating circumstances that are clearly supported by the record may imply that the trial court failed to properly consider them."   Id.   An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to

19

establish that the mitigating evidence is both significant and clearly supported by the record. Carter v. State, 711 N.E.2d 835, 838 (Ind. 1999).

Skeens argues that he "submitted several proposed mitigating factors that were supported by the record," but were not identified as mitigating by the trial court including: (1) the likelihood that he would respond positively to probation; (2) the low adult risk assessment instrument score provided by the probation department; (3) that the offense was unlikely to recur; (4) that he had custody of his son which would result in undue hardship; and (5) that he had a steady employment history. Appellant's Brief at 13. At sentencing, the trial court considered the proposed mitigators and stated that "in considering those, I don't find those to be mitigators." Transcript at 716.

Initially, regarding the proposed mitigator that Skeens would respond positively to probation, we note that Skeens merely states that the trial court overlooked this proposed mitigator and does not make any argument in his brief that there is evidence in the record showing that this was both significant and clearly supported by the record. This does not rise to the level of proof needed for Skeens to satisfy his burden on appeal. Pennington v. State, 821 N.E.2d 899, 905 (Ind. Ct. App. 2005) (citing Powell v. State, 751 N.E.2d 311, 315 (Ind. Ct. App. 2001)).

Next, regarding the low adult risk assessment instrument score provided by the probation department, Skeens argues that his assessment score of three points "indicated a low level of supervision was needed." Appellant's Brief at 14. The risk assessment instrument rated the following factors which were then assigned a certain value

20

depending upon the answer: (1) age at first conviction or adjudication; (2) number of prior convictions; (3) number of prior supervisions; (4) number of prior violations of community supervisions; (5) prior commitments; (6) history of substance abuse; (7) time employed full-time during the last twelve months; (8) residence change within the last twelve months; (9) educational attainment; and (10) expectation of compliance. Thus, half of the factors examined dealt with Skeens's lack of criminal history which the trial court *did* accord mitigating weight, and another factor dealt with Skeens's employment history which he advanced independently in mitigation. Also, Skeens did not receive any points related to those six factors which largely resulted in the low score. Thus, the adult risk assessment instrument primarily represents duplicative mitigating evidence and is not significant. See Malenchik v. State, 928 N.E.2d 564, 572 (Ind. 2010) (noting that risk assessment tool scores "do not in themselves constitute an aggravating or mitigating circumstance").

Regarding undue hardship on Skeens's son, who was six years old at the time of trial, we note that "[m]any persons convicted of serious crimes have one or more children and, absent special circumstances, trial courts are not required to find that imprisonment will result in an undue hardship." Dowdell v. State, 720 N.E.2d 1146, 1154 (Ind. 1999). Skeens has failed to establish that the mitigating evidence is both significant and clearly supported by the record. Thus, we cannot say that the trial court abused its discretion when it rejected this proposed mitigator. See, e.g., Grund v. State, 671 N.E.2d 411, 419

(Ind. 1996) (finding no "error in the trial court's failure to find hardship [to the defendant's children] to be a mitigating factor").

Skeens also proposed in mitigation "that the offense was unlikely to recur." Appellant's Brief at 13. Skeens argues that he "was not the biological father of K.W., he has no legal right [to] any further contact with her, making the crime unlikely to recur." Id. at 14. However, Skeens does not point to any evidence that an offense of child molesting against *other* children is unlikely to occur. Thus, Skeens failed to meet his burden on this proposed mitigator.

Finally, Skeens proposed "that he had a steady employment history" in mitigation. Id. at 13. Skeens argues that he "had been employed full-time for at least nine months before his arrest," and that "he had been employed for a substantial period of time and had been a productive member of society." Id. at 14. The only evidence Skeens provided regarding his employment was a notation in the Adult Risk Assessment score, however. Skeens has failed to establish that the mitigating evidence is both significant and clearly supported by the record. Thus, the trial court did not abuse its discretion by not considering Skeens's work history as a mitigating circumstance. See, e.g., Bennett v. State, 787 N.E.2d 938, 948 (Ind. Ct. App. 2003) (holding that the trial court properly did not find that defendant's employment was a significant mitigating circumstance where defendant did not present a specific work history, performance reviews, or attendance records), trans. denied.

We conclude that the trial court did not abuse its discretion by declining to find Skeens's proposed mitigators as mitigating factors. See, e.g., O'Neill, 719 N.E.2d at 1244 (holding that trial court did not abuse its discretion when it considered and specifically rejected defendant's proposed mitigators).

### III.

The third issue is whether Skeens's sentence of 187 years is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006). Skeens argues that the nature of his offenses, in which there "was a long period of time where the relationship between Skeens and K.W. was constructive prior to the alleged molestation," and that "[t]here was no evidence that Skeens inflicted substantial physical injuries on K.W.," and Skeens's character, most notably "his complete lack of prior criminal convictions" and that he "had custody of his five-year-old son at the time of his arrest," does not justify the 187 year sentence imposed by the trial court. Appellant's Brief at 16-17.

Our review of the nature of the offense reveals that between September 2007 and November 2008, Skeens molested K.W., his stepdaughter, multiple times. During some of these molestations, Skeens would show K.W. pornographic movies on their living

23

room television. Since K.W. has reported Skeens's repeated acts of touching, she has recurring nightmares and wets the bed.

Our review of the character of the offender reveals that Skeens has no prior adult or juvenile criminal history. Skeens graduated high school and attended Ivy Tech. Skeens has custody of his six year old son, and the mother of Skeens's son states that Skeens is "[t]he best dad ever." Appellant's Appendix at 294. Skeens had been working full-time during nine of the past twelve months prior to being charged. Also, at the time of sentencing Skeens had a pending charge for child molesting as a class A felony in Kosciusko County for molesting K.W.

The Indiana Supreme Court has recently issued opinions which are instructive on Skeens's case. First, in Rivers v. State, the defendant was convicted of two counts of class A felony child molesting and one count of class C felony child molesting for molesting his seven- or eight-year-old niece on two occasions. 915 N.E.2d 141, 143 (Ind. 2009). The trial court imposed consecutive thirty-year, advisory terms for the class A convictions and a concurrent four-year term on the class C felony conviction for a total of sixty years. Id. The Supreme Court, in examining Rivers's character, noted that he had no criminal history, maintained steady employment, and served as a father figure to the victim for a number of years before committing his crimes. Id. The victim also testified "that her relationship with Rivers was good and that the two of them did a lot of family activities together prior to his crimes." Id. Regarding the nature of the offenses, the Court noted that "[t]he record does not indicate his crimes occurred over a long period of

24

time, however, or that there was any other sexual misconduct on Rivers' part. Rather, the record indicates Rivers molested M.N. on two occasions (charged as three) in a relatively short period of time . . . ." Id. at 144. The Court concluded that Rivers's convictions should run concurrently rather than consecutively. Id.

In Harris v. State, the Court examined the sentence of a defendant who had been convicted of two counts of child molesting as class A felonies and sentenced to consecutive fifty-year terms. 897 N.E.2d 927, 928 (Ind. 2008). The Court noted that Harris had occupied a position of trust with his victim, who was eleven years old at the time of the charged offenses, and had committed multiple uncharged acts of sexual misconduct that occurred over a period of time. Id. at 928, 930. The Supreme Court observed, however, that the two counts of child molestation were identical involving sexual intercourse with the same child. Id. at 928, 930. Harris had a prior criminal history, but the Court emphasized that he had no prior sex offenses in his record and concluded that his criminal history was not a significant aggravator. Id. at 930. The Supreme Court held that while enhanced sentences were warranted, consecutive sentences were unwarranted and revised Harris's sentence to two concurrent fifty-year terms. Id.

Further, in Monroe v. State, the Court revised the sentence of a defendant convicted of five counts of class A felony child molesting. 886 N.E.2d 578, 579 (Ind. 2008). In Monroe, the defendant was charged with ten counts of child molesting as class A felonies: five alleging that Monroe engaged his victim, who was nine years old when

she reported the allegations, in sexual intercourse, and five counts alleging that he engaged her in deviate sexual conduct. Id. at 578-579. A jury returned a guilty verdict on the five counts of child molesting based upon deviate sexual conduct, and the trial court sentenced Monroe to twenty-two years on each count with two years suspended to probation and ordered the terms to be served consecutively, for an aggregate sentence of 100 years imprisonment. Id. at 579. The Supreme Court, in considering the nature of the offense, noted that Monroe was in a position of trust with his victim and molested the child repeatedly for over two years, but the Court also observed that the five counts were identical and involved the same child. Id. at 580. Regarding Monroe's character, the Court noted that although he had a prior criminal record, all of his convictions were driving-related, so his criminal history did not justify the imposition of consecutive sentences. Id. In the end, the Supreme Court held that the nature and circumstances of the offenses and his character warranted enhanced, but not consecutive, sentences, and it revised Monroe's sentence to a maximum fifty-year term for each of the five counts but directed that they be served concurrently. Id. at 581. In so holding, the Court noted that "[a]lthough the trial court identified three aggravating circumstances, it does not explain why these circumstances justify consecutive sentences as opposed to enhanced concurrent sentences. Indeed we find it ironic that despite a finding of aggravating circumstances, the trial court nonetheless imposed less than the presumptive sentence on each count." Id. at 580.

Here, we find Skeens's conduct to be more egregious than the defendants in Rivers, Harris, and Monroe. Unlike in Harris and Monroe, Skeens's molestations of K.W. were not identical. Rather, Skeens's molestations involved having sexual intercourse, performing oral sex, receiving oral sex, digital penetration, and the fondling of K.W.'s breasts with both his finger and his tongue. Thus, K.W. was exposed to a wide array of sexual conduct. Also, K.W. was younger than the victim in Harris. Further, Skeens molested K.W. on many more occasions than the defendant molested the victim in Rivers. Also, here there is evidence in the record that Skeens threatened K.W. to not tell anyone about the molestations. Nevertheless, we also find that in light of the Indiana Supreme Court's holdings in the cases discussed, Skeens's aggregate sentence of 187 years is inappropriate and warrants modification. Accordingly, we conclude that Skeens's sentence of four consecutive forty-five-year sentences should be modified and order that Counts I and II for child molesting as a class A felony run concurrent with Counts III and IV, respectively. We also order that Count V, child molesting as a class C felony, be served concurrent with Counts I and II. Thus, Skeens's aggregate term is modified to ninety years in the Department of Correction. See Smith v. State, 889 N.E.2d 261, 264 (Ind. 2008) (holding that defendant's "repeated molestations . . . together with his violation of his position of trust and his infliction of psychological abuse, warrant the sentence on one of these counts being imposed consecutive to one of the other counts"); cf. Laster v. State, 918 N.E.2d 428, 436 (Ind. Ct. App. 2009) (holding that the

27

circumstances of defendant's child molestings warranted a similar result to that reached in Harris and Monroe in revising defendant's sentence).

For the foregoing reasons, we affirm Skeens's convictions for child molesting, and we remand this case to the trial court with instructions to issue an amended sentencing order and to issue any other documents or chronological case summary entries necessary to impose a sentence of ninety years.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and VAIDIK, J., concur.