Brief of Appellant
Eric Benson Skeens, Appellant

# IN THE
# INDIANA COURT OF APPEALS
## CAUSE NO. 20A-PC-00686

| | | |
|---|---|---|
| **ERIC BENSON SKEENS** | ) | |
| **DOC #196051** | ) | **Huntington Circuit Court** |
| **Appellant** | ) | |
| **(Petitioner below)** | ) | |
| | ) | **Hon. Davin G. Smith, Judge** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **STATE OF INDIANA,** | ) | |
| **Appellee** | ) | |
| **(Respondent below))** | | |

## BRIEF OF APPELLANT

Cynthia M. Carter
Atty No. 233305-49
Law Office of Cynthia M. Carter, LLC
212 W. 10th Street, Suite D-320
Indianapolis, IN 46202
P: (317) 955-7997
F: (317) 454-0710
AttorneyCarter@cynthiamcarterlaw.com

Counsel for the Appellant

1

Brief of Appellant
Eric Benson Skeens, Appellant

## Table of Contents

STATEMENT OF CASE                                    4

STATEMENT OF FACTS                                   6

SUMMARY OF ARGUMENT

ARGUMENT                                             11

    ISSUE 1                                    12

    ISSUE 2                                    25

    ISSUE 3                                    41

CONCLUSION

## Table of Authorities

### *Cases*

*Ben-Yisrayl v. State*, 738 N.E.2d 253 (Ind. 2000)                    42

*Bieghler v. State*, 690 N.E.2d 188 (Ind. 1997)                       26

*Brady v. Maryland*, 373 U.S. 83 (1963)                            20, 21

*Brummett v. State*, 24 N.E.3d 965 (Ind. 2015)                        27

*Bunch v. State*, 964 N.E.2d 274 (Ind. Ct. App. 2012)                 27

*Canaan v. State*, 683 N.E.2d 227 (Ind. 1997)                         26

*Cone v. Bell*, 129 S.Ct. 1769 (2009)                                 20

*Cook v. Hoppin*, 783 F.2d 684 (7th Cir. 1986)                        38

*Harley v. State*, 952 N.E.2d 301 (Ind. Ct. App. 2011)                27

*Hatton v. State,* 626 N.E.2d 442 (Ind. 1993)                      42, 46

*Horel v. Valdovinos*, 2011 U.S. LEXIS 1035 (2011)                    21

2

Brief of Appellant

Eric Benson Skeens, Appellant

*Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) 40

*Napue v. Illinois*, 360 U.S. 264 (1959)                                                   22

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001)                                            35

*People v. Donovan*, 184 A.D.2d 654, 585 N.Y.S.2d 70 (2d Dept. 1992)        41

*People v. Stokes*, 95 N.Y.2d 633, 744 N.E.2d 1153, 722 N.Y.S.2d 217 (2001)   45

*Stone v. State*, 536 N.E.2d 534 (Ind. Ct. App. 1989)                              38

*Strickland v. Washington,* 466 U.S. 668 (1984)                                   24 - 25

*Taylor v. Illinois*, 484 U.S. 400 (1988)                                          29

*Thomas v. Sullivan*, 2011 U.S. Dist. LEXIS 123371                                 41

*Turner v. State*, 974 N.E.2d 575 (Ind. Ct. App. 2012)                             26

*U.S. v. Bagley*, 473 U.S. 667 (1985)                                             21, 41

*U.S. v. Kenyon*, 481 F.3d 1054 (8th Cir. 2007)                                    38

*U.S. v. Lawson*, 653 F.2d 222 (7th Cir. 1981)                                     44

*United States v. Nixon*, 418 U.S. 683 (1974)                                      29

*U.S. v. Oriedo*, 498 F.3d. 593 (7th Cir. 2007)                                    38

*United States v. Zeuli,* 725 F.2d 813 (1st Cir. 1984)                             38

*Valdovinos v. McGrath*, 598 F.3d 568 (9th Cir. 2010)                              21

*Constitution*

U.S. Const., Am. VI                                                                passim

U.S. Const., Am. XIV                                                               passim

Brief of Appellant
Eric Benson Skeens, Appellant

## Statement of Issues

**I.      Whether the court proceedings violated the Fourteenth Amendment right to Due Process and *Brady v. Maryland* when false testimony by the State's agent, then-detective Melbourne Hunnicutt, led to a critical and outcome determinative discovery violation.**

**II.      Whether trial counsel, Richard Thonert, failed to properly represent Skeens during pre-trial and trial proceedings and violated the Sixth Amendment and prevented a fair trial when trial counsel did not properly investigate the case, did not properly cross-examine the witnesses, did not secure exculpatory evidence, and did not properly object to the sexual assault nurse examiner (SANE) providing expert testimony despite the fact the defense received no discovery concerning studies to which the SANE testified.**

**III.      Whether appellate counsel, Jeremy Nix, failed to properly represent Skeens in his direct appeal and thereby violated the Sixth Amendment right to counsel and prejudiced the outcome of the proceedings resulting in the conviction being upheld.**

## Statement of Case

1. On December 10, 2008, the State charged Eric Benson Skeens ("Skeens") by

Information with the following:

Count1 Child Molesting an A felony (intercourse with K.W.)

Count 2 Child Molesting an A felony (deviate sexual conduct

performing oral sex upon K.W.)

Count 3 Child Molesting as an A felony (deviate sexual conduct

receiving oral sex from K.W.)

Count 4 Child Molesting an A felony (deviate sexual conduct

penetrating the sex organ of K.W. with an object)

Count 5 Child Molesting a C felony (fondling) App. Vol. III at 61- 62

Brief of Appellant

Eric Benson Skeens, Appellant

2. On July 23, 2009, a jury found Skeens guilty as charged on all five counts. App. Vol. III at 65

3. On August 31, 2009, the trial court (then Judge Thomas Hakes presiding) sentenced Skeens to 45 years each on each of the first four counts and to seven years on Count 5 and ran all sentences consecutively for an aggregate sentence of 187 years. *Id.*

4. Skeens appealed, and on August 25, 2010, a panel of this Court affirmed his convictions and determined the trial court did not abuse its discretion in determining the aggravating and mitigating factors at sentencing. The Court found that the 187-year sentence was inappropriate in light of the nature of the offense and the character of the offender and reduced the aggregate sentence to 90 years. App. Vol. III at 66

5. Skeens sought transfer to the Indiana Supreme Court, and, on November 3, 2010, the Court declined to accept transfer.

6. On January 27, 2011, Skeens filed a *pro se* Petition for Post-Conviction Relief. App. Vol. II at 16 - 35

7. On February 1, 2011, the State filed its Answer to the pro se Petition for Post-Conviction Relief. *Id.* at 37 - 38

8. On November 30, 2018, Skeens, by counsel, filed his first amended Petition for Post-Conviction Relief. *Id.* at 112 - 122

9. On December 28, 2018, the State filed its Answer to the first amended Petition for Post-Conviction Relief. *Id.* at 129 - 130

Brief of Appellant
Eric Benson Skeens, Appellant

10. On July 23, 2019, Skeens filed his Verified Second Motion to Amend Petition for Post-Conviction Relief. *Id.* at 198 - 206

11. On August 6, 2019, the State filed its Answer to the second amended Petition for Post-Conviction Relief. App. Vol. III at 7

12. The trial court conducted hearings in the post-conviction case on April 30, 2019; August 13, 2019; and September 24, 2019. *Id.* at 67

13. The trial court, upon agreement of the parties, took judicial notice of the contents of the underlying trial file (Cause No. 35C01-0812-FA-73) as well as the contents of the trial court's post-conviction file. Tr. at 36

14. On December 17, 2019, the trial court issued its findings of fact and conclusions of law denying post-conviction relief. App. Vol. III at 61 - 87

15. On January 16, 2020, Skeens, by counsel, filed a Motion to Correct Errors. *Id.* at 85 - 89

16. On February 21, 2020, the trial court denied the Motion to Correct Errors. *Id.* at 94

17. On March 20, 2020, Skeens timely filed his Notice of Appeal.

## Statement of Facts

Eric Benson Skeens ("Skeens") and his ex-wife, R.W., met in 2003 and married in December of 2004. Mother's child, K.W., was born in 2000 and considered Skeens her "Dad" though he was not her biological father. *See Skeens v. State*, Cause No. 35A05-0909-CR-515 (Aug. 25, 2010)(hereinafter "*Skeens 1*") at pp. *1-2. Skeens and R.W. divorced in 2006 but continued living together. *Id.* at *2.

6

Brief of Appellant

Eric Benson Skeens, Appellant

Here are the facts most favorable to the conviction as delineated in the direct

appeal:

In September 2007, Skeens, Mother, and K.W. moved into a home on Williams Street in Huntington, Indiana. Skeens's son also lived at the home "on and off." Skeens would care for K.W. while Mother was at work. In June, 2008, Mother moved with K.W. to another home on Wabash Circle in Huntington. However, even after moving to Wabash Circle, Mother continued to allow Skeens to visit with and care for K.W. because K.W. "thought of him as her dad." K.W. would spend, on average, three nights per week at Skeens's house. In September 2008, Skeens moved to Warsaw, Indiana, but Mother would still make arrangements for Skeens to have K.W. on some weekends.

During the period of time between September 2007, when Skeens, Mother, and K.W. moved to Williams Street, and November 2008, Skeens subjected K.W. to a variety of sexual encounters. Mother would be "either at the grocery store, some type of store or she was at work." Skeens removed both his and K.W.'s clothing and placed her on top of a bathroom sink, and he had sexual intercourse with K.W. which "hurt." Skeens placed a towel underneath K.W. "to wipe up white stuff that came out" of her vagina. Aftewards, Skeens would ask K.W. to go the bathroom, and her vagina "kind of burned."

Also, Skeens would remove his and K.W.'s clothing in either the living room, Mother's bedroom, or the bathroom and "put his tongue" on K.W.'s vagina. When in either the living room or bedroom, Skeens would remove both his and K.W.'s clothing, like under [her] legs sort of," which were "separated." Skeens would use his tongue to "lick[]" K.W.'s vagina which felt "[w]et" and "[w]eird" to K.W. When Skeens would put his tongue on K.W.'s vagina in the bathroom, K.W. would be "in the same position" on top of the sink as when Skeens had sexual intercourse with her. Skeens would be "kind of squatting."

Further, Skeens would touch K.W.'s vagina with his fingers in the living room, the bathroom, and the bedroom. Skeens would remove his and K.W.'s clothes and "rub" her vagina "in circles" using one finger on each hand. Skeens would also rub "the part of [K.W.'s vagina] where [she goes] potty" using one finger "on both hands and then sometimes two fingers."

Skeens would also make K.W. put his penis in her mouth in the living room and the bedroom. Skeens would remove his and K.W.'s clothes,

7

Brief of Appellant
Eric Benson Skeens, Appellant

and K.W. would lay on the floor on her back and Skeens would be
"laying on top of [her] with his hands like sort of pushing up." Skeens
would then put his "private" in K.W.'s mouth and "[h]e would sort of
push." His "private" was "[s]ort of like a long type of mushroom shape,"
with "a triangle at the top with the top corner kind of curved" and a
"hole." His penis felt "[w]eird" and "[k]ind of smooth."

Skeens would also touch K.W.'s "boobs" with his finger and his tongue.
Skeens would remove K.W.'s and his own clothing and lick "sometimes
one, sometimes both" of K.W.'s breasts. He would similarly "rub" either
one or both of K.W.'s breasts with his finger.

During some of the incidents in the living room when Skeens would
touch K.W.'s "privates" with "[h]is tongue, his finger and . . . his
private," Skeens would show K.W. movies "that had people touching
each other." He would show K.W. the movies, including one called "real
sex," on a "flat screen" television by "download[ing] [them] from his
computer . . . ." The movie would depict "three or four people and they
were touching each other[']s privates."

There was one incident when Skeens tried to touch K.W. and K.W. told
Skeens "no," and she attempted to "go downstairs and [she] was like on
the first step and then [Skeens] said if you don't come back here and do
this with me, I'll call the police on you and they'll tell your mom." K.W.
"went back [because she] was scared." Skeens then "touch[ed] [K.W.'s]
privates."

If Skeens's son was home during these encounters, Skeens would "get
him to go out of the room." Once, Skeens told his son to "go play with
your cars, I just bought those for you." Skeens's son told Skeens that
"no I want to go play with [K.W.]," and Skeens went with his son to
play with the cars for "a few minutes and then [Skeens] would say, oh,
I'll be right back and then he would go and touch [K.W.'s] privates."
Skeens would also lock the bedroom door to keep his son out of the
room. Skeens's son "would knock on the door . . . .[and] would say dad,
let [me] in there." Skeens would say "yeah," but then he would not go
to the door.

Skeens told K.W. to not tell anyone about the touching, and that if she
did K.W. would "get in big trouble." K.W. once tried to tell Mother
about Skeens but K.W. "got scared" because she "thought that [Mother]
wouldn't believe [her] and then like [K.W. would] get in big trouble."

8

Brief of Appellant
Eric Benson Skeens, Appellant

On December 5, 2008, the school counselor at K.W.'s elementary school showed a video to the class titled "Breaking the Silence, Children Against Child Abuse" and the video included "two segments . . . one on physical abuse and one on sexual abuse." After the sexual abuse segment of the video, the counselor directed the class to write in their "reflection journals," and to "write the word help on their paper" if they needed help. While the counselor was "walking around the different table clusters," K.W. "raised her hand and whispered [']this happened to me.[']" The counselor told K.W. that she would speak to her about it later, but when the children were leaving for lunch K.W. "asked again, [']can I talk to you about this, this happened to me,[']" and the counselor "told K.W. [she] would come get her after lunch." Again, however, K.W. "found [the counselor] first," when K.W. "was walking from lunch towards recess and stopped by [the counselor's] room and said [']can I please talk to you right now?[']" After their conversation, the counselor called the Department of Child Services and repeated what K.W. had reported to her.

Later that day, Nicole Allen, a family case manager at the Department of Child Services, met with Mother to "discuss . . . the nature of the report that [she] had received." Mother was "shocked, in disbelief[ ], immediately just started crying and just wasn't sure what to think about the whole situation . . . ." Mother agreed to take K.W. out of school and bring her to a child advocacy center in Huntington for an interview. At the interview, conducted by Allen, K.W. used age appropriate language and descriptions of the events that took place between K.W. and Skeens, and K.W. "gave a lot of information, very detailed information about the abuse." Mother also reported that it had been two weeks since Skeens had seen K.W.

On December 8, 2008, Mother, Allen, and Detective Mel Hunnicutt transported K.W. to the Fort Wayne Sexual Assault Treatment Center for a physical evaluation. K.W. was seen by Sharon Robison, a sexual assault nurse examiner. Robison conducted a genital examination and concluded that her genitals were "normal," meaning that "her hymen was perfect . . . . [T]here was no [ ] injury to her hymen and her anus was perfect also."

On December 16, 2008, K.W. began seeing Lynn Baker, a counselor at the Bowen center in Huntington. K.W. continued to see Baker once a week to help her deal with "behavioral issues," including K.W's nightmares and bed-wetting. Most of the sessions were in the play therapy room, which "is used to allow a child to use any of the therapeutic toys available . . . in a way that they need in order to work

Brief of Appellant
Eric Benson Skeens, Appellant

through why they're there.

*Skeens 1* at *2 - *10.

Additional facts were established during post-conviction proceedings through documentary evidence and testimony. Attorney Richard Thonert ("Trial Counsel") testified during the post-conviction hearings as did Attorney Jeremy Nix ("Appellate Counsel"). Skeens testified on his own behalf. Skeens called four law enforcement officers to testify during post-conviction proceedings: Tony Faucett, Melbourne Hunnicutt, Devin Hostetler, and Ronald Hochstetler. Skeens's ex-girlfriend, Dawn (Wallis) Rose and Skeens's brother Thomas Skeens, and Skeens's son, J.S., also testified on behalf of Petitioner. Skeens presented Affidavit testimony from Stephanie Mangun.

The documentary evidence Skeens presented during post-conviction proceedings included: (1) the Record on Appeal from the direct appeal (Cause No. 35A05-0909-CR-515) including the briefs; (2) Transcript of December 10, 2008 probable cause/search warrant hearing in Huntington Superior Court; (3) a computer examination report completed by Devin Hostetler on July 15, 2009; (3) the Warsaw Police Department's receipt list of items seized from Skeens's apartment (Feb. 18, 2009); (4) a Return of Search Warrant for Skeens's apartment (Dec. 10, 2008); (5) a Search Warrant and Return for Thomas Skeens's house in Huntington, Indiana; and (6) several Transcripts of Taped attorney/client conferences between Skeens and Trial Counsel; (7) a Search Warrant (issued by Huntington Superior Court Judge Jennifer Newton); (8) Melbourne Hunnicutt's documents and police

10

Brief of Appellant
Eric Benson Skeens, Appellant

reports; (9) Transcript of a Taped Conference between Ron Hochstetler and Richard

Thonert (July 14, 2009); and (10) copy of a drawing depicting Skeens's penis from

K.W.'s journal.

The State presented an Affidavit from K.W. as well as live testimony from

Fort Wayne Sexual Assault Nurse Examiner Leslie Cook who testified she was not

the nurse who performed the physical examination on K.W. The State also

presented an audio disk containing the *voir dire* from the trial. The State also

presented signed waivers Trial Counsel obtained from Skeens indicating he did not

wish to present witnesses and evidence and did not wish to retain an expert.

Additional facts will be added as is necessary and appropriate for developing

Petitioner's argument. Skeens will not recite a witness by witness summary of the

post-conviction testimony here because he understands the Court's time is valuable

and does not see the need to unnecessarily repeat information.

## Summary of Argument

The State's lead detective, Melbourne Hunnicutt, who did not testify at trial

and who was contemporaneously suspended for viewing pornography on the job,

gave false testimony at a probable cause and search warrant hearing and again at a

pre-trial hearing where Trial Counsel for Skeens sought exculpatory evidence.

Hunnicutt's false testimony led to the suppression and spoliation of exculpatory

evidence. The fact Hunnicutt was suspended for viewing pornography at work did

not come to light until post-conviction proceedings. The false testimony by the

Brief of Appellant
Eric Benson Skeens, Appellant

State's agent was a violation of Due Process and prevented Skeens from receiving a fair trial.

Trial Counsel, Richard Thonert, failed to adequately represent Skeens. He did not properly investigate the case, failed to confront and cross-examine the witnesses, failed to ask the child victim even one question on cross-examination, and even told the jury his client was guilty. Skeens was so distraught and upset with Trial Counsel after the trial that the trial court appointed a public defender to represent him at sentencing.

Skeens received ineffective assistance from Appellate Counsel when appellate counsel failed to raise any of the preserved issues and instead pursued a very weak sufficiency issue as the first issue. Appellate Counsel also failed to pursue a Davis-Hatton procedure to stay the direct appeal so that more evidence of the Sixth Amendment claim could be developed.

The mistakes at trial and on appeal, both by the State's agent Hunnicutt and by the attorneys, prejudiced the outcome of the case and prevented Skeens from receiving a fair trial. The convictions should be overturned and the case remanded so that Skeens can have a new and fair trial.

Argument

**I.  The trial proceedings violated the Fourteenth Amendment right to Due Process and *Brady v. Maryland* when false testimony by the State's agent, then-detective Melbourne Hunnicutt, led to a critical and outcome determinative discovery violation.**

On March 5, 2009, Trial Counsel filed a Non-Party Motion to Produce. *See* Pet. Ex.1 (*see specifically* App. at pp. 52 -54). The purpose of that motion was to

Brief of Appellant
Eric Benson Skeens, Appellant

obtain access to computers from K.W.'s home that were shared by K.W. and her

mother. *Id.* On March 31, 2009, the Judge issued an order which, in pertinent part,

read as follows:

> **Hunnicutt indicated that the search warrant obtained relating to
> Defendant's computers had to do with the Kosciusko County case,
> and not the matter before the Court. The defendant's motion to
> produce is therefore denied.**

*Id.* at p. 86.

The following evidence shows (A) that the State and its agents knew K.W.

claimed to have been shown pornographic images (movies) in Huntington County

via Skeens's computer and (B) that Mr. Thonert was remiss in not preserving these

errors; or, alternatively, (C) Mr. Nix was remiss in not raising them for the appeal.

(1) When asked about K.W.'s statement during post-conviction proceedings,
Mr. Thonert testified K.W. said in her statement to the advocacy center
interviewer that Skeens would only show her "elicit [sic]" movies at the
old house. Mr. Thonert testified K.W.'s statement indicated Skeens did
not have those at his new house. Tr. Vol. III at pp. 72 – 73

(2) Det. Hunnicutt's notes/supplemental police report also indicate the
pornographic movies were only alleged to have been shown in Huntington
and not in Warsaw. Pet. Ex. 12 (confidential Ex. Vol. IIA at p. 84)

(3) Det. Hunnicutt's notes/supplemental reports also document the collection
of K.W.'s spiral notebook as evidence on December 8, 2008. Pet. Ex. 12
(confidential Vol. IIA at p. 84)

Brief of Appellant
Eric Benson Skeens, Appellant

(4) On Dec. 10, 2008, the Superior Court Judge, Hon. Jennifer Newton

presiding, conducted a probable cause/search warrant hearing. Pet. Ex. 2

at pp. 22 – 25, 30, 33 (pagination as indicated for the PDF file for Pet. Ex.

Vol. II Public Access)

(5) The July 15, 2009 computer examination report indicates the scan of

Skeens's computer (seized from Warsaw) came up clean. Pet. Ex. 5 (Ex.

Vol. II at pp. 43 – 44)

(6) The transcript from the July 21 -23 jury trial shows the pornographic

movies were only alleged to have been viewed in Huntington. See Pet. Ex.

1 (*see specifically* Direct Appeal Tr. Vol. III at pp. 539:7 – 543:19; 657: 4 -

5; 682: 19 – 25 (pagination as in original paper transcripts))

(7) Both Ron Hochstetler's and Mel Hunnicutt's testimony during post-

conviction proceedings prove the only movie K.W. claimed she'd been

shown in Warsaw was Tinkerbell, a well-known Disney movie. Tr. at pp.

152 – 53; 204.

Contrast the evidence cited in the foregoing with what Det. Hunnicutt

testified to at the March 30, 2009 "Hearing on Pending Motions":

**THE STATE:**      The computers, everything that was taken in the
defendant's apartment in Kosciusko County. The child indicated that she was
shown pornographic movies while in Kosciusko County. The computer seized,
everything seized from that apartment have nothing to do with the
Huntington County case [Pet. Ex. 1, *see specifically* Direct Appeal Tr. Vol. I at
p. 89:24 – 90:5 (pagination as in original paper transcripts)]

**HUNNICUTT:**      the victim did not disclose anything about computers in
Huntington [County] [*Id.* at p. 103: 16 – 17]

14

Brief of Appellant
Eric Benson Skeens, Appellant

**TRIAL COUNSEL:**      You're telling this Court that you had no information concerning the allegations against Eric Skeens about his computer use in Huntington County as it relates to Huntington County before December 10, 2008?

**HUNNICUTT:**      Not in Huntington County [*Id.* at p. 103: 18 – 22]

**HUNNICUTT:**      Sir, she never disclosed about a, any computer use in Huntington County [*Id.* at p. 105: 21 – 22]

**TRIAL COUNSEL:**      My question of you is why didn't you examine them [computers] for that purpose

**HUNNICUTT:**      Because they were for Kosciusko County [*Id.* at p. 109: 17 19]

**TRIAL COUNSEL:**      The child told you specifically that at no time in Huntington, Indiana did Eric Skeens download any, any uh, pornographic or sexual information in front of her while she was in Huntington County?

**HUNNICUTT:**      She said nothing about that [*Id.* at p. 115: 2 – 6]

**TRIAL COUNSEL:**      So when she described the movies, those couples that were licking each other's privates, touching others privates . . . that relates only to Warsaw, Kosciusko County, is that correct?

**HUNNICUTT:**      About the, the movies, yes sir it does [*Id.* at p 115: 7 – 13]

**TRIAL COUNSEL:**      And when you testified at the Probable Cause hearing uh, you were asked, did she say where she got the movies from, she said they were on the computer, on her dad's computer, that was only in Warsaw Indiana not Huntington, only in Kosciusko County?

**HUNNICUTT:**      It's the only time she said that she saw those things.

**TRIAL COUNSEL:**      In Kosciusko County.

**HUNNICUTT:**      Yes sir [*Id.* at p. 115: 14 – 22]

**TRIAL COUNSEL:**      And you were asked by the prosecutor how it would, what he would do or how he would get those movies on the computer, witness Hunnicutt, she said he would download those . . . to the computer. She even drew out how it would start at zero percent and . . . it went clear up

15

Brief of Appellant
Eric Benson Skeens, Appellant

to a hundred percent. You remember giving those answers to those
questions?

**HUNNICUTT:**     Yes sir.

**TRIAL COUNSEL:**     And that related only to Kosciusko County
Indiana?

**HUNNICUTT:**     Yes sir [*Id.* at pp. 115:23 – 116:12]

**JUDGE:**     Every time you've asked the question he's said, Warsaw,
Kosciusko County. You ask it again. He says Warsaw, Kosciusko County. You
ask it again. He says Warsaw, Kosciusko County. Now do you wish to ask it
again and hear again or are you finished with this.

**TRIAL COUNSEL:**     My last question is, all information linking any
computers, playstations, downloading, all occurred in Kosciusko County,
Indiana and the information you had from the child, from this child is that
correct?

**HUNNICUTT:**     Yes [*Id.* at pp. 116:22 – 117:7]

**THE STATE:**     Regarding the computer information, we have gone over
adnauseum [sic] that the uh, computers and all the evidence seized apply to
the Kosciusko County case [*Id.* at p. 133: 8 – 11]

Since the trial court's March 31, 2009 Order on the Defendant's Non-Party

Motion to Produce denied access to those computers, clearly the testimony

Hunnicutt gave was the basis for the denial. Pet. Ex. 1 (*see specifically* Direct

Appeal App. at p. 86). Because K.W. described pornographic movies being shown to

her in Huntington County, the Motion should have been granted. Clearly, the

computers the defense wanted to examine were relevant to the Huntington County

case, and Hunnicutt's false testimony resulted in the Motion being denied and

thereby affected the Court's ruling and was extremely prejudicial to Skeens's case.

Brief of Appellant
Eric Benson Skeens, Appellant

Trial Counsel knew how important these computers were because he and

Skeens discussed it in their March 2, 2009 attorney/client conference. *See* Pet. Ex. 8.

**TRIAL COUNSEL:**        There is no porn in your apartment [Kosciusko County]

**SKEENS:**   Nope

**TRIAL COUNSEL:**        Nothing and they didn't find any from what I can tell all the DVD are kids stuff or has nothing to do with porn. Now R.W. [K.W.'s mother] says you never used porn but you and she might watch it.

**SKEENS:**   Uh-huh

**TRIAL COUNSEL:**        Would K.W. see some of that if you and R.W. had been watching it

**SKEENS:**   Um, she could have I guess, I don't know

**TRIAL COUNSEL:**        Which is fine because maybe that is where she is getting these ideas and she is talking about your downloading it off your computer

**SKEENS:**   well see, R.W. and I downloaded [it] before on the computer and on the old computer and it was on the old computer not the [new] one (inaudible) she has at home and we watched it. Me and R.W. downloaded it so when it was on the computer like if you turn the [playstation] on it would pull up whatever movie was downloaded and we could watch the porn on the [playstation]

**TRIAL COUNSEL:**        You and R.W.

**SKEENS:**   Yeah me and R.W. but I mean if K.W. got on there, if K.W. turned on the [playstation] she could get on there and select anything that was on there also.

**TRIAL COUNSEL:**        She [K.W.] knew how it was downloaded you saw her describe it

**SKEENS:**   Yeah because we downloaded movies all the time, not just porn. We download cartoons [all] the time, movies and stuff all the time and she [K.W.] seen how I downloaded a lot of times and my son and I have downloaded movies that he wanted to watch too

Brief of Appellant
Eric Benson Skeens, Appellant

***** 

**TRIAL COUNSEL:** Now has K.W. seen pornography and R rated stuff, to your knowledge has she

**SKEENS:** Not to my knowledge she hasn't

**TRIAL COUNSEL:** Would R.W. ever have showed her anything

**SKEENS:** I don't think so

**TRIAL COUNSEL:** Is there any way K.W. can get on the computer and watch this stuff

**SKEENS:** Oh yeah

**TRIAL COUNSEL:** Whose computer would that be

**SKEENS:** Well like I said her mom has a computer, she can get on her mom's computer at any point and time and the last time I was talking to her on the phone she called me and she was in a chat room with some girl

**TRIAL COUNSEL:** That is K.W.

**SKEENS:** Yeah K.W. was in a chat room talking with some girl for a half hour

**TRIAL COUNSEL:** R.W.'s computer, how long has she had that computer

**SKEENS:** Probably, I got it when I was working at Best Buy and that has been maybe 6 years ago, 5 or 6 years ago

**TRIAL COUNSEL:** So everything she had done on the computer is there, it can be found

**SKEENS:** Oh yeah

**TRIAL COUNSEL:** If K.W. is on there is there a way to determine if K.W. was getting on to it and not R.W.

**SKEENS:** I don't know

**TRIAL COUNSEL:** Do you know where that computer is now

Brief of Appellant
Eric Benson Skeens, Appellant

**SKEENS:**   At R.W.'s house

**TRIAL COUNSEL:**      The police did not take it

**SKEENS:**   No, that is what I asked about before and you said it would cost like $3500 to get it or something like that

**TRIAL COUNSEL:**      What we will do . . . I file a document to ask the court to order her to produce her computer and all of her disks and everything . . .On your computer if they go through the whole thing will they find any pornography, child pornography, anything

**SKEENS:**   No

Pet. Ex. 8 (Confidential Ex. Vol. IIA at pp. 50 – 51, 54 – 55)

The following excerpts from the March 30, 2009 "Hearing on Pending

Motions" show exactly how damaging the false testimony was to the defense.

**TRIAL COUNSEL:**      Indiana trial rule 34 and cited in *Purdue* [*v. State*], the court has said, a defendant is allowed to obtain information which may lead to discoverable evidence, in particular which may lead to exculpatory evidence. Uh, this is critical to our defense because the child [K.W.] had access to uh, from what I understand, that computer and knows how to use it.[Pet. Ex. 1, *see specifically* Direct Appeal Tr. Vol. 1 at p. 78: 10 – 17 (pagination as in original paper transcripts)]

**JUDGE:**      You're [sic] argument is that you need to look in to the computer to see what's in there because there may be exculpatory evidence in there

**TRIAL COUNSEL:**      Yes, and it would identify who used it when and what which could include use by the child going on to particular sites, finding information, things like that, that may lead to discoverable if not exculpatory evidence.

**JUDGE:**      What would that be? . . .

**TRIAL COUNSEL:**      I'm looking for information, uh either why mother or child, relating to information concerning allegations of child molestation, chat sites, chat rooms, discussing those things relating to accusing father or other individuals. Uh, pornographic sites that may have made an access by the child [K.W.] which would show uh, not only sexual activity between

Brief of Appellant
Eric Benson Skeens, Appellant

adults but perhaps children, all of these things which would lead to
discoverable information or evidence to establish a basis for where the child
is getting this information for which she has used to make allegations against
my client [*Id.* at pp. 80:6 – 81:12]

**\*\*\*\*\***

**JUDGE:**      So, your argument as I understand it is, is there was a search
warrant issued uh, for the purpose of looking in to your client's computers for
specific information based upon information that was given to the police
officer evidently by the child. Uh, that those computers were looked at and at
least as far as you know at this moment the information was not found that
they were looking for and so your theory is, if it's not in this and it was
brought up, it has to be somewhere and that at that point makes it material
to the case that we're hearing today?

**TRIAL COUNSEL:**      Yes.

**JUDGE:**      Did I restate what you said correctly?

**TRIAL COUNSEL:**      Yes [*Id.* at pp. 88:23 – 89:12]

According to the U.S. Constitution, the Government **must** disclose certain

types of evidence to defendants. This is dictated by the Bill of Rights and its Due

Process protections. *See specifically* Am. V and Am. XIV. According to *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good or bad faith of the

prosecution." *See also Cone v. Bell*, 129 S.Ct. 1769, 1782 (2009)(holding "When the

State withholds from a criminal defendant evidence that is material to his guilt or

punishment, it violates his right to due process of law in violation of the Fourteenth

Amendment.")

Brief of Appellant

Eric Benson Skeens, Appellant

Not only is the Government obligated to disclose exculpatory evidence, it is also obligated to disclose information that could be used to impeach the State's witnesses, particularly when those witnesses give testimony comprising an important part of the State's case. *Valdovinos v. McGrath*, 598 F.3d 568, 579 (9th Cir. 2010)(court found *Brady* violation occurred when the cumulative effect of the undiscovered evidence in conjunction with the State's relatively weak case would be sufficient to undermine confidence in the verdict), vacated by *Horel v. Valdovinos*, 2011 U.S. LEXIS 1035 (2011).

Some types of discovery violations are considered structural errors. This type of structural error can and should be found when the Government withholds material evidence that is favorable to the defendant. *Brady*, 373 U.S. at 87; *see also U.S. v. Bagley*, 473 U.S. 667, 682 (1985) (reasoning the State's failure to disclose certain evidence may mislead the defense into failure to pursue independent lines of inquiry and strategy). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A [']reasonable probability['] is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Appellate Counsel, Mr. Nix, failed to include all of the hearings in the Record of Proceedings. Tr. at p. 121. In particular, the probable cause / search warrant hearing was not included. *Cf.* Pet. Ex. 1 (ROP); Pet. Ex. 2 (Transcript of the Dec. 10, 2008 hearing in the Huntington Superior Court). Failing to raise a structural error

Brief of Appellant
Eric Benson Skeens, Appellant

cannot be excused as a reasonable strategic decision. Further, counsel cannot make a strategic decision concerning a portion of the transcript he has not reviewed.

Either Trial Counsel was wrong for not properly preserving the Due Process argument or Appellate Counsel was wrong for not properly raising it or the State's commission, whether deliberate or inadvertent, of the discovery violation abridged Mr. Skeens's right to Due Process.

The State did not call its lead detective, Mel Hunnicutt, at trial because he had huge credibility problems. Not only did Hunnicutt provide false testimony at the pre-trial hearings (*see supra*), he was also in trouble and facing disciplinary action for viewing pornography on the job. Tr. at pp. 144 – 45. No other detective contacted Hunnicutt and requested he transfer the Skeens file. Trial Counsel also did not communicate with Hunnicutt after the disciplinary action. Tr. at pp. 146 – 47.

According to *Napue v. Illin*ois, 360 U.S. 264, 269 (1959): "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." This is true even if the falsehood bears only upon the witness's credibility and not directly upon the defendant's guilt. *Id*.

According to the testimony of investigators who testified at the post-conviction hearing and their supporting documentation, no items were ever seized, gathered or analyzed from K.W.'s home in Huntington. Tr. at pp. 146, 212; *see also* Pet. Ex. 9, 10, 11, and 12. The State committed prosecutorial misconduct at the

22

Brief of Appellant
Eric Benson Skeens, Appellant

March 30, 2009 "Hearing on Pending Motions" and prevented Skeens from

obtaining discoverable and probably even exculpatory evidence. The State first tried

to prevent this evidence from being discovered by claiming Trial Counsel was on a

fishing expedition, but Trial Counsel overcame that claim [Pet. Ex. 1, *see specifically*

Direct Appeal Tr. Vol. 1 at pp. 87:5 – 89:13 (pagination as in original paper

transcripts)]. Upon recognition of this, the State immediately changed its course of

action and told the Court this evidence had nothing to do with the Huntington

County case [Pet. Ex. 1, see specifically Direct Appeal Tr. Vol. 1 at pp. 89:14 –

90:22]. The State's attempt to parse the cases so neatly between counties is illogical

because: (a) both involved the same parties; and (b) the Huntington County charges

alleged the crimes took place between September of 2007 and December of 2008,

and Skeens moved to Kosciusko County in September of 2008. *See* Pet. Ex. 12; see

also *Skeens* 1 at *2.

    The State elicited false testimony from Hunnicutt, and based upon his false

testimony the trial court denied Skeens access to the evidence he needed to defend

himself. Pet. Ex. 1, *see specifically* App. at p. 86. Because the State initiated the

false testimony that ultimately resulted in Skeens being denied favorable material

evidence, the State placed Skeens in a position of grave peril and prevented him

from mounting an adequate defense. In a case that hinged on witness credibility

with no physical evidence and no corroborating witness, there is a reasonable

probability it would have changed the outcome of the trial.

Brief of Appellant
Eric Benson Skeens, Appellant

The evidence was discoverable, unique, and critical to Skeens's defense, and there was no other source upon which he could rely to present that part of the defense. Thus, the evidence went to the very heart of the fundamental right to a fair trial and its illegal exclusion impinged upon the right to present a complete defense, thus depriving Skeens of a meaningful opportunity to present a complete defense.

Clearly, Hunnicutt's testimony at the March 30, 2009 hearing was false and led the trial court to deny the defense's motion to review the mother's computers. It matters not whether Hunnicutt deliberately perjured himself or whether the trial court chose to believe that he is not "perfect" and made a grievous and pervasive mistake, as he testified during cross-examination at the post-conviction hearing. Tr. at p. 157. Either way, the conviction was obtained based upon a material misrepresentation of a crucial fact and that prevented Skeens from mounting an adequate defense. This is prejudicial under *Strickland v. Washington,* 466 U.S. 668 (1984), especially where there was no physical evidence of injury and no other witness could corroborate what K.W. said happened. The Constitution requires that the convictions be reversed and that the matter be addressed properly in a new trial. The law is with the Petitioner and against the State of Indiana.

Brief of Appellant
Eric Benson Skeens, Appellant

**II. Trial Counsel, Richard Thonert, failed to properly represent Skeens during pre-trial and trial proceedings and violated the Sixth Amendment and prevented a fair trial when trial counsel did not properly investigate the case, did not properly cross-examine the witnesses, did not secure and present exculpatory evidence, and did not object to the sexual assault nurse examiner (SANE) providing expert testimony despite the fact he had not received discovery concerning studies to which the SANE testified.**

Skeens received deficient assistance from Trial Counsel when Mr. Thonert failed to secure the evidence from R.W.'s computers, failed to obtain Hunnicutt's and Faucett's disciplinary records that were contemporaneous with the case at bar, failed to secure and present other exculpatory evidence including J.S.'s testimony and Skeens's former fiancée's testimony, and failed to properly object to the SANE providing expert testimony without prior notice.

Trial Counsel's performance failed to satisfy the Sixth Amendment right to counsel. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

The leading Sixth Amendment case is *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). The *Strickland* test contains two prongs: (1) the successful petitioner must prove the "identified acts or omissions of counsel were outside the wide range of professionally competent assistance"; and (2) adverse

Brief of Appellant
Eric Benson Skeens, Appellant

prejudice resulted from the deficient performance. *Bieghler v. State*, 690 N.E.2d 188, 193 (Ind. 1997) (citing *Canaan v. State*, 683 N.E.2d 227, 229 (Ind. 1997)). The petitioner bears the burden of proof by a preponderance of the evidence and must show both prongs are met. Ind. Post-conviction Rule 1(5). If the petitioner carries this burden, then the requested relief should be granted and the conviction set aside.

Indiana's appellate courts do "not reverse unless the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012). This Court will not reconsider the findings of fact unless clearly erroneous but does not defer to the post-conviction court's conclusions of law. *Id.*

*Trial Counsel failed to properly preserve the issue concerning R.W.'s computers*

Trial Counsel failed to properly preserve the issue concerning R.W.'s computers and the exculpatory evidence he believed they contained.[1] By failing to properly preserve the issue, Trial Counsel's inadequate representation fell below prevailing professional norms. This mistake undermines confidence in the verdict and renders it unreliable because there is a reasonable probability of a different outcome if Trial Counsel had performed adequately. Cumulative instances of

---

[1] As articulated in first issue, Skeens believes the State committed prosecutorial misconduct by its concealment of R.W.'s computers through the false testimony Hunnicutt gave. However, if the Court decides that is a "freestanding error" and cannot be raised here – as opposed to a "structural error" – then Skeens argues in the alternative that his Trial Counsel's performance violated the Sixth Amendment with respect to the computers which Trial Counsel believed contained exculpatory evidence.

Brief of Appellant
Eric Benson Skeens, Appellant

prosecutorial misconduct can amount to fundamental error; however, normally a

defense counsel must interpose a contemporaneous objection to the perceived

prosecutorial misconduct else it is waived. *See Brummett v. State*, 24 N.E.3d 965,

966 (Ind. 2015). Here, Trial Counsel should have known the testimony Hunnicutt

gave was false and should have objected to it at the December 10, 2008 probable

cause hearing and at the March 30, 2009 hearing on pending motions. He should

also have renewed these concerns at trial.

Because Trial Counsel failed to do so, he let Skeens down and also missed an

opportunity to set the Record straight and gain access to evidence he deemed

exculpatory. Evidence he deemed exculpatory translates to evidence that would

have a reasonable probability of a different outcome. *Bunch v. State*, 964 N.E.2d

274, 311 (Ind. Ct. App. 2012)(quoting *Harley v. State*, 952 N.E.2d 301, 303 (Ind. Ct.

App. 2011): "A reasonable probability is a probability sufficient to undermine

confidence in the outcome). Such foregone evidence undermines confidence in the

outcome of the trial, and Trial Counsel's failure to object was therefore prejudicial.

*Trial Counsel failed to obtain Hunnicutt's and Faucett's disciplinary records*

Trial Counsel suspected there were issues with Hunnicutt's testimony at the

December 10, 2008 and the March 30, 2009 hearings. That explains why he

hammered away during his examination of Hunnicutt, even to the point where

then-Judge Thomas Hakes said: "Every time you've asked the question he's said,

Warsaw, Kosciusko County. You ask it again. He says Warsaw, Kosciusko County.

You ask it again. He says Warsaw, Kosciusko County. Now do you wish to ask it

Brief of Appellant

Eric Benson Skeens, Appellant

again and hear again or are you finished with this." Pet. Ex. 1, *see specifically* DA

Tr. Vol. I at pp. 116:22 – 117:7. Hunnicutt was the lead detective. If Trial Counsel

doubted the veracity of Hunnicutt's testimony, it makes no sense that he failed to

question further or follow up with him after the disciplinary action was imposed. Tr.

at pp. 145 – 46. The disciplinary action was contemporaneous with the investigation

and trial of Skeens. The jury was neither aware of these concerns nor was the jury

shown how the child could possibly have knowledge about age-inappropriate things

by any other means than having been a victim to the alleged crimes, and the issue

was not adequately preserved for the direct appeal.[2]

Trial Counsel's missteps resulted in a dual problem for Skeens. First and

foremost, the jury found him guilty. Second, because Trial Counsel failed to properly

preserve the issue the direct appeal decision concluded that the evidence was

sufficient, relying particularly on the level of detail with which the child victim

described things about which a child that age (third grade) should have no

independent knowledge.

---

[2] The State continued to suppress information concerning the officers' disciplinary files, aligning itself with the City attorneys from both Huntington and Warsaw. Skeens tried to obtain the records through subpoenas but the cities' motions to quash were upheld. App. Vol. II at pp. 193  95; Vol. III at p. 11. Skeens hired a private investigator and filed a public records request which was directed at the City of Warsaw and obtained records concerning Faucett after the evidentiary hearings. App.Vol. III at pp. 24 - 29. Skeens moved to re-open the evidence after his investigator obtained some records, but that was denied. App. Vol. III at p. 33.

Brief of Appellant
Eric Benson Skeens, Appellant

*Trial Counsel failed to secure and present other exculpatory evidence, including J.S.'s and Dawn Rose's testimony and did not confront and cross-examine K.W.*

Trial Counsel failed to call Skeens's son six-year-old J.S. as a witness at trial. Pet. Ex. 1. This was a below average mistake since K.W. testified that Skeens would lock J.S. out of the bedroom and that J.S. would be knocking on the door trying to gain entry. [Pet. Ex. 1 (*see specifically* DA Tr. Vol. III at pp. 510, 544 – 46 pagination as in original paper transcripts)]. Longstanding U.S. Supreme Court precedent holds the Sixth Amendment right to confront the witnesses is sacrosanct. *See, e.g., Taylor v. Illinois*, 484 U.S. 400 (1988)(explaining "[t]he right to compel a witness'[s] presence in the courtroom could not protect the integrity of the process if it did not embrace the right to have the witness'[s] testimony heard by the trier of fact." *Taylor* cited *United States v. Nixon*, 418 U.S. 683, 709 (1974) for the following principle of law:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*Taylor* (quoting *Nixon*).

Skeens called J.S. as a witness at the post-conviction hearing, and J.S. testified as follows:

**MS. CARTER:**        Thank you. And how are you related to Eric Skeens?

Brief of Appellant
Eric Benson Skeens, Appellant

**J.S.:**  He is my father.

**MS. CARTER:**      Alright. And, um, prior to my contacting you about this case, did any previous attorney ask you about this case?

**J.S.:**  No they did not.

**MS. CARTER:**      Did Mr. Thonert ever try and talk to you?

**J.S.:**  He did not.

**MS. CARTER:**      Just directing your attention back to, um, the time that your father was apprehended for these charges, do you remember that time?

**J.S.:**  When he got arrested?

**MS. CARTER:**      Yes.

**J.S.:**  Uh, I was with my mom at the time, but I remember hearing about it.

**MS. CARTER:**      Okay, so, um, looking back to December of 2008, you do remember that period of time when your dad got in trouble?

**J.S.:**  Yeah.

**MS. CARTER:**      Um, if Mr. Thonert would've tried to talk to you about any of these things, is there something you feel you could've contributed to the case?

**J.S.:**  Um, that I was like always with his side. It was mentioned that doors were locked. Doors were never locked – not one time. Doors were always wide open. I even slept with my dad in his room on the floor.

**MS. CARTER:**      So there's never a time when your dad put you out of the room and locked you out of the room?

**J.S.:**  No, never. No.

**MS. CARTER:**      And there was never a time when your dad put you out of the house and locked you out of the house?

**J.S.:**  Absolutely not. No.

Brief of Appellant
Eric Benson Skeens, Appellant

Tr. at pp. 174 – 75.

**Compounding the problem of his failure to call J.S. as a witness,**

***Trial Counsel did not ask K.W. even one question on cross-examination.*** [Pet.

Ex. 1 (*see specifically* DA Tr. Vol. III at p. 551 (pagination as in original paper

transcripts)]

> **STATE:** Okay. I'm going to sit down and Mr. Thonert's going to ask you some questions.
>
> **COURT:** Okay, Mr. Thonert?
>
> **DEFENSE:** Uh, no questions, thank you.

*Id.*

Trial Counsel also failed to call Skeens's former fiancée, Dawn (Wallis) Rose,

who lived with Skeens during the time the allegations of child molestation were

raised. Dawn Rose testified for Skeens during post-conviction proceedings.

> **MS. CARTER:** And, are you acquainted with my client Mr. Skeens?
>
> **DAWN ROSE:** Yes.
>
> **MS. CARTER:** And how are you acquainted with him?
>
> **DAWN ROSE:** Uh, we were engaged.
>
> **MS. CARTER:** And when was that?
>
> **DAWN ROSE:** And grew up together before all this started.
>
> **MS. CARTER:** Pardon me?
>
> **DAWN ROSE:** Before all this started.
>
> **MS. CARTER:** Ok, so, um—
>
> **THE COURT:** If you could speak up just a little bit, ma'am.

Brief of Appellant
Eric Benson Skeens, Appellant

**DAWN ROSE:**     Okay.

**MS. CARTER:**     So, when you say before all this started, do you mean before the charges were filed against –

**DAWN ROSE:**     Mm-hmm

**MS. CARTER:**     – Eric Skeens?

**DAWN ROSE:**     That's when we were engaged, but we grew up together, so.

**MS. CARTER:**     Okay. So you've basically known him how many years would you say?

**DAWN ROSE:**     My entire life.

**MS. CARTER:**     Okay, so over 20 years then?

**DAWN ROSE:**     Mm-hmm.

**MS. CARTER:**     And when you say grew up together, was he someone that you would see every week, every day? How close were you guys?

**DAWN ROSE:**     Almost every day.

**MS. CARTER:**     Okay. And did you live in the same neighborhood?

**DAWN ROSE:**     Yes, we did.

**MS. CARTER:**     Okay, and were you next door neighbors or back-to-back, or how was that?

**DAWN ROSE:**     Um, back-to-back.

**MS. CARTER:**     So you're [sic] backyards adjoined each other?

**DAWN ROSE:**     Mm-hmm.

*****

**MS. CARTER:**     . . . as far as your relationship with Eric Skeens is concerned, I believe you said you were engaged and living together, correct?

32

Brief of Appellant
Eric Benson Skeens, Appellant

**DAWN ROSE:**      Yes, yes.

**MS. CARTER:**      And in the – in the context of your living together with Eric Skeens, were you able to observe Eric Skeens around K.W.?

**DAWN ROSE:**      Yes.

**MS. CARTER:**      And in your observations of how he interacted with K.W., did anything every strike as weird or disturbing?

**DAWN ROSE:**      No.

**MS. CARTER:**      And did you have children of your own at that time?

**DAWN ROSE:**      Yes, I did. I had two.

**MS. CARTER:**      And would they stay with you and Mr. Skeens at times?

**DAWN ROSE:**      Yes.

**MS. CARTER:**      And did you trust –

**DAWN ROSE:**      I had them full-time. They were there all the time.

**MS. CARTER:**      They were there all the time?

**DAWN ROSE:**      Mm-hmm.

**MS. CARTER:**      And did you trust Mr. Skeens with K.W. and your children?

**DAWN ROSE:**      Yes.

**MS. CARTER:**      And was Mr. Skeens'[s] child also with you guys from time to time?

**DAWN ROSE:**      Yes.

**MS. CARTER:**      And that would be J.S.?

**DAWN ROSE:**      Yes.

Brief of Appellant
Eric Benson Skeens, Appellant

**MS. CARTER:**     And, again, did you – did you trust [Skeens] with that child?

**DAWN ROSE:**     Fully.

**MS. CARTER:**     And were you willing to share this information with Mr. Thonert?

**DAWN ROSE:**     Yes, and I did.

**MS. CARTER:**     And did you go to some of the appointments with, uh, with Mr. Thonert?

**DAWN ROSE:**     Several.

**MS. CARTER:**     Several appointments. And you provided him with this information?

**DAWN ROSE:**     Yes.

**MS. CARTER:**     And you were willing to testify at the trial?

**DAWN ROSE:**     Yes.

**MS. CARTER:**     And in fact you were present in the courthouse for the trial?

**DAWN ROSE:**     Yes, I was.

**MS. CARTER:**     But you were not in this courtroom?

**DAWN ROSE:**     Correct.

**MS. CARTER:**     Where were you?

**DAWN ROSE:**     We were stuck out in the hallway.

**MS. CARTER:**     Why were you stuck out in the hallway?

**DAWN ROSE:**     Because he said we were going to be called as witnesses and wouldn't let us in here, and then never called anybody.

**MS. CARTER:**     Okay. So were you allowed in for any of it whatsoever?

Brief of Appellant
Eric Benson Skeens, Appellant

> **DAWN ROSE:**    Uh, when they came back with the verdict.
>
> **MS. CARTER:**    And that's it? Just for the verdict?
>
> **DAWN ROSE:**    Mm-hmm.

Tr. at pp. 160 – 64.

There was no good reason for Trial Counsel not to have cross-examined K.W. nor was there a good reason for his failure to call J.S., the occurrence witness, and Dawn Rose, the former fiancée whose testimony would have been incredibly helpful to the jury. A similar case is *Pavel v. Hollins*, 261 F.3d 210, 216 – 26, 223, 228 (2d Cir. 2001)(wherein a federal court found ineffective assistance of counsel where trial counsel did not prepare a defense, failed to call two important fact witnesses, and did not call a medical expert).

*Trial Counsel compounded the problems when he indoctrinated the jury with the State's theory.*

Trial counsel told the jury "I believe her" multiple times in reference to K.W.'s allegations against Skeens. Throughout the defense's closing argument, Mr. Thonert repeatedly used phrases referencing Skeens' guilt. These statements worked in tandem with the State's final (rebuttal) closing argument. Trial counsel further stated: "it's more than likely that he committed each of these crimes." Tr. at p. 661, Lines 4 -6. Trial counsel continued: "you can believe her . . . it's more likely than not . . . you can believe her." Tr. at p. 664, Lines 6 -9. Trial counsel said: "it doesn't mean that you cannot believe her." Tr. at p. 673, Lines 6 – 7. Mr. Thonert told the jury: "I believe her, it's more likely than not." Tr. at p. 673, Lines 8 – 9. Yet again Mr. Thonert threw his client under the bus: "you believe he is probably

Brief of Appellant
Eric Benson Skeens, Appellant

guilty." Tr. at p. 676, Lines 7 – 8. Mr. Thonert told the jury: "the evidence is shown

that Eric is probably guilty." Tr. at p. 676, Lines 11 – 12. Yet worse, Mr. Thonert

used the phrase "Eric is guilty." Tr. at p. 676, Line 17. Finally, Mr. Thonert used

this language: "That evidence is so great that each of you will return a vote and

come back and say that man . . . is a Class A felon." Tr. at p. 677, Lines 4 – 6.

The damaging phrases used by Mr. Thonert in the foregoing paragraph

worked in tandem with the State's rebuttal argument during closing. In its rebuttal,

the State claimed: "in these kinds of cases, it's either you believe the child, or you

don't. There's no in between. You either believe (Minor) or you don't." Tr. at p. 686,

Lines 6 – 8. Further, the prosecution urged: "if you believe her, you return a verdict

of guilty. If you don't, you return other verdicts." Tr. at p. 686, Lines 8 – 10. "I ask

you to believe (Minor)." Tr. at p. 686, Lines 14 -15. Finally, the State proclaimed:

"There is nothing to make you doubt her, everything to make you believe her." Tr.

at p. 686, Lines 17 – 19. This is not reasonably competent representation. When

combined with the complete lack of cross-examination – **not one question** – of the

child witness and the failure to present J.S. and Dawn Rose's strong defense

testimony it basically sealed Skeens's fate. There is a reasonable probability the

jury would have reached a different conclusion but for counsel's unprofessional

mistakes.

*Trial Counsel failed to properly prepare for the expert witnesses' testimony and did not adequately preserve his objection to same.*

Then-presiding Huntington County Circuit Court Judge Thomas Hakes

allowed expert testimony to be introduced that was not disclosed prior to trial.

Brief of Appellant
Eric Benson Skeens, Appellant

According to Indiana Rules of Trial Procedure 26(B)(4) and specifically

26(B)(4)(a)(i), the State was supposed identify the State's expert witnesses, the

subject matter upon which the experts were expected to testify, and to state the

substance of the facts and opinions to which the expert was expected to testify, and

to provide the defense a summary of the grounds for each opinion. Yet neither

Sharon Robison ("the SANE") nor Lynn Baker (K.W.'s play therapist at the Bowen

Center) were identified as experts and no information was provided in discovery, as

requested, other than their names and addresses; both of these witnesses taught

the jury, stated facts, gave their opinions and repeated K.W.'s prior statements in

the form of vouching and hearsay. The SANE even testified to damning statistics

from studies, yet neither she nor the State provided such studies themselves or

advance notice of such studies to defense counsel either in the discovery process or

during the trial. Without the discovery, Skeens was unable to properly and

adequately prepare. [Pet. Ex. 1, see specifically DA Tr. Vol. III at pp. 566:6 – 11;

587:15 – 588:16; 592: 4 – 7; 593: 10 – 18; 594: 15 – 25 (examples of SANE's

testimony) and 619:12 – 622:16; 625:14 – 630:22; 632:11 – 16 (examples of

Baker's)(pagination as in original paper transcripts)].

This testimony consisted of 79 pages (*Id*. at pp. 553 – 632); it was highly

unfair and prejudicial and was only meant to arouse the jury and to provoke its

instinct to punish Skeens. It is well settled that evidence is unfairly prejudicial only

if it "will induce the jury to decide the case on an improper basis, commonly an

emotional one, rather than on the evidence presented . . . ." (citation omitted) As a

Brief of Appellant

Eric Benson Skeens, Appellant

panel of this Court recited: "Evidence that appeals to the jury's sympathies, arouses

its sense of horror, provokes its instinct to punish, or triggers other mainsprings of

human action may cause a jury to base its decision on something other than the

established propositions in the case. (cite omitted) This is the type of evidence that

[Federal Rules of Evidence] Rule 403 excludes as being unfairly prejudicial. *See*

*United States v. Zeuli,* 725 F.2d 813, 817 (1st Cir. 1984)." *Stone v. State*, 536 N.E.2d

534, 539 (Ind. Ct. App. 1989)(quoting *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir.

1986)).

Here there was no disclosure of either the SANE or Baker as an expert

witness; disclosure was required because of their testimony regarding child

molesting and because they made inference based upon that specialized knowledge.

*See U.S. v. Oriedo*, 498 F.3d. 593, 602 – 03 (7th Cir. 2007)(disclosure of federal

agent as expert witness required only when agent's testimony regarding narcotics

trafficking officer requires giving his general opinion). In Skeens's case, the State

did not discover the experts' testimony; such was required because the SANE and

Baker gave testimony about typical characteristics of sexual abuse. *See U.S. v.*

*Kenyon*, 481 F.3d 1054, 1061 – 62 (8th Cir. 2007)(disclosure required because

medical expert gave testimony about specific, typical characteristics of sexual

abuse). Trial Counsel was ineffective for allowing these witnesses to testify as

experts because they were never identified as experts and because they never

disclosed their testimony prior to trial, in the discovery, as was requested and as is

Brief of Appellant
Eric Benson Skeens, Appellant

required by law. [Pet. Ex. 1, *see specifically* DA App. at pp. 22 – 23, 145 (pagination as in original paper appendix)]

Because Trial Counsel did not obtain the appropriate discovery, the State ambushed him with surprise testimony by the SANE. The SANE testified she teaches doctors about myths [Pet. Ex. 1, *see specifically* DA Tr. Vol. III at p. 566: 6 – 11]; for example, the SANE testified the hymen or "cherry" doesn't have to "pop" at intercourse. *Id.* at p. 588: 12 – 16. The SANE testified, "the most recent study out currently says ninety percent to ninety-five percent of pre-pubertal children, females, do not have any type of genital injury" (*Id.* at p. 592: 4 – 7); and if there was an injury it "would heal very quickly." *Id.* at p. 593: 10 – 18. Robison explained that for these reasons, she did not expect to find any injuries to K.W.'s genitals. *Id.* at p. 594: 15 – 25. Because the State withheld this key testimony from Skeens and did not disclose either the nature of the specialized testimony or the reports which the SANE referenced, it prevented Skeens from defending himself.

Trial Counsel should have deposed the SANE and should have filed a motion to suppress the illegal evidence. Had Trial Counsel exercised his due diligence and done so he could have argued to suppress the damaging and prejudicial testimony. For instance, consider the following. First, Robison testified that her clinic has examined 1,053 children "to date [July 2009]" for sexual assault. *Id.* at p. 555: 23 – 24. Robison also testified her clinic keeps the statistics on these children (*Id.* at p. 593: 5 – 9) and they are comparable to the national study (*Id.* at p. 601:20 -21) that

Brief of Appellant
Eric Benson Skeens, Appellant

says 90-95% of pre-pubertal females don't have any type of genital injury (*Id.* at p.

592: 4 – 7).

Trial Counsel should have argued – in support of a motion to suppress –  that

according to Robison's testimony it meant that K.W. who was examined on

December 8, 2008, was one of those 1,053 children "to date [July 2009]" that were

examined for sexual assault; and the only requirement for K.W.'s inclusion was

K.W.'s allegations, which Robison presumed to be true. Based upon Robison's

testimony, Trial Counsel should have argued that these studies were based entirely

on the presumption that every allegation from all 1,053 children was factually true

and accurate. These studies are not based on facts known to be true but upon

presumptions assumed to be true.

Skeens is now suffering punitive action (serving a 90-year sentence at the

Indiana State prison, which is for all intents and purposes a Life Sentence) as a

result of incredulous, prejudicial, and misleading studies that allowed the jury to

dismiss and discount the medical exam documenting everything was perfect. [Pet.

Ex. 1, *see specifically* DA Tr. Vol. III at pp. 590: 16 – 18; 604: 16 -24 (pagination as

in original paper transcripts)] Trial Counsel was ineffective because he failed to

move to suppress Robison's testimony after he failed to conduct an adequate

investigation before trial by not obtaining Robison's testimony in discovery or

through a deposition. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 – 87, 106 S.Ct.

2574, 2588 – 90, 91 L.Ed.2d 305, 326 – 27 (1986), (finding ineffective assistance

when counsel failed to move to suppress evidence because of counsel's failure to

40

Brief of Appellant
Eric Benson Skeens, Appellant

investigate), superseded by statute (AEDPA) on other grounds as stated in *Thomas v. Sullivan*, 2011 U.S. Dist. LEXIS 123371 at n.2; *see also People v. Donovan*, 184 A.D.2d 654, 654 – 56, 585 N.Y.S.2d 70, 71 – 72 (2d Dept. 1992)(ordering a new trial after attorney provided ineffective assistance of counsel by not moving to suppress certain evidence and by failing to conduct an adequate investigation before trial).

Trial Counsel's performance was below average because he made no effective challenge against the expert's testimony which was based upon unnamed studies. Trial Counsel's sub-standard performance resulted in prejudice. There is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. "A [']reasonable probability['] is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Skeens believes each of the errors listed above is sufficient to show the proceedings violated his right to counsel and impeded a fair trial. However, even if the Court concludes that individually the aforementioned errors do not constitute a Sixth Amendment right to counsel violation which prevented a fair trial, then the Court should give this case just and due consideration and conclude that cumulatively the errors prove by a preponderance of the evidence post-conviction relief is appropriate and should be granted.

**III.      Whether appellate counsel, Jeremy Nix, failed to properly represent Skeens in his direct appeal and thereby violated the Sixth Amendment right to counsel and prejudiced the outcome of the proceedings resulting in the conviction being upheld.**

Attorney Jeremy Nix ("Appellate Counsel") was appointed to represent Skeens for the sentencing hearing and also for his direct appeal. Tr. at p. 111.

41

Brief of Appellant

Eric Benson Skeens, Appellant

Appellate Counsel was appointed to Skeens for the sentencing hearing after Skeens

wrote a letter to the trial court "expressing his dissatisfaction with Mr. Thonert at

the conclusion of the trial." *Id.* Skeens, in his Nov. 30, 2018 Motion to Amend

Petition for Post-Conviction Relief alleged that Appellate Counsel "did not raise

issues that were preserved at trial. He also did not implement the *Davis-Hatton*

procedure to raise ineffective assistance of trial counsel as he was requested to do by

Skeens['s] letter to [Appellate Counsel]." App. Vol. II at p. 121.

"To prevail on a claim of ineffective assistance of appellate counsel, a

defendant must therefore show from the information available in the trial record or

otherwise known to appellate counsel that failed to present a significant and

obvious issue and that this failure cannot be explained by any reasonable strategy."

*Ben-Yisrayl v. State*, 738 N.E.2d 253, 261 (Ind. 2000). Skeens presents two claims

here: first, Skeens claims that Appellate Counsel failed to raise the issues that were

preserved at trial. Second, Skeens claims that Appellate Counsel failed to

implement the *Davis-Hatton* procedure which would have allowed the appeal to be

stayed until the ineffective assistance of trial counsel claims could be litigated at

the trial court level. *See Hatton v. State,* 626 N.E.2d 442, 442 (Ind. 1993).

*Appellate Counsel failed to raise the issues that were preserved at trial*

Appellate Counsel raised two issues in the direct appeal. First, he raised a

sufficiency issue, arguing that the evidence was insufficient to support Count IV

and that K.W.'s testimony in general was "incredible." [Pet. Ex. 1, see specifically

Brief of Appellant]. Second, he raised a two-part challenge to the sentence, arguing

Brief of Appellant
Eric Benson Skeens, Appellant

that the trial court abused its discretion in determining and weighing aggravating

and mitigating factors and that the overall sentence was inappropriate in light of

the nature of the offense and the character of the offender. *Id.*  A panel of this Court

rejected most of the arguments but found that the overall sentence imposed –187

years – was inappropriate in light of the nature of the offense and the character of

the offender. Therefore, the Court reduced Skeens's sentence to 90 years. *Skeens 1*

at *37 – *38.

*Appellate Counsel's decision to raise sufficiency over the preserved errors cannot be
explained by any reasonable strategy*

Appellate Counsel failed to raise the problems with the State's preventing

discovery of the computers Trial Counsel sought through pre-trial motions. The

December 10, 2008 probable cause / search warrant hearing was not transcribed.

Because Appellate Counsel did not review the proceedings, he cannot have made a

strategic decision to forego this issue. There were two main issues that were clearly

stronger than the sufficiency issue and should have been raised in the direct appeal.

First, there was the issue involving the computers and the State's preventing the

discovery of exculpatory evidence which has been discussed at length in the

previous sections. Suffice it to say, Skeens believes Appellate Counsel should have

raised that issue and would have done so had he obtained the hearing from the

probable cause / search warrant hearing. Skeens would incorporate those previous

arguments here as well. The second issue involves objections that were made to

hearsay testimony and violations of the right to confront the State's witnesses,

particularly the expert witnesses.

Brief of Appellant
Eric Benson Skeens, Appellant

Skeens's right to confrontation was denied during the SANE's testimony.

Skeens did not have access to the hearsay (studies the SANE mentioned) relied upon by the expert witness and that violated his right to confrontation because he did not have the opportunity to cross-examine the persons who prepared the data on which the expert opinion was based. The SANE testified: "the most recent study out currently says ninety percent to ninety-five percent of pre-pubertal children, females, do not have any type of genital injury." [Pet. Ex. 1, *see specifically* DA Tr. Vol. III at p. 594: 4 – 7 (pagination as in original paper transcripts)]. Trial Counsel objected and preserved this issue for direct appeal:

> **TRIAL COUNSEL:**     Objection . . . I cannot confront and cross-examine, she's referring to a study that has not been identified or any foundation laid, we don't know what child was studied, how many children, what the circumstances were or whether it had anything to do with the facts upon which this case is based so, we'd have to object, hearsay, cannot confirm [sic] and cross-examine and this studies never been disclosed to uh, the discovery to the defense so that we could examine it. I have no idea what she's talking about. [*Id.* at p. 592: 13 – 23]

Admission of expert testimony based largely on hearsay may violate a criminal defendant's right to confrontation, unless the defendant has the opportunity to cross-examine the persons who prepared the data on which the expert opinion is based. Skeens clearly did not have access to the hearsay information relied upon by the expert witness. *U.S. v. Lawson*, 653 F.2d 222 at p. 302 and n.8 (7th Cir. 1981), cert. denied 102 S.Ct. 1017 (effective cross-examination is impossible unless the criminal defendant has access to the hearsay information relied upon by the expert witness). This hearsay was the sole instrument which allowed the jury to disregard and discount the medical exam that stated there were

44

Brief of Appellant

Eric Benson Skeens, Appellant

no signs of injury from head to toe including K.W.'s hymen. [Pet. Ex. 1, see

specifically DA Tr. Vol. III at p. 590: 16 – 18 (pagination as in original paper

transcripts)].

The right to effective appellate counsel was not adequately safeguarded

because the brief Appellate Counsel submitted contained no reference to defense

counsel's objections at trial including conditioning the jury, hearsay, vouching,

uncharged misconduct, the prosecutor's having testified on behalf of K.W., etc. [Pet.

Ex. 1, *see specifically* DA Tr. Vol. 1 at pp. 169: 3 – 6; 173: 8 – 10; 173:16 – 175:11;

Vol. II at pp. 421:15 – 16; 415: 11 – 14; 416:16 – 18; 440:11 – 22; Vol. III at pp. 524:8

–9; 529:13 – 19; 543: 1 – 10; 547:4 – 548:3; 576:16 – 21; 578:10 – 584:12; 591:8 – 13;

592:13 – 24; 594:1 – 6; 595:11 – 17; 607:10; 608:21; 612:3; 619:22 – 622:10; 625:14 –

630:22; 632:5; 651:2 – 10 (pagination as in original paper transcripts)] Failing to

raise **any** of the preserved issues does not satisfy the Sixth Amendment right to

counsel. *See People v. Stokes*, 95 N.Y.2d 633, 638 – 639, 744 N.E.2d 1153, 1156, 722

N.Y.S.2d 217, 220 (2001)(finding defendant's right to appellate counsel was not

adequately safeguarded because the brief submitted by appellate counsel contained

no reference to the evidence or to defense counsel's objections at trial). Appellate

Counsel was ineffective for not properly raising the issues that were preserved for

direct appeal. There is a reasonable probability Skeens could have received a better

outcome had his appeal been handled properly.

Brief of Appellant
Eric Benson Skeens, Appellant

*Appellate Counsel's decision not to pursue the Davis-Hatton procedure cannot be explained by any reasonable strategy.*

When asked why he did not pursue the *Davis-Hatton* procedure on behalf of Skeens, Appellate Counsel testified that it was not in his contract. Tr. at pp. 119 – 120. Appellate Counsel could not recall if he explained to Skeens how he would go about doing so. Because Skeens believed his previous attorney was ineffective and did not adequately represent him, as is evidenced by Appellate Counsel's having replaced Trial Counsel for the sentencing hearing, it was below average representation to have foregone the *Davis-Hatton* procedure, especially in a fact-sensitive case such as this where the State's case rested upon the uncorroborated testimony of one witness. There is a reasonable probability that, had the Record been properly developed prior to the direct appeal being completed, the outcome would have been different. The proceedings violated the Sixth Amendment right to counsel and prevented Skeens from receiving a fair trial, which is his right under the Constitution.

## Conclusion

The mistakes at trial and on appeal, both by the State's agent Hunnicutt and by the attorneys, prejudiced the outcome of the case and prevented Skeens from receiving a fair trial. The convictions should be overturned and the case remanded so that Skeens can have a new and fair trial.

Respectfully submitted,

/s/Cynthia M. Carter
Atty No. 23305-49
*Counsel for Skeens*

Brief of Appellant
Eric Benson Skeens, Appellant

## Word Count Verification

I, Cynthia M. Carter, verify that the foregoing Brief of Appellant contains no more than 14,000 words.

/s/Cynthia M. Carter

## Certificate of Service

I, Cynthia M. Carter, verify that a true and accurate copy of the foregoing was served upon the Indiana Attorney General, Curtis T. Hill, via the Court's Electronic Filing System this 10th day of August, 2020.

/s/Cynthia M. Carter