UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ERIC BENSON SKEENS,

               Petitioner,

    v.                                    CAUSE NO. 3:21-CV-692-DRL-MGG

WARDEN,

               Respondent.

<u>OPINION AND ORDER</u>

Eric Benson Skeens, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2009 child molestation conviction in Huntington County. For the following reasons, the court denies the petition.

BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state courts are correct, unless Mr. Skeens rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals set forth the facts underlying Mr. Skeens's conviction as follows:

> K.W. was born to R.W. ("Mother") in April 2000. Skeens, who was born on June 22, 1980, met Mother in 2003 and married Mother in December 2004. Skeens and Mother were divorced in June 2006, but they, along with K.W., continued to live together. K.W. thought of Skeens as her "dad." In September 2007, Skeens, Mother, and K.W. moved into a home on Williams Street in Huntington, Indiana. Skeens's son also lived at the home "on and off." Skeens would care for K.W. while Mother was at work. In June 2008, Mother moved with K.W. to another home on Wabash Circle in Huntington. However, even after moving to Wabash Circle, Mother continued to allow Skeens to visit with and care for K.W. because K.W. "thought of him as her dad." K.W. would spend, on average, three nights

per week at Skeens's house. In September 2008, Skeens moved to Warsaw, Indiana, but Mother would still make arrangements for Skeens to have K.W. on some weekends.

During the period of time between September 2007, when Skeens, Mother, and K.W. moved to Williams Street, and November 2008, Skeens subjected K.W. to a variety of sexual encounters. Mother would be "either at the grocery store, some type of store or [ ] she was at work." Skeens removed both his and K.W.'s clothing and placed her on top of a bathroom sink, and he had sexual intercourse with K.W. which "hurt" K.W. Skeens placed a towel underneath K.W. "to wipe up white stuff that came out" of her vagina. Afterwards, Skeens would ask K.W. to go to the bathroom, and her vagina "kind of burned."

Also, Skeens would remove his and K.W.'s clothing in either the living room, Mother's bedroom, or the bathroom and "put his tongue" on K.W.'s vagina. When in either the living room or bedroom, Skeens would remove both his and K.W.'s clothing, and K.W. would be "laying down" on her back and Skeens was "[l]ike under [her] .... like under [her] legs sort of," which were "separated." Skeens would use his tongue to "lick [ ]" K.W.'s vagina which felt "[w]et" and "[w]eird" to K.W. When Skeens would put his tongue on K.W.'s vagina in the bathroom, K.W. would be "in the same position" on top of the sink as when Skeens had sexual intercourse with her. Skeens would be "kind of squatting."

Further, Skeens would touch K.W.'s vagina with his fingers in the living room, the bathroom, and the bedroom. Skeens would remove his and K.W.'s clothes and "rub" her vagina "in circles" using one finger on each hand. Skeens would also rub "the part of [K.W.'s vagina] where [she goes] potty" using one finger "on both hands and then sometimes two fingers." Skeens would also make K.W. put his penis in her mouth in the living room and the bedroom. Skeens would remove his and K.W.'s clothes, and K.W. would lay on the floor on her back and Skeens would be "laying on top of [her] with his hands like sort of pushing up." Skeens would then put his "private" in K.W.'s mouth and "[h]e would sort of push." His "private" was "[s]ort of like a long type of mushroom shape," with "a triangle at the top with the top corner kind of curved" and a "hole." His penis felt "[w]eird" and "[k]ind of smooth."

Skeens would also touch K.W.'s "boobs" with his finger and his tongue. Skeens would remove K.W.s and his own clothing and lick "sometimes one, sometimes both" of K.W.'s breasts. He would similarly "rub" either one or both of K.W.'s breasts with his finger. During some of the incidents in the

living room when Skeens would touch K.W.'s "privates" with "[h]is tongue, his finger and ... his private," Skeens would show K.W. movies "that had people touching each other." He would show K .W. the movies, including one called "real sex," on a "flat screen" television by "download[ing] [them] from his computer. . . ." The movie would depict "three or four people and they were touching each other[']s privates."

There was one incident when Skeens tried to touch K.W., and K.W. told Skeens "no," and she attempted to "go downstairs and [she] was like on the first step and then [Skeens] said if you don't come back here and do this with me, I'll call the police on you and they'll tell your mom." K.W. "went back [because she] was scared." Skeens then "touch[ed] [K.W.'s] privates."

If Skeens's son was home during these encounters, Skeens would "get him to go out of the room." Once, Skeens told his son to "go play with your cars, I just bought those for you." Skeens's son told Skeens that "no I want to go play with [K.W.]," and Skeens went with his son to play with the cars for "a few minutes and then [Skeens] would say, oh, I'll be right back and then he would go and touch [K.W.'s] privates." Skeens would also lock the bedroom door to keep his son out of the room. Skeens's son "would knock on the door . . .  [and] would say dad, let [me] in there." Skeens would say "yeah," but then he would not go to the door. Skeens told K.W. to not tell anyone about the touching, and that if she did K.W. would "get in big trouble." K.W. once tried to tell Mother about Skeens but K.W. "got scared" because she "thought that [Mother] wouldn't believe [her] and then like [K.W. would] get in big trouble."

On December 5, 2008, the school counselor at K.W.'s elementary school showed a video to the class titled "Breaking the Silence, Children Against Child Abuse" and the video included "two segments . . . one on physical abuse and one on sexual abuse." After the sexual abuse segment of the video, the counselor directed the class to write in their "reflection journals," and to "write the word help on their paper" if they needed help. While the counselor was "walking around the different table clusters," K.W. "raised her hand and whispered [']this happened to me.[']" The counselor told K.W. that she would speak to her about it later, but when the children were leaving for lunch K.W. "asked again, [']can I talk to you about this, this happened to me,['] " and the counselor "told [K.W.] [she] would come get her after lunch." Again, however, K.W. "found [the counselor] first," when K.W. "was walking from lunch towards recess and stopped by [the counselor's] room and said [']can I please talk to you right now?[']" After their conversation, the counselor called the Department of Child Services and repeated what K.W. had reported to her.

Later that day, Nicole Allen, a family case manager at the Department of Child Services, met with Mother to "discuss . . . the nature of the report that [she] had received." Mother was "shocked, in disbelief [ ], immediately just started crying and just wasn't sure what to think about the whole situation. . . . " Mother agreed to take K.W. out of school and bring her to a child advocacy center in Huntington for an interview. At the interview, conducted by Allen, K.W. used age appropriate language and descriptions of the events that took place between K.W. and Skeens, and K.W. "gave a lot of information, very detailed information about the abuse." Mother also reported that it had been two weeks since Skeens had seen K.W.

On December 8, 2008, Mother, Allen, and Detective Mel Hunnicutt transported K.W. to the Fort Wayne Sexual Assault Treatment Center for a physical examination. K.W. was seen by Sharon Robison, a sexual assault nurse examiner. Robison conducted a genital examination and concluded that her genitals were "normal," meaning that "her hymen was perfect . . . [T]here was no [ ] injury to her hymen and her anus was perfect also."

On December 16, 2008, K.W. began seeing Lynn Baker, a counselor at the Bowen center in Huntington. K.W. continued to see Baker once a week to help her deal with "behavioral issues," including K.W.'s nightmares and bed-wetting. Most of the sessions were in the play therapy room, which "is used to allow a child to use any of the therapeutic toys available . . . in a way that they need in order to work through why they're there."

On December 10, 2008, the State charged Skeens with Count I, child molesting as a class A felony which alleged that Skeens performed or submitted to sexual intercourse with K.W.; Count II, child molesting as a class A felony which alleged that Skeens performed oral sex on K.W.; Count III, child molesting as a class A felony which alleged that Skeens submitted to oral sex from K.W.; Count IV, child molesting as a class A felony which alleged that Skeens penetrated K.W.'s female sex organ with an object; and Count V, child molesting as a class C felony which alleged that Skeens touched or fondled K.W. with the intent to arouse or satisfy his own or K.W.'s sexual desires.

On July 21, 2009, the trial court held a jury trial. At trial, Sharon Robison testified that, for victims of sexual abuse ages zero to thirteen, there is a seventy-two hour window after vaginal penetration and a twenty-four hour window after an "oral . . . or anal assault" to collect DNA samples. Robison also testified that K.W. told her that Skeens "would put his fingers inside [her] private and would suck [her] boobs." Robison testified that it is

not common to find evidence of penetration in a young child "[b]ecause the hymen is elastic tissue that expands and goes back. . . ." Robison also testified that recent studies have concluded that eighty-five to ninety-five percent "of pre-pubertal [female] children [who have been molested] . . . do not have any type of genital injury." Robison testified that this is so because "the internal female sex organ is [ ] very vascular, which means there's a lot of blood flow. . . . [A]ny injury to that area would heal very quickly," and that based upon the information provided by K.W. "and the time lapse between ... the last time it happened and the time that she came to see [her]," she did not expect to find any injuries to K.W.'s genitalia. Robison also testified that she did not do any DNA collection because "[i]t was past the time frame."

Baker testified at trial that it is "common for younger children to delay or wait to tell about sexual abuse." When asked whether K.W. was prone to exaggerate in sexual matters, Baker testified that "quite the opposite, it's been very, very uncomfortable for her to talk about anything that's happened." Baker also testified that K.W.'s behavior at "her play therapy reflects [ ] a child as extremely in emotional pain. The farther we move in to what's actually happened in the abuse the more painful she feels."

On July 23, 2009, the jury found Skeens guilty as charged. On August 31, 2009, the trial court held a sentencing hearing, identified the aggravating and mitigating circumstances, and found that the aggravators outweighed the mitigators. The court sentenced Skeens to forty-five years each for Counts I–IV, and to seven years for Count V. The sentences were ordered to be served consecutively in the Department of Correction. Thus, Skeens's aggregate sentence was for 187 years.

*Skeens v. State*, 932 N.E.2d 258 (Table), 2010 WL 3332137, 1-4 (Ind. Ct. App. Aug. 25, 2010)

(internal citations omitted).

On appeal, Mr. Skeens argued that the evidence was insufficient to support his conviction and also challenged the length of his sentence. *Id.* at 5-13. The Indiana Court of Appeals determined that K.W.'s testimony was sufficient evidence to support his conviction. *Id.* at 5-7. The court agreed with Mr. Skeens that his sentence was inappropriately long and reduced it to 90 years. *Id.* at 7-14. Mr. Skeens raised the

sufficiency of the evidence claim in a petition to transfer to the Indiana Supreme Court (ECF 14-6), which was denied (ECF 14-2 at 5).

On January 27, 2011, Mr. Skeens filed a *pro se* petition for post-conviction relief, which he later amended with counsel. He asserted ineffective assistance of trial and appellate counsel and other claims. The state court held a hearing on the petition. Mr. Skeens, represented by counsel, called numerous witnesses including his trial and appellate attorneys (ECF 15-18, 15-19). The state also called witnesses and presented an affidavit from K.W., now living in Missouri, who stood by her trial testimony. The trial court issued a lengthy opinion denying the petition (ECF 15-14 at 61-70; 15-15 at 1-14).

On appeal, Mr. Skeens asserted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), and numerous claims of ineffective assistance by trial and appellate counsel. *Skeens v. State*, 163 N.E.3d 284 (Table), 2020 WL 7019315, 2-6 (Ind. Ct. App. Nov. 30, 2020). The Indiana Court of Appeals summarized his trial counsel claims as alleging that counsel (1) failed to preserve issues related to the mother's computers; (2) failed to obtain police disciplinary records for Detective Hunnicutt; (3) failed to present a "vigorous" defense; (4) failed to prepare for and object to expert witness testimony; and (5) improperly bolstered the prosecution's case during closing arguments. *Id.* He also argued that appellate counsel should have "raised the issues that were preserved at trial" and should have pursued an early post-conviction petition through Indiana's *Davis-Hatton* procedure. *Id.*

The Indiana Court of Appeals affirmed the denial of post-conviction relief. *Id.* at 6. The court first concluded that Mr. Skeens had waived his *Brady* claim because it was

known and available at the time of his direct appeal but was not raised. *Id.* at 2-3. The court then considered his trial counsel claims and concluded that his counsel was not ineffective. *Id.* at 4-6. Instead, the court concluded that counsel had made reasonable strategic decisions regarding the issues Mr. Skeens pointed to, and that Mr. Skeens did not establish deficient performance or prejudice. *Id.* Finally, the court analyzed Mr. Skeens's claims about appellate counsel's performance. *Id.* at 6. The court concluded that Mr. Skeens did not sufficiently identify which issues counsel should have pursued on appeal, "let alone what the arguments might be" in support of those issues. *Id.* The court noted that counsel obtained a 90-year reduction in Mr. Skeens's sentence based on the arguments he did raise. *Id.* The court further concluded that Mr. Skeens failed to show that appellate counsel was deficient or that he was prejudiced by counsel's decision to forego relief under *Davis-Hatton*. *Id.* Mr. Skeens raised these same issues in a petition to transfer to the Indiana Supreme Court, which was denied. *Skeens v. State*, 171 N.E.3d 614 (Ind. 2021). The United States Supreme Court denied his petition for a writ of certiorari. *Skeens v. Indiana*, 142 S. Ct. 722 (2021).

In August 2021, Mr. Skeens petitioned the Indiana Court of Appeals for leave to file a successive petition for post-conviction relief to pursue a number of new claims (ECF 14-14). His request was denied, as the court concluded that he "failed to establish a reasonable possibility that [he] is entitled to post-conviction relief" under Indiana law (*Id.* at 2).

Mr. Skeens then turned to federal court. In his amended petition filed on September 29, 2021, he raises the following claims: (1) "the Huntington Circuit Court

through its agents (i.e., court reporter, prosecutor, judge) obstructed justice when it intentionally tampered with the audio recording of Skeens' trial;" (2) "the trial proceedings were in violation of *Brady v. Maryland* and *Napue v. Illinois* when by official misconduct, the state's agent, then-detective Melbourne Hunnicutt committed perjury multiple times;" (3) "the state violated Indiana Trial Rule of Procedure 26 . . . when it withheld expert witness testimony that was specifically requested on numerous occasions;" (4) his trial counsel was ineffective in that he (a) failed to request a mistrial when a potential juror "tainted" the jury pool, (b) failed to "preserve issues related to Mother's computers," (c) failed to obtain police disciplinary records for Detective Hunnicutt, (d) failed to properly "prepare for and object to expert witness testimony," (e) improperly bolstered K.W.'s credibility with a comment he made during closing argument, and (f) failed to present a "vigorous defense," including failing to call Mr. Skeens' son and his former fiancée as witnesses and failing to crossexamine K.W. about a birthmark on his penis; (5) his appellate counsel was ineffective in failing to raise certain issues on direct appeal; (6) his post-conviction counsel provided ineffective assistance in that she "forwent meritorious claims against [his] express wishes;" (7) the state did not present sufficient evidence of his guilt because there was no physical evidence of sexual abuse; (8) the trial court "abused its discretion and entered an inappropriate sentence" that did not adequately consider his proposed mitigating factors; and (9) his conviction should be vacated because of "[t]he cumulative effect of all the Grounds in this petition including: (1) obstruction of justice; (2) illegal misconduct by the state and its agents; and

(3) ineffective assistance of counsel, etc." which "prejudiced Skeens" and "prevented [him] from obtaining the proper relief from the courts." (ECF 7 at 1-65).

ANALYSIS

Mr. Skeens's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which allows a district court to issue a writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas corpus was intended as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Gilbreath v. Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021) (citation and quotations omitted). The court can grant an application for habeas relief if it meets the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959 F.3d 819, 832 (7th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a

'substantially higher threshold.'" *Hoglund*, 959 F.3d at 832 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). In effect, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A.     *Audio Recording of Jury Selection*.

In claim one, Mr. Skeens argues that "the Huntington Circuit Court through its agents (i.e., court reporter, prosecutor, judge) obstructed justice when it intentionally tampered with the audio recording of Skeens' trial." In effect, he claims that the jury pool was tainted by the comments of a potential juror during voir dire. Although the official transcript and audio recording do not contain the comments he claims she made, he speculates that court staff and/or the prosecutor tampered with the audio recovering to cover this up. The respondent argues that this claim is procedurally defaulted and without merit under AEDPA standards.

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Hoglund*, 959 F.3d at 832. The exhaustion requirement is premised on a recognition that the state courts must be given the first opportunity to address and correct violations of their prisoners' federal rights. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claim in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845. This includes seeking

discretionary review in the state court of last resort. *Boerckel*, 526 U.S. at 848. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground, or when the claim was not presented to the state courts and the time for doing so has passed. *Davila*, 137 S. Ct. at 2064; *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

As the respondent points out, Mr. Skeens raised a claim in the post-conviction proceedings about comments made by a potential juror, Brenda Armbruster.[1] However, his claim was that Ms. Armbruster made comments that were not contained in the official transcript; he did not claim that court staff had tampered with the audio recording of the trial, which is the claim he presents today.

To understand the distinction, some background is necessary. Mr. Skeens's claim centers on Ms. Armbruster's brief involvement in this case as a potential juror. The record reflects that during the course of voir dire, defense counsel was questioning eight potential jurors, including Ms. Armbruster, about whether they could presume Mr. Skeens to be innocent. Ms. Armbruster raised her hand in response to counsel asking whether anyone would have difficulty presuming that Mr. Skeens was innocent (ECF 15-8 at 8). Counsel then questioned the eight potential jurors as to whether they could listen to the evidence and reach a verdict based on the evidence. Ms. Armbruster stated: "Um,

---

[1] This individual is now known as "Brenda Waite," but to avoid confusion, the court refers to her as Ms. Armbruster, the name she was known by at the time of Mr. Skeens's trial. The court notes that Ms. Armbruster was at times identified as "Potential Juror #19" in the trial transcript.

I was married to a police officer about, for ten years. I worked security at Marshall Fields for twelve years. Ninety-nine percent—" At that point, defense counsel interrupted her and stated, "Well, wait, wait, wait ma'am and I apologize, uh, but let me just come to you or we might have . . . " Ms. Armbruster responded, "Okay." (ECF 15-8 at 10). Defense counsel then proceeded to question other jurors about other matters. Thereafter, a bench conference was held out of earshot of the jurors.

Portions of the bench conference were inaudible, but the court stated in apparent reference to Ms. Armbruster: "[U]nless there's an objection . . . I'm going to let her go."[2] (*Id.* at 40). The prosecutor stated something that was inaudible, and the court responded: "I know, but she also started to go into what he was arguing to begin with. I'm not going to take a chance on asking her something and then we have her screw up, we've spent too much time already so I'm going to take her out for cause." (*Id.*). Thereafter, the bench conference ended, and the court released six of the eight potential jurors, including Ms. Armbruster (*Id.* at 42). There was no further mention of her during the course of jury selection or the remainder of the trial.

In the post-conviction proceedings, Mr. Skeens's attorney submitted an affidavit from Ms. Armbruster dated July 31, 2018, in which she attests as follows:

> I was seated in the jury box being questioned as a potential juror during *Voire Dire* [sic] when I made these statements to the courtroom:
>
> *I was married to a police officer for about 10 years. I worked security at Marshall Fields for twelve years. Ninety-nine percent of the time there is no evidence of*

---

[2] Although Mr. Skeens attributes the poor quality of the audio to malfeasance by court staff and/or the prosecutor, his appellate attorney testified at the post-conviction hearing that based on his experience in reviewing many trial transcripts, "jury selection is often very difficult to pick up in the transcript" (ECF 15-18 at 120).

> *sexual abuse but one-hundred percent of the time it occurred. I don't need to see any evidence to know he's guilty, because I know for a fact he is. Nobody makes up stories about being sexually abused. He is guilty beyond a reasonable doubt he doesn't deserve a trial, and he should go straight to jail. I am familiar with cases similar to this and they didn't have any evidence either but they were guilty. I have a friend who is a nurse at the Fort Wayne Sexual Assault Unit. She told me there is almost never any evidence in these types of cases and that is why people like him almost always get away with it.*

(ECF 13-1). Given the discrepancy between her affidavit and her testimony in the official transcript, the state sought production of the original audio recording from Mr. Skeens's trial so that the parties could listen to it. This request was granted (ECF 15-13 at 149, 177).

At the post-conviction evidentiary hearing, Mr. Skeens's attorney acknowledged that she had listened to the audio recording and did not "hear anything like" the statements contained in Ms. Armbruster's affidavit on the tape (ECF 15-18 at 246). Counsel further acknowledged that she did not hear "any muffled talking or anything like that on the tape" to suggest that Ms. Armbruster was still talking after being interrupted by defense counsel. In other words, the audio recording firmly undercut Mr. Skeens's claim. The post-conviction court denied his request to admit the affidavit from Ms. Armbruster, and he abandoned this claim in his proposed findings fact and conclusions of law (ECF 15-14 at 37-60). He also did not present this claim in his brief to the Indiana Court of Appeals filed by counsel or his *pro se* petition to transfer to the Indiana Supreme Court (ECF 14-9; ECF 14-13). It is thus defaulted.

He presented a claim in his petition seeking authorization to pursue a successive post-conviction petition that the audio recording of *voir dire* had been tampered with by court staff or the prosecutor. However, the Indiana Court of Appeals denied his request

for authorization, concluding that he did not meet the state law requirements for pursuing such relief. Because he did not pass the screening procedure, he was procedurally barred from presenting his claims. *See Baird v. State*, 831 N.E.2d 109, 115 (Ind. 2005). The state court's determination that he did not satisfy the standard for pursuing a successive post-conviction petition under state law constitutes a state procedural ground that precludes federal habeas review.[3] *See Thomas v. Williams*, 822 F.3d 378, 384–85 (7th Cir. 2016) ("[W]here the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements . . . the state court judgment rests on an independent and adequate state ground"); *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010) ("[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . . that decision rests on independent and adequate state law grounds.").

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice. *Davila*, 137 S. Ct. at 2064. "Cause" in this context means "an objective factor external to the defense that impeded the presentation of the claim to the state courts," and only applies to factors that "cannot fairly be attributed to the prisoner." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th

---

[3] Mr. Skeens claims that he filed a petition to transfer to the Indiana Supreme Court seeking review of the Indiana Court of Appeals' determination that he could not pursue a successive petition, but if he did, the petition was procedurally improper, because there is no right to review of such decisions under state law. *See* Ind. S. Ct. R. 57(B) ("an order declining to authorize the filing of a successive petition for post conviction relief [] shall not be considered an adverse decision for the purpose of petitioning to transfer").

Cir. 2018) (citation and internal quotation marks omitted). A habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice because he is actually innocent. *House v. Bell*, 547 U.S. 518, 536 (2006).

In his traverse, Mr. Skeens argues that errors by his post-conviction counsel caused the default and should be excused. Attorney error rising to the level of ineffective assistance of counsel can amount to cause sufficient to excuse a procedural default. *Davila*, 137 S. Ct. at 2065. As a general rule, however, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause" to set aside a procedural default. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). The Supreme Court has recognized an exception wherein ineffective assistance by post-conviction counsel can provide cause to set aside the default of a claim of ineffective assistance by trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). This so-called *Martinez-Trevino* exception applies to prisoners in Indiana. *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). It is of no benefit to Mr. Skeens, however, because *Martinez-Trevino* is a narrow exception that applies solely to review of defaulted claims of ineffective assistance by trial counsel, not to other types of defaulted claims. *Davila*, 137 S. Ct. at 2065-66. Thus, alleged errors by post-conviction cannot be used to obtain review of a defaulted claim pertaining to the audio recording of Mr. Skeens's trial.

Assuming for the sake of argument that Mr. Skeens could overcome the procedural default, the respondent alternatively argues that the claim lacks merit. The court agrees. As a preliminary matter, Ms. Armbruster's affidavit is not part of the state

court record because the post-conviction court denied his request to admit the affidavit and he did not pursue the matter further in his post-conviction appeal. Mr. Skeens nevertheless asks the court to consider the affidavit in connection with his federal petition. He filed two motions related to the affidavit. The first asks that the court arrange a "polygraph" test before an "independent polygraph examiner . . . so that he can read aloud the 'Affidavit of Brenda [Armbruster]' and then answer the following questions: 1. Is Brenda [Armbruster's] affidavit a true and accurate record or events? 2. Did the prosecutor shake her head 'no' to the court reporter during Brenda [Armbruster's] testimony, as recorded in her affidavit? 3. Did the court reporter react to said 'no'?" (ECF 10). His second motion asks that the court conduct a "deposition" of Ms. Armbruster to "preserve" her testimony "should something happen" to her (ECF 13).

A federal habeas court generally does not engage in fact-finding, and instead AEDPA permits the court to expand the record in only very narrow circumstances. 28 U.S.C. § 2254(e)(2); *see also Boyko v. Parke*, 259 F.3d 781, 789-90 (7th Cir. 2001) (observing that a federal habeas court's ability to supplement the record is "severely circumscribed"). In general, the court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A habeas petitioner is entitled to a hearing to expand the record only when his factual allegations "if true, would entitle [him] to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Conversely, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Additionally, a habeas petitioner is entitled to develop

the factual basis for his claim in federal court only when "the factual predicate could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). The court is precluded from expanding the record when there has been a "lack of diligence" by the petitioner in developing his claim in the state proceedings. *Williams v. Jackson*, 964 F.3d 621, 631 (7th Cir. 2020). "Diligence requires that a prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court, even if those efforts are unsuccessful[.]" *Id.* (citation and internal quotation marks omitted).

Mr. Skeens has not made the necessary showing of diligence. He was represented by two attorneys at the post-conviction hearing, and his counsel made a vigorous effort to subpoena and present testimony from a number of witnesses to support his claims. However, Ms. Armbruster was not called as a witness so that her account could be tested through the adversarial process. Indeed, the prosecutor complained that the state had not even been given contact information for Ms. Armbruster so that it could explore the circumstances surrounding her affidavit. At the post-conviction hearing, Mr. Skeens' attorney acknowledged that she had listened to the audio recording of the trial and that there was nothing on it to support Ms. Armbruster's account. Although several witnesses testified on Mr. Skeens' behalf at the post-conviction hearing, none of them were asked about this alleged outburst by Ms. Armbruster or the alleged tampering with the audio recording by court staff. The prosecutor who handled Mr. Skeens' criminal trial also handled the post-conviction proceeding and could have given her account of what occurred had Mr. Skeens pursued the issue further. He did not do so when he had the

opportunity; instead, he abandoned the claim in the trial court and then failed to present it on appeal. He has not made the requisite showing of diligence to expand the record at this late stage.

Furthermore, even if the court were to consider Ms. Armbruster's affidavit, it would not entitle Mr. Skeens to federal habeas relief. The official transcript of Mr. Skeens' trial reflects that Ms. Armbruster did not say anything after "ninety-nine percent," at which point she was cut off by defense counsel. Ms. Armbruster's eleventh-hour affidavit is not enough to rebut the presumption that the official transcript is accurate. The last court to consider this issue was the trial court, which concluded in the post-conviction proceedings that "[t]he voir dire process, including the bench conferences conducted during voir dire, were recorded and transcribed accurately" (ECF 15-15 at 10). The court also found "no evidence that audible portions of voir dire for Brenda Armbruster were erroneously indicated as 'inaudible' in the trial transcript, nor is there any evidence that a portion of Brenda Armbruster's voir dire is missing from the trial court's audio recording" (*Id.*). This factual finding is binding on habeas review unless Mr. Skeens' rebuts the presumption of correctness that attaches with "clear and convincing evidence," which he has not done. 28 U.S.C. § 2254(e)(1).

It is worth noting that nearly a decade passed between Ms. Armbruster's jury service and her signing the affidavit. Nowhere does she or Mr. Skeens explain how she could recall verbatim the statements she made at a stranger's trial ten years earlier. This is not to say that she is necessarily lying; she may be misremembering the point at which Mr. Skeens' trial attorney cut her off, or perhaps she may have spoken under breath so

that no one else—including Mr. Skeens' post-conviction counsel listening to the audio recording years later—could hear what she said. If Mr. Skeens' post-conviction counsel could not hear her alleged statements when actively listening for them, there is no basis to believe that other members of the jury pool heard them either. Indeed, Mr. Skeens apparently misheard what she said, as he claimed in his *pro se* post-conviction petition filed years ago that she told the jury pool she had "a previous job in a sex related medical field," which is clearly not accurate (*see* ECF 15-13 at 20).

The court also finds it highly implausible that Mr. Skeens' trial counsel and the trial judge would have simply sat by and said nothing while Ms. Armbruster engaged in a lengthy monologue about Mr. Skeens' guilt. The record reflects that defense counsel was a vigorous advocate for Mr. Skeens' interests throughout the trial, and that both he and the trial judge were specifically attuned to the issue of potential jurors prejudicing the jury pool. They were clearly attuned to the need to prevent Ms. Armbruster from tainting the jury pool after she acknowledged she would have difficulty listening to the evidence and presuming him to be innocent. The official transcript reflects that defense counsel took quick action to cut her off when she began speaking about her knowledge of other cases and that he did in fact prevent her from making such statements. A short time later, the court excused her for cause from further jury service. Mr. Skeens has not demonstrated that he is entitled to expand the record to obtain consideration of the affidavit, nor has he demonstrated that if the affidavit were considered, he would be entitled to federal habeas relief. Claim one is denied.

B.     *Brady/Napue*

In claim two, Mr. Skeens asserts that "the trial proceedings were in violation of *Brady v. Maryland* and *Napue v. Illinois* when by official misconduct, the state's agent, then-detective Melbourne Hunnicutt committed perjury multiple times." The respondent argues that this claim is procedurally defaulted and without merit under AEDPA standards.

This claim centers on Mr. Skeens' efforts to obtain the mother's computers before to trial. Mr. Skeens speculated that the mother might have pornography on her computers that K.W. had watched. In Mr. Skeens' view, that would show that the mother was the source of K.W.'s knowledge of adult sexual acts and male body parts, not him. He discussed the issue with his trial attorney and acknowledged that he did not know what was on the mother's computers, but they agreed that counsel would try to obtain them to rule out whether they contained pornography (ECF 15-16 at 54-55). Thereafter, counsel subpoenaed the mother's computers (ECF 15-1 at 64).

The state moved to quash; and, after briefing, a hearing was held. *Skeens*, 2020 WL 7019315, at 3. During the course of the hearing, Detective Hunnicutt inaccurately stated that K.W. had only reported being shown pornography in Kosciusko County, not in Huntington County, where the mother's computers were located.[4] After hearing

---

[4] The record reflects that K.W., the mother, and Mr. Skeens lived together in Huntington County for some years, and after the mother and Mr. Skeens separated, the mother and K.W. remained in Huntington County while Mr. Skeens relocated to Kosciusko County. K.W. stated during her forensic interview with Nicole Allen that Mr. Skeens showed her pornography "at the old house." At the post-conviction evidentiary hearing, Detective Hunnicutt acknowledged that he erroneously stated that K.W. was shown pornography in Kosciusko County, but he explained this was a simple "mistake of fact" (ECF 15-18 at 157). It is worth noting that Detective Hunnicutt

arguments from counsel, the trial court quashed the subpoena, concluding that the mother's computers were not sufficiently relevant to be produced (ECF 15-1 at 99).

On post-conviction appeal, Mr. Skeens argued that the state committed a *Brady* violation by failing to turn over Mother's computers. *Skeens*, 2020 WL 7019315 at 1. The court found such a claim to be waived because it was not raised at trial or on direct appeal. *Id.* Under Indiana law, issues that were known and available on direct appeal but not raised are procedurally barred in post-conviction proceedings. *See Williams v. State*, 808 N.E.2d 652, 659 (Ind. 2004). "[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . . that decision rests on independent and adequate state law grounds," which bars federal review. *Kaczmarek*, 627 F.3d at 591; *see also Bobo v. Kolb*, 969 F.2d 391, 399 (7th Cir. 1992) ("A federal court reviewing a habeas petition is required to respect a state court's finding, under state law, of waiver or procedural default.").

Additionally, Mr. Skeens did not fairly present any claim under *Napue*, which prohibits the state from knowingly relying on false testimony to obtain a conviction, on direct appeal or in the post-conviction proceedings. *See Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017) (to fairly present a claim, the "petitioner must place before the state court both the controlling law and the operative facts" supporting his claim). It appeared to the Indiana Court of Appeals that he might be "gestur[ing] toward a claim of prosecutorial misconduct" in his brief on post-conviction review, but the court found the argument so

---

never personally interviewed K.W. and was instead relying on the interview conducted by Ms. Allen.

undeveloped as to be waived under Indiana Appellate Rules. *Skeens*, 2020 WL 7019315 at 2 n.1. The finding of waiver constitutes an adequate and independent state procedural ground that bars federal review. *Kaczmarek*, 627 F.3d at 591; *Bobo*, 969 F.2d at 399. Therefore, claim two is procedurally defaulted.

In his traverse, Mr. Skeens again attributes the errors to his post-conviction counsel and asks that they be set aside. As explained above, however, errors by post-conviction can only be used to obtain review of a defaulted claim of ineffective assistance by trial counsel, not to obtain review of other types of defaulted claims. *Davila*, 137 S. Ct. at 2065-66. Thus, alleged errors by post-conviction counsel cannot be used to obtain review of Mr. Skeens's defaulted *Brady/Napue* claim.

Even if he were to establish cause and prejudice to set aside the default, the claim has no merit. *Brady*, 373 U.S. at 87, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" Likewise, *Napue*, 360 U.S. at 264, held that a defendant's due process rights are violated when the prosecution knowingly relies on false testimony to obtain a conviction. The Indiana Court of Appeals considered the *Brady* argument pertaining to the mother's computers in the context of Mr. Skeens' claim that his trial attorney was ineffective. *Skeens*, 2020 WL 7019315 at 2. The court found no evidence that the state ever possessed or searched the mother's computers, or that there was anything exculpatory on them. *Id.* at 2-3. This factual finding is binding in this proceeding unless Mr. Skeens rebuts it with clear and convincing evidence. 28 U.S.C. § 2254(e)(2). He has not done so. Indeed, at the post-conviction evidentiary hearing, he

admitted that he had no idea what was on the mother's computers, or whether they contained pornography (ECF 15-18 at 224, 240). He simply felt that he should have been allowed to "check and see" what they contained (*Id.* at 242).

Nor did he ever adduce any evidence that the prosecution knew Detective Hunnicutt's testimony about where K.W. said she saw pornography was inaccurate. Detective Hunnicutt offered unrebutted testimony that he had made a simple mistake about where K.W. was living at the time Mr. Skeens showed her pornography; but, even assuming he intentionally lied, "perjured testimony unknowingly presented does not violate due process." *Kirkman v. Thompson*, 958 F.3d 663, 666 (7th Cir. 2020). Furthermore, Detective Hunnicutt's testimony was not used to procure Mr. Skeens' conviction, as the state did not call him as a witness at trial. Instead, the inaccurate testimony he points to was procured by the defense at a pretrial hearing on a peripheral discovery issue. For these reasons, claim two is denied.

      C.    *Indiana Trial Rule.*

In claim three, Mr. Skeens asserts that "the state violated Indiana Trial Rule of Procedure 26 . . . when it withheld expert witness testimony that was specifically requested on numerous occasions." The respondent argues that this claim wasn't presented to the state courts and, in any event, isn't cognizable on federal habeas review.

This claim is premised on a study used by Sharon Robison, the sexual assault nurse examiner, during her trial testimony. Specifically, Nurse Robison testified that according to one study, 85 to 90 percent of prepubescent female children who have been sexually molested do not have any type of genital injury. *Skeens*, 2010 WL 3332137 at 4. She

attributed this to the fact that "the female sex organ is very vascular, which means that there's a lot of blood flow," such that "any injury to that area would heal very quickly." *Id.* (internal citations and modifications omitted).

Mr. Skeens appears to argue that the state should have disclosed this study before trial. However, as the respondent points out, he did not raise any such claim in the state proceedings. Even if he did, a claim based on a violation of Indiana Trial Rules could not form the basis for granting him federal habeas relief.[5] *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (a federal habeas court has no authority to "second-guess state courts in interpreting state law"). Furthermore, as discussed in more detail below in the context of Mr. Skeens' ineffective assistance of trial counsel claim, his counsel was well aware of the study he references and was well-prepared to crossexamine Nurse Robison about it, as counsel had heard her testify about the same study in prior sexual assault cases he had handled. *Skeens*, 2020 WL 7019315 at 4. For these reasons, claim three is denied.

D.     *Ineffective Assistance of Counsel.*

Claims four through six center on the performance of the attorneys who represented him during the state proceedings. Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on a claim of ineffective

---

[5] He also argues that this violated Federal Rule of Criminal Procedure 16, but the federal rules are not applicable to a criminal case litigated in state court.

assistance, the petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Gilbreath v. Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021). The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a federal habeas proceeding: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Furthermore, the court should "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight," *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010), and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel," *Premo v. Moore*, 562 U.S. 115, 125 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Rather, "[i]t must merely be reasonably competent." *Id.*

Counsel is also afforded significant discretion in selecting a trial strategy based on the information known at the time. *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011). "[S]trategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable[.]" *Gilbreath*, 21 F.4th at 982. If the defendant wanted counsel to raise an argument that had no merit, an ineffective assistance claim cannot succeed, because "[c]ounsel is not ineffective for failing to raise meritless claims." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013); *see also Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Gilbreath*, 21 F.4th at 981 (citation omitted). In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

        1.    *Ineffective Assistance by Trial Counsel*.

Mr. Skeens first argues that he received ineffective assistance from his retained trial counsel. The record reflects that trial counsel was admitted to practice in Indiana in 1974; and, by the time of Mr. Skeens' trial in 2009, he had more than two decades of experience, including handling more than 100 jury trials, as well as bench trials and post-conviction hearings. He had handled many prior cases of child molestation and sexual assault (ECF 15-18 at 37).

The state court record reflects that trial counsel was well prepared and vigorously represented Mr. Skeens' interests throughout the criminal proceeding. Among other things, he conducted pretrial discovery; moved for a speedy trial; met with Mr. Skeens several times at the jail; filed and argued pretrial motions in limine; fought to have Mr. Skeens' bond reduced; actively participated in jury selection; gave an opening statement; objected multiple times during the testimony of the state's witnesses, several of which were sustained or resulted in the prosecutor rephrasing her questions; moved to strike certain testimony of the state's witnesses; moved for a mistrial based on testimony by Nurse Robison; moved for a directed verdict at the close of the state's case; actively participated in the jury instruction conference; gave a closing argument; and objected during the prosecution's opening and rebuttal arguments (ECF 15-10; ECF 15-11). With this background in mind, the court turns to the specific errors asserted by Mr. Skeens.

a.  *Requesting a Mistrial During Voir Dire.*

Mr. Skeens first argues that trial counsel was ineffective when he failed to request a mistrial after Ms. Armbruster "tainted" the jury pool. The respondent argues that this claim is procedurally defaulted.

Although Mr. Skeens raised a number of grounds of ineffective assistance of trial counsel in the post-conviction proceedings, each ground of ineffective assistance is considered distinct for exhaustion purposes. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). Mr. Skeens did not present any claim in the post-conviction proceedings that his trial counsel was ineffective in failing to request a mistrial based on Ms. Armbruster's alleged statements during *voir dire*, and it is thus procedurally defaulted. *Id.* (where

petitioner complained about one aspect of counsel's performance in state proceeding but not the specific error he was challenging in federal habeas petition, claim was procedurally defaulted).

Even if he could overcome the procedural default, the claim has no merit, as it is based on an account of Ms. Armbruster's testimony that is not reflected in the official transcript. As outlined above in connection with Mr. Skeens' claim regarding the audio recording of jury selection, the official record reflects that defense counsel was attuned to the issue of potential jurors prejudicing the jury pool, and that he took quick action to cut Ms. Armbruster off before she said anything prejudicial. She was subsequently excused from serving on the jury. There is simply nothing in the record to suggest that had counsel requested a mistrial, the trial court would have granted one. *See Warren*, 712 F.3d at 1104; *Stone*, 86 F.3d at 717. Thus, Mr. Skeens could not establish deficient performance or prejudice, even if he had not defaulted this claim. The claim is denied.

b.   *The Mother's Computers*.

Mr. Skeens next argues that trial counsel failed to "preserve issues related to Mother's computers." The respondent argues that the claim lacks merit under AEDPA standards.

In rejecting Mr. Skeens' ineffective assistance claim on this ground on post-conviction review, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *Skeens*, 2020 WL 7019315 at 2. The court concluded that Mr. Skeens did not establish deficient performance or prejudice. *Id.* The court observed that trial counsel did try to obtain the computers prior to trial, but the court ruled against him. *Id.*

28

Mr. Skeens didn't clearly outline what additional steps he expected counsel to take. *Id.* Furthermore, even if counsel should have taken some additional step to obtain the computers, Mr. Skeens didn't establish prejudice. *Id.* There was simply no evidence that the mother had pornography on her computers; and, even if she did, Mr. Skeens would have had to prove that K.W. saw those images, a point on which he had no evidence. *Id.* Furthermore, even if he could overcome these hurdles, "he would have faced the formidable task of convincing the jury that pornography was the sole source of the young child's testimony that [Mr.] Skeens' penis felt 'smooth,' that it 'hurt' when [Mr.] Skeens penetrated her, and her vagina 'burned' afterwards." *Id.* The court thus denied his claim.

This wasn't an objectively unreasonable application of *Strickland*. The record is devoid of any evidence that the mother's computers contained pornography, much less that K.W. viewed it. Mr. Skeens acknowledged as much during his testimony at the post-conviction evidentiary hearing. His trial counsel had only his vague speculation about what might be on the computers, but counsel nevertheless attempted to press the issue. He subpoenaed the computers, and filed a written response to the state's motion to quash. He presented witness testimony and arguments at a hearing on the issue. The trial court ultimately did not agree that the computers were relevant. This court cannot conclude that counsel fell below professional norms due to his inability to obtain the computers. Nor has he demonstrated that had counsel obtained them, the outcome of the proceeding would have been different. As stated, Mr. Skeens has no idea whether the computers contained anything exculpatory.

It is worth noting that during her trial testimony, the mother acknowledged that when she and Mr. Skeens lived together in Huntington, they occasionally watched pornography on a computer that K.W. also used to play video games (ECF 15-9 at 136-38). So the jury had this evidence before them, but, as aptly stated by the Indiana Court of Appeals, K.W.'s mere exposure to pornography would not account for her graphic description of the molestation committed by Mr. Skeens and the feelings she experienced during it. This claim is denied.

c.      *Police Disciplinary Records.*

Mr. Skeens next argues that counsel was ineffective in failing to obtain police disciplinary records for Detective Hunnicutt. The respondent argues that this claim has no merit under AEDPA standards.

The record reflects that around the time of Mr. Skeens's trial, Detective Hunnicutt was disciplined for viewing adult pornography on a department computer while he was on duty (ECF 15-18 at 145).[6] Mr. Skeens believes that his trial counsel should have obtained Detective Hunnicutt's disciplinary record and presented this evidence to the jury. In rejecting the claim on post-conviction review, the Indiana Court of Appeals concluded that Mr. Skeens failed "to establish any connection between his charges and Officer Hunnicutt's discipline other than that they both involved pornography." *Skeens*, 2020 WL 7019315 at 3. Further, the court found that he did not establish prejudice, as it

---

[6] Mr. Skeens or someone associated with him apparently learned this information through a television news report in July 2009 (ECF 15-18 at 13-14).

was "unclear what [counsel] would have done with it," because Detective Hunnicutt did not testify as a witness at trial. *Id.*

This wasn't an unreasonable application of *Strickland*. Detective Hunnicutt's unrebutted testimony at the post-conviction hearing was that this incident occurred in June 2009 and did not relate in any way to Mr. Skeens's case or to any other criminal case. After serving a suspension for neglect of duty, he returned to serve as an officer for several years until his retirement in 2017 (ECF 15-18 at 154-55). Other than pointing to Detective Hunnicutt's unprofessional conduct, Mr. Skeens does not explain how the incident prejudiced him or even related to him. Although Detective Hunnicutt was involved in investigating K.W.'s allegations of abuse, the investigation was completed and Mr. Skeens already on trial when this workplace incident occurred. Additionally, Detective Hunnicutt did not testify at the trial or otherwise play a significant role in the case. K.W. first reported the abuse to a counselor at her school, and her forensic interview was conducted by Nicole Allen while Detective Hunnicutt and others listened from another room. He never interviewed K.W. himself, nor did he ever interview Mr. Skeens. Although Detective Hunnicutt was involved in obtaining the search warrants for Mr. Skeens' home and other locations, he was not involved in executing the warrants (ECF 15-16 at 66, 88). Furthermore, no pornography or other inculpatory evidence was found in the searches.

At the post-conviction evidentiary hearing, Mr. Thonert testified that he was vaguely aware of Detective Hunnicutt's disciplinary record, although he was unsure when he learned about it or when the incident with the pornography occurred. He did

not view this information as helpful to Mr. Skeens, however, because Detective Hunnicutt did not testify as a witness at trial, nor did counsel want him to, because he feared it would lead to a lot of inculpatory information being admitted about the scope of the investigation. In counsel's view, information about an act of workplace misconduct by Detective Hunnicutt unrelated to Mr. Skeens' case would "probably never get in front of the jury" (ECF 15-18 at 62).

In light of the record, Mr. Skeens has not established that counsel's performance fell below an objective standard of reasonableness. Instead, the record reflects that counsel made a reasonable decision not to pursue this issue. Mr. Skeens also has not demonstrated prejudice. Detective Hunnicutt did not testify as a witness at trial; and, even if he had, Indiana law would not permit admission of evidence of a prior bad act he committed unrelated to the issues in the case. *See* Ind. R. Evid. 403, 404(b); *Caldwell v. State*, 43 N.E.3d 258, 264 (Ind. Ct. App. 2015). Even if the evidence was somehow admitted, it would have done nothing to undercut K.W.'s graphic testimony about the acts of molestation Mr. Skeens committed against her. There is no basis to conclude that information about this unrelated incident of workplace misconduct by Detective Hunnicutt would have exculpated Mr. Skeens or otherwise changed the outcome of the case. The claim is denied.

d.    *Expert Witness Testimony.*

Mr. Skeens next claims that trial counsel failed to properly "prepare for and object to expert witness testimony," specifically the testimony of Nurse Robison and K.W.'s

counselor, Lynn Baker. The respondent argues that this claim lacks merit under AEDPA standards.

In rejecting this claim on post-conviction review, the Indiana Court of Appeals concluded that Mr. Skeens failed to establish deficient performance by his counsel. *Skeens*, 2020 WL 7019315 at 4. This wasn't an unreasonable application of *Strickland*. To the contrary, the trial transcript reflects that counsel was well-prepared and well-versed on the testimony presented by these witnesses. He objected upwards of ten times during Nurse Robison's testimony, moved to strike certain portions of her testimony, and at one point moved for a mistrial. He also subjected her to vigorous crossexamination, emphasizing that she had found no DNA or other physical evidence that K.W. had been molested. Counsel explained at the post-conviction hearing that he was quite familiar with Nurse Robison, including the studies she cited, as he had heard her testify before in other criminal cases he had handled.

With respect to Lynn Baker, counsel objected seven times during the course of her testimony and moved to strike certain portions of her testimony. Some of his objections were sustained and one resulted in the trial court giving a limiting instruction to the jury. He also subjected Ms. Baker to strong crossexamination, highlighting discrepancies in K.W.'s statements to her. It is not clear what else Mr. Skeens wanted counsel to do in connection with this witness. Based on the record, Mr. Skeens has not established deficient performance, nor has he established that had counsel taken some other action with respect to the testimony of these witnesses, the result of the proceeding would have been different. The claim is denied.

e.    *Closing Argument.*

Mr. Skeens next argues that trial counsel improperly bolstered K.W.'s credibility with a comment he made during closing argument. The respondent argues that this claim lacks merit under AEDPA standards.

This claim centers on counsel's closing argument in which he gave a lengthy summation about the lack of any physical evidence to corroborate K.W.'s account. He argued that it was not enough for jurors to conclude that it was more likely than not that the abuse occurred. He emphasized that jurors had to be convinced of Mr. Skeens' guilt beyond a reasonable doubt. In the course of his argument he made the following statements:

> There is nothing to corroborate what she said. There is nothing to substantiate. Now, it doesn't mean that you cannot believe her, if you were in a civil court, you certainly could. I believe her, it's more likely than not, but clearly under the standard of clear and convincing evidence, or probably. But in a criminal court, we're submitting that as a juror you should require some, you should require corroboration to exclude any reasonable doubt. That degree of certainty of guilt beyond a reasonable doubt.

(ECF 15-11 at 74). Mr. Skeens objects to his words, "I believe her." In his view, counsel effectively told the jury to find him guilty.

In rejecting this claim on post-conviction review, the Indiana Court of Appeals assumed without deciding that "a reasonable attorney would not have made this statement," but concluded that Mr. Skeens failed to establish prejudice. *Skeens*, 2020 WL 7019315 at 5. The court concluded that the statement was somewhat ambiguous, and could have been understood by the jury as stating, "You, the jury, may think to yourself:

I believe the victim." *Id.* at n.3. The court further concluded that the evidence of Mr. Skeens's guilt was "so substantial that it is not reasonably likely that trial counsel's ill-advised statement affected the result." *Id.* at *5.

This wasn't an unreasonable application of *Strickland*. The court considers the recent opinion in *Gilbreath,* 21 F.4th at 980-82, which decided a habeas case with strikingly similar facts. There, the defendant was accused of sexually assaulting his young stepdaughter over the course of several years. There were no other witnesses to the abuse. The Seventh Circuit concluded that defense counsel had acted reasonably when he adopted a strategy of arguing that there was insufficient evidence to prove the crime beyond a reasonable doubt, rather than attacking the victim with every available means. "Fully aware that a young accuser in a sexual abuse case can be perceived sympathetically by the jury, he sought to demonstrate not that she was a liar but rather that she was not a reliable witness." *Id.* at 982. Counsel explained in the post-conviction proceedings that his "general approach is not to treat a young witness who claims to have been assaulted with attack mode but rather with, we need to feel sorry for her but we can't rely on her." *Id.* at 982-83. Counsel noted that in closing arguments he would sometimes "say [the victim] believes it happened . . . which is to give her emotional credibility," but would then argue that the evidence was insufficient to convict. *Id.* The Seventh Circuit found counsel's approach imminently reasonable. *Id.*; *see also Karr v. Sevier*, ---F.4th----, 2022 WL 94619729, 6 (7th Cir. 2022) (in assessing counsel's performance on habeas review, recognizing the "significant downsides to attacking a sympathetic accuser or even being perceived as attacking her").

Here, it is evident from the trial record and trial counsel's testimony at the post-conviction hearing that his strategy was to emphasize that there was no physical evidence to corroborate K.W.'s account. He recognized that he had to tread carefully in his treatment of K.W., as he risked alienating the jury by attacking a 9-year-old witness who accused her stepfather of heinous acts of abuse, and who, according to her therapist, was in "extreme[] emotional pain." Counsel's closing argument reflected this strategy. Over the course of the argument, which spans twenty pages in the transcript, he emphasized that the state bore the burden of proof beyond a reasonable doubt, and that there was simply no physical evidence to corroborate K.W.'s account. He argued that one would expect to find some type of physical injury if an adult male repeatedly had sexual intercourse with a very young child as K.W. claimed. He argued at length that it was not enough for the jury to simply conclude that the abuse possibly happened, or even likely happened, but instead they had to be convinced beyond a reasonable doubt (ECF 15-11 at 61-81).

Read in context, counsel's statement about whether to believe K.W. can be understood as an attempt to give her "emotional credibility," perhaps even developing rapport with the jury rather than alienate the jury for the pitch that really mattered, while still maintaining that the evidence was insufficient to convict. Like the Indiana Court of Appeals, this court reads counsel's brief comment as suggesting that jurors might think to themselves, "I believe her," but that was not enough to convict in a criminal case. [7] Put

---

[7] It is worth noting that pretrial discussions between Mr. Skeens and his counsel reflect that they both viewed her as being outwardly credible. During one of their pretrial meetings, counsel noted

another way, jurors might conclude that K.W. believed the abuse occurred, but without some type of corroboration, the prosecution did not meet its burden of proof. His statement may have been somewhat inartful, but an attorney need not be "perfect" to satisfy the Sixth Amendment. *Delatorre*, 847 F.3d at 845. Counsel's statement cannot reasonably be understood as conceding Mr. Skeens' guilt or telling the jury to find him guilty as Mr. Skeens claims.

Mr. Skeens has not established that counsel was deficient, or that the result of the proceeding would have been different in the absence of this statement. This court attributes the guilty verdict to the graphic and detailed testimony of K.W. about the abuse she suffered for years rather than to this brief, somewhat ambiguous comment by counsel in the course of a lengthy closing argument. The state court's resolution of this claim was not objectively unreasonably, so the claim is denied.

f.   *Vigorous Defense.*

As his final ground of ineffective assistance by trial counsel, Mr. Skeens argues that counsel failed to present a "vigorous defense," including failing to call Mr. Skeens' young son and his former fiancée as witnesses and in failing to cross-examine K.W. about a birthmark on his penis. The respondent argues that this claim lacks merit under AEDPA standards.

---

that the jury would at least find her a "pretty good actress" and observed, "I mean if you do nothing else watch that DVD [of her forensic interview], they will find you guilty." Mr. Skeens responded, "I know." (ECF 15-16 at 55). Counsel was thus faced with the unenviable task of trying to challenge the testimony of a highly sympathetic, outwardly credible nine-year-old witness.

In rejecting this claim on post-conviction review, the Indiana Court of Appeals concluded that counsel had made reasonable strategic decisions on these issues. *Skeens*, 2020 WL 7019315 at 3. As to the crossexamination of K.W., the court concluded that counsel reasonably decided to forego asking her about an unusual mark on Mr. Skeens' penis "for fear of corroborating K.W.'s story." *Id.* As to presenting other defense witnesses, the court concluded that counsel made a reasonable strategic decision not to call the family member witnesses Mr. Skeens proposed because their testimony was of "limited usefulness." *Id.* Mr. Skeens' son was only four years old at the time of the abuse and six years old at the time of trial. *Id.* The record reflected that counsel was concerned about calling a child so young as a witness because, in his experience, "you don't know exactly what they're going to say." *Id.* He also concluded that Mr. Skeens' fiancée and other family members would be of limited help to the defense, as K.W. claimed that the abuse occurred when no one else was in the house. *Id.* The court concluded that Mr. Skeens did not prove counsel was ineffective on this ground. *Id.*

Based on the record, this wasn't an unreasonable application of *Strickland*. Again, the court looks to the Seventh Circuit's opinion in *Gilbreath*. There, defense counsel did not call any witnesses at trial. *Gilbreath*, 21 F.4th at 988. The petitioner argued that counsel had been ineffective in failing to present testimony from his family members, including the victim's sibling, who would have said they saw no signs of abuse. *Id.* The court of appeals found that counsel reasonably decided not to call the victim's sibling, who was seven years old at the time of the abuse, given his age and the fact that he did not have a "direct line of sight to the relevant events." *Id.* The court of appeals concluded that

counsel also reasonably decided not to call the petitioner's other family members to testify that they "saw nothing amiss," because by the victim's account, they were not present at the time of the abuse and could be easily impeached for bias. *Id.*

Here, the record reflects that trial counsel met with Mr. Skeens several times before trial and interviewed every witness Mr. Skeens suggested to determine whether they could assist the defense (ECF 15-18 at 67, 163). He also took steps to subpoena several family members and to disclose them as witnesses in the event their testimony was needed (ECF 15-1; ECF 15-2 at 20-30). Several family members were in fact present at the trial and prepared to testify (ECF 15-18 at 164). Counsel also took the step of having these proposed witnesses wait in the hallway, due to a witness separation order entered by the court, so as to preserve their ability to testify should that become necessary. However, counsel ultimately made a strategic decision not to call any of these witnesses.

Counsel reasonably concluded that it was risky to call Mr. Skeens' son, who was only six years old at the time of trial and four years old at the time of the abuse, because he might say something that actually damaged the defense. At the post-conviction hearing, Mr. Skeens' son, by this time 16 years old, explained that if he had been called as a witness at trial he would have testified that no doors were ever locked in his father's home—in his words, "[n]ot one time" (*Id.* at 175). Given that he was four years old at the time of the abuse, his ability to recall this minor detail seems questionable, and certainly subject to vigorous crossexamination. His son also acknowledged during his post-conviction testimony that several of Mr. Skeens' family members had spoken about the case in front of him multiple times, and that he was upset his father was "taken away"

from him (*Id.* at 176). The court cannot conclude that counsel acted unreasonably in declining to call this very young witness with an obvious bias to offer testimony helpful to the defense. *See Gilbreath*, 21 F.4th at 988.

As for Mr. Skeens' other family members, it can be discerned from their testimony at the post-conviction hearing that if called at trial they would have testified that Mr. Skeens and K.W. had a good relationship and that they never saw any signs of abuse.[8] However, counsel reasonably concluded that such testimony was of limited value. It was already evident from the mother's testimony that K.W. and Mr. Skeens had an outwardly good relationship, that she viewed him as her "dad" even though he was not her biological father, and that she continued to visit him on a regular basis even after he and the mother divorced. Other than his young son, none of Mr. Skeens's family members were alleged to have been present in the home during the abuse. His fiancée lived with him for part of the time the abuse occurred and claimed she never saw anything "disturbing," but she acknowledged that she did not get home from work until approximately 2 a.m. on Friday nights when K.W. was visiting.[9] His mother and brother did not live with him and would not have been able to testify about whether any abuse occurred when they were not present.

---

[8] As counsel noted at the post-conviction hearing, these witnesses would not have been able to testify about Mr. Skeens's reputation for truthfulness because he did not testify as a witness. Ind. R. Evid. 404, 608.

[9] Notably, K.W. told Ms. Allen that one incident of abuse ended when Mr. Skeens told her to "hurry and put her clothes back on" because "his girlfriend would be coming home" (ECF 15-16 at 84).

Additionally, these witnesses could be readily impeached as having a motive to offer testimony helpful to Mr. Skeens. *Gilbreath*, 21 F.4th at 988; *see also Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias."). The record reflects that counsel recognized the potential dangers of calling family member witnesses and discussed them with Mr. Skeens. During one of their pretrial discussions, counsel cautioned Mr. Skeens that it was not how many witnesses he called, but what they had to say. He discussed the potential danger of calling a lot of witnesses, because "a juror may not like one of your witnesses," or a "juror may think one of your witnesses is trying to help you out and that will work against you" (ECF 15-16 at 46). He also expressed concerns that if these witnesses were called, it would give the prosecution an opportunity "try to get them to say things that they can work with to twist around . . . and make you look guilty" (*Id.* at 47). By contrast, if no defense witnesses were called, it did not give the prosecution "much to work with" (*Id.*). Ultimately, counsel made a reasonable strategic decision that his family members would not meaningfully add to the defense.

Counsel also reasonably decided not to question K.W. about an unusual birthmark on Mr. Skeens' penis. Mr. Skeens testified at the post-conviction hearing that he has a dark colored birthmark on his penis about a quarter of an inch thick (ECF 15-18 at 233). In one of his pretrial discussions with counsel, he raised the issue of whether counsel should ask K.W. about the birthmark (ECF 15-16 at 58). After some discussion, counsel expressed reservations about pursuing this strategy. As counsel reasonably recognized,

this was a very "delicate" matter: If K.W. could accurately describe a distinguishing mark on Mr. Skeens' penis, this would effectively be the "nail in the coffin" for Mr. Skeens (ECF 15-16 at 58; ECF 15-18 at 84).[10] Ultimately, counsel reasonably opted to forego this risky line of questioning.

The record also reflects that counsel discussed his proposed trial strategy with Mr. Skeens at several points, and that Mr. Skeens signed off on it both orally and in writing (ECF 15-16 at 46, 58, 95-96; ECF 15-18 at 79). He now tries to claim that counsel unduly pressured him into not calling any witnesses or asking about the birthmark, but his argument is based solely on his own self-serving statements and appears to be revisionist history, at best. The record reflects that trial counsel was well-prepared for trial, that he secured the presence of several defense witnesses, and that he would have called the witnesses and asked the questions Mr. Skeens wanted him to though he did not agree that they would be helpful. The record further reflects that the two ultimately decided that counsel should pursue his chosen approach, which was to try to poke holes in the state's evidence and argue reasonable doubt. Mr. Skeens regrets that the strategy proved unsuccessful, but he has not proven that counsel was deficient, or that had counsel called his family members as witnesses and asked K.W. questions about a birthmark on his penis, there is a reasonable likelihood that the result of the proceeding would have been different. Therefore, the claim is denied.

---

[10] Investigators recovered a drawing K.W. had made of Mr. Skeens's penis, which depicted it as having certain markings on it (ECF 15-16 at 94). Mr. Skeens acknowledged at the post-conviction hearing that he did not know what K.W. intended to show with those markings (ECF 15-18 at 237).

        2.     *Ineffective Assistance of Appellate Counsel.*

Mr. Skeens next argues that his counsel on direct appeal was ineffective in failing to raise certain issues on direct appeal and in failing to request dismissal of the appeal so he could pursue an early post-conviction petition under Indiana's *Davis-Hatton* procedure. The respondent argues that this claim lacks merit under AEDPA standards.

A claim of ineffective assistance of appellate counsel is also subject to the *Strickland* analysis. *Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). On the deficiency prong, the petitioner must show that counsel failed to present a "significant and obvious" issue on appeal. *Id.* at 790. However, counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). On the prejudice prong, the petitioner must demonstrate that if the argument had been raised, there is "a reasonable probability that his case would have been remanded for a new trial or that the decision of the state trial court would have been otherwise modified on appeal." *Howard*, 225 F.3d at 790.

In rejecting this claim on post-conviction review, the Indiana Court of Appeals concluded that Mr. Skeens failed to demonstrate appellate counsel was ineffective. *Skeens*, 2020 WL 7019315 at 6. He did not clearly identify what issues he thought counsel should have pursued, "let alone what the arguments might be" in support of those issues. *Id.* Additionally, appellate counsel raised an argument about an error at sentencing that led the court to cut Mr. Skeens's sentence in half. *Id.* As to counsel's decision not to seek relief under *Davis-Hatton,* the court found "no reason to believe" that had Mr. Skeens pursued

an early post-conviction petition, "his arguments . . . would have been any more successful than they are now." *Id.* Therefore, the court concluded that Mr. Skeens failed to demonstrate that he received ineffective assistance from appellate counsel. *Id.*

This wasn't an unreasonable application of *Strickland*. The record reflects that Mr. Nix was admitted to practice in 2003, and that he had handled multiple criminal appeals prior to representing Mr. Skeens (ECF 15-18 at 117).[11] In preparing a brief in this case, he spoke with trial counsel and Mr. Skeens and reviewed the entire record. His general strategy is not to raise every conceivable issue, but to narrow the issues to only a few so that the brief is "succinct" (*Id.* at 124). He filed a full 28-page appellate brief on Mr. Skeens's behalf, raising two arguments and citing to applicable case law (ECF 14-3). One of the arguments challenged the sufficiency of the evidence on several points; if successful, this argument would have resulted in his convictions being vacated. The other argument challenged Mr. Skeens's sentence, and the Indiana Court of Appeals found merit to this argument and reduced his sentence from 187 years to 90 years. *Skeens*, 2010 WL 3332127 at 13-14. In total, counsel's arguments warranted 15 pages of discussion by the court. Not satisfied with the Indiana Court of Appeals' reduction of Mr. Skeens's sentence, counsel filed a 15-page petition to transfer with the Indiana Supreme Court pressing the sufficiency of the evidence claim, which could have resulted in his conviction being vacated (ECF 14-6).

---

[11] At the time he handled Mr. Skeens' case, appellate counsel was employed by a private firm that contracted with the court to provide representation to indigent criminal defendants when appointed to do so (ECF 15-18 at 113-14). By the time of the post-conviction hearing, he was working as a criminal prosecutor (*Id.* at 112).

Mr. Skeens argues that appellate counsel should have challenged the trial court's ruling as to the mother's computers; but, because trial counsel did not object on this basis at trial, the ruling would have been considered under Indiana's "fundamental error" standard, which is very difficult to meet. *See Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). "The fundamental error exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.* (citation and internal quotation marks omitted). The error claimed must "either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." *Id.* (citation and internal quotation marks omitted). Relief is warranted under this exception "only in egregious circumstances." *Id.* (citation and internal quotation marks omitted).

There is no basis in the record to conclude that had appellate counsel raised a claim about the trial court's order denying production of the mother's computers, the Indiana Court of Appeals would have found an error so grave as to make "a fair trial impossible." Mr. Skeens concedes that he has no knowledge of what was on the mother's computers, or whether they contained pornography. As previously outlined, even if they did contain pornography, Mr. Skeens would still have the difficult task of proving that K.W. saw the pornography on the mother's computers, and that this was the sole source of her knowledge of male anatomy and adult sex acts. Other than Mr. Skeens's speculation, there is nothing in the trial record to support such an argument. He has not shown

deficient performance or prejudice in connection with counsel's decision to forego this argument. *See Howard*, 225 F.3d at 790; *Stone*, 86 F.3d at 717.

To the extent he wanted counsel to challenge other evidentiary rulings that were properly preserved by trial counsel, it is evident that appellate counsel considered but rejected this course of action (ECF 15-18 at 127). In counsel's view, such arguments were unlikely to be successful because they would be reviewed under a deferential abuse of discretion standard. *See Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021) ("A trial court has discretion regarding the admission of evidence and its decisions are reviewed only for abuse of discretion. We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and errors affect a party's substantial rights."). Instead, counsel opted to narrow his arguments to two that he felt were stronger, one of which resulted in a 90-year reduction in Mr. Skeens's sentence. Mr. Skeens has not demonstrated, or even argued, that any specific evidentiary ruling was so egregious as to meet the abuse of discretion standard. He has not shown that counsel was deficient in his selection of arguments to raise on direct appeal, or that he suffered any prejudice.

Mr. Skeens also believes counsel should have advised him to pursue an early post-conviction petition under the *Davis-Hatton* procedure. Indiana's *Davis-Hatton* procedure "is a tool used in rare instances to allow defendants to pursue post-conviction relief prior to direct appeal." *Skeens*, 2020 WL 7019315 at 6. The procedure involves a termination of the direct appeal upon the appellant's motion to allow him to file a post-conviction petition in the trial court. *Taylor v. State*, 929 N.E.2d 912, 917 n.1 (Ind. Ct. App. 2010). Once

those proceedings are concluded, the appellant pursues a combined direct and post-conviction appeal. *Id.* The procedure does not expand a defendant's substantive rights, but merely impacts the timing of when post-conviction relief is sought. *See Karr*, 2022 WL 94619729 at 8 (observing that this procedure "is limited and rarely used").

Mr. Skeens does not clearly explain why counsel should have taken this path, other than to profess a general belief that it would have helped him develop facts to show he is innocent. The record reflects that appellate counsel was well aware of the *Davis-Hatton* procedure but did not recommend it to Mr. Skeens. Among other things, counsel would not have been able to represent Mr. Skeens in connection with a post-conviction petition because this exceeded the scope of his appointment (ECF 15-18 at 118). Instead, Mr. Skeens would have had to file a *pro se* petition and ask for the public defender to be appointed that would result in delays. Counsel felt a better approach was to pursue certain direct appeal issues at that time. As discussed above, counsel pursued a sentencing issue that resulted in a 90-year reduction in Mr. Skeens' sentence. The court cannot conclude that counsel was deficient in not recommending that Mr. Skeens pursue this rarely used procedure.

Nor is there any basis in the record to conclude that had Mr. Skeens pursued early post-conviction relief under *Davis-Hatton*, it would have led to a more favorable result. As the Indiana Court of Appeals recognized, he did eventually pursue post-conviction relief, had two attorneys representing him, and was granted an evidentiary hearing, yet he failed to demonstrate an entitlement to relief. He has not shown that moving the

process up in time would have helped him in any way. Based on the record, the state court's resolution of this claim was not objectively unreasonable, so the claim is denied.

### 3.    *Ineffective Assistance by Post-Conviction Counsel.*

In claim six, Mr. Skeens asserts that his post-conviction counsel provided ineffective assistance in that she "forwent meritorious claims against [his] express wishes." The respondent argues that this claim is not cognizable on federal habeas review. The court agrees.

There is no Sixth Amendment right to counsel in state post-conviction proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). When there is no constitutional right to counsel, there can be no deprivation of effective assistance of counsel under the Sixth Amendment. *Coleman*, 501 U.S. at 752. Indeed, AEDPA expressly provides: "The ineffectiveness or incompetence of counsel during . . . State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Accordingly, this claim does not present a cognizable basis for overturning Mr. Skeens' conviction.

### E.    *Sufficiency of the Evidence.*

In claim seven, Mr. Skeens asserts that the state did not present sufficient evidence that he sexually abused K.W. because there was no physical evidence of abuse, K.W. was not credible, and she did not testify that he penetrated her sex organ. The respondent argues that this claim lacks merit under AEDPA standards.

Under the due process clause of the Fourteenth Amendment, a defendant cannot be convicted unless the state proves all the elements of the crime beyond a reasonable

doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970).

When considering a sufficiency of the evidence claim, the court must determine

"whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

In considering Mr. Skeens' sufficiency of the evidence claim on direct appeal, the

Indiana Court of Appeals applied a standard consistent with *Jackson*.[12] *Skeens*, 2010 WL

3332137 at 5. The court set forth what the prosecution was required to prove under

Indiana law for Mr. Skeens to be found guilty:

> The offense of child molesting as a class A felony is governed by Ind. Code
> § 35–42–4–3(a), which provides: "A person who, with a child under
> fourteen (14) years of age, performs or submits to sexual intercourse or
> deviate sexual conduct commits child molesting, a Class B felony.
> However, the offense is a Class A felony if: (1) it is committed by a person
> at least twenty-one (21) years of age[.]" Under Count I, the State was
> required to prove that Skeens, who was at least twenty-one years of age,
> performed sexual intercourse with K.W., who was under fourteen years of
> age. Under Counts II–IV, the State was required to prove that Skeens, who
> was at least twenty-one years of age, performed deviate sexual conduct
> with K.W., who was under fourteen years of age. "Deviate sexual conduct"
> means "an act involving: (1) a sex organ of one person and the mouth or
> anus of another person; or (2) the penetration of the sex organ or anus of a
> person by an object." Ind. Code § 35–41–1–9.

---

[12] The Indiana Court of Appeals articulated the standard as follows: "When reviewing claims of
insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses.
Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict.
We will affirm the conviction if there exists evidence of probative value from which a reasonable
trier of fact could find the defendant guilty beyond a reasonable doubt." *Skeens*, 2010 WL 3332137
at 5 (internal citations omitted). Although the court cited to a state case rather than to *Jackson*,
under AEDPA, a state court need not cite to or even be aware of applicable Supreme Court case
law, "so long as neither the reasoning nor the result of the state-court decision contradicts"
Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Indiana Court of Appeals'
decision does not contradict Supreme Court precedent.

Furthermore, the offense of child molesting as a class C felony is governed by Ind. Code § 35–42–4–3(b), which provides that "[a] person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Class C felony." Thus, to convict Skeens of child molesting as a class C felony, the State needed to prove that: Skeens performed or submitted to any fondling or touching of either K.W., a child under fourteen years of age, or Skeens, with the intent to arouse either K.W. or Skeens.

*Id.*

The court found the evidence sufficient to satisfy these elements. *Id.* The court recognized that under Indiana law, "even the slightest penetration is sufficient to sustain convictions for child molesting." *Id.* (citing *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996)). There is also no requirement that the vagina be penetrated, only that the female sex organ, which includes the "external genitalia," be penetrated. *Id.* The definition of an "object" in this context includes a finger. *Id.* The court noted that because K.W. was a young child, her "sexual vocabulary was limited," but she nevertheless testified that Mr. Skeens, who was then 26 years old, would remove their clothes and "rub" her "private," which she identified as her female sex organ, "sort of in circles" using one finger on each hand. *Id.* at 6. He would also rub "the part of [her] private where [she goes] potty" using one finger "on both hands and then sometimes two fingers." *Id.* Nurse Robison testified that K.W. told her during her examination that Mr. Skeens "would put his fingers inside [her] private and would suck [her] boobs." *Id.* The court found the evidence sufficient to show that Mr. Skeens penetrated K.W.'s sex organ using his finger. *Id.* The court also rejected Mr. Skeens's arguments that K.W. was "wholly incredible," and that her

testimony was not sufficient to convict even in the absence of physical evidence of a genital injury. *Id.*

On habeas review, this court's consideration of a sufficiency of the evidence is limited, and it is not permitted to reweigh the evidence or substitute its judgment for that of the factfinder. *Jackson*, 443 U.S. at 319; *Ford v. Ahitow*, 104 F.3d 926, 938 (7th Cir. 1997). Rather, it must view all of the evidence in the light most favorable to the prosecution. *Ford*, 104 F.3d at 938. A sufficiency of the evidence claim premised on witness credibility is particularly difficult to prove. *McFowler v. Jaimet*, 349 F.3d 436, 456 (7th Cir. 2003). To find in favor of the petitioner, the court must conclude not only that the witness was unreliable as a matter of law, "but that no court could reasonably think otherwise." *Id.*

Mr. Skeens has fallen far short of meeting this standard. The record reflects that K.W.—then nine years old—provided a detailed description of multiple acts of child molestation by Mr. Skeens. She described his placing her on top of a sink and having sexual intercourse with her, and using a towel "to wipe up white stuff that came out" of her vagina. She described how he would lick her vagina, put his penis in her mouth, and use his fingers to rub her vagina. She described how it felt when he did these things, and described burning in her vagina after the acts of sexual intercourse. She was able to describe pornographic movies that he showed her in detail. The jury, which had the opportunity to see her testify, believed her. It is not the task of this court to reweigh the evidence and make its own determination of guilt or innocence. *Jackson*, 443 U.S. at 319. Mr. Skeens offers speculation about other ways K.W. may have gained her knowledge of

adult male anatomy and adult sexual acts, but he has not shown that she was unreliable as a matter of law, or that no court could reasonably think otherwise.

The absence of any documented genital injury or DNA evidence also does little to further his argument. Nurse Robison explained that one would not necessarily expect to find a genital injury from the abuse described by K.W. because the hymen is very "elastic," and because "there's a lot of blood flow" to the female sex organ, meaning that "any injury to that area would heal very quickly." *Skeens*, 2010 WL 3332137 at 3. She also explained that when K.W. was brought in for an examination, she had not seen Mr. Skeens in approximately two weeks and was thus well past the time for recovering a DNA sample. *Id.* Mr. Skeens has offered nothing to undercut this testimony.

To the extent he is arguing there was no evidence of actual penetration, the court disagrees. K.W.'s testimony was sufficient to prove that Mr. Skeens penetrated her sex organ within the meaning of Indiana law, as she testified that on several occasions he placed one or two fingers inside her "private," which she defined as her vagina, and "rubbed" in "circles." Based on the record, Mr. Skeens has not demonstrated that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Claim seven is denied.

      F.    *Inappropriate Sentence*.

In claim eight, Mr. Skeens asserts that the trial court "abused its discretion and entered an inappropriate sentence" that did not adequately consider various mitigating factors. The respondent argues that this claim is not cognizable on federal habeas review.

Mr. Skeens does not clearly articulate the source of law underlying this claim, but it can be discerned that he is relying on Indiana law.[13] *See* Ind. App. R. 7(B) (providing that appellate court may revise a sentence on appeal if it finds "that the sentence is inappropriate in light of the nature of the offense and the character of the offender"). Indeed, the claim he raised in state court challenging his sentence was framed entirely in terms of state law (ECF 14-3 at 18-24). That is how the Indiana Court of Appeals analyzed the claim. *See Skeens*, 2010 WL 3332137 at 7-14. A claim that the trial court abused its discretion or failed to adequately consider certain mitigating factors under state law in imposing his sentence is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68. This claim does not entitle him to habeas relief.

G.     *Cumulative Error.*

Finally, in claim nine, Mr. Skeens asserts that his conviction should be vacated because of "[t]he cumulative effect of all the Grounds in this petition including . . . obstruction of justice; . . . illegal misconduct by the state and its agents; and . . . ineffective assistance of counsel, etc." which "prejudiced Skeens" and "prevented [him] from obtaining the proper relief from the courts." In effect, he is asserting that "cumulative error" warrants overturning his conviction. The respondent argues that this claim is not cognizable on federal habeas review.

---

[13] Mr. Skeens does not directly address whether this claim is based on state law in his traverse, and instead states only that "grounds seven, eight and nine . . . can and should be considered in light of all the illegal and intentional misconduct by the State and its agents" (ECF 16 at 23).

The court disagrees that this claim is non-cognizable. The law recognizes that "[t]rial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." *Alvarez v. Boyd*, 225 F.3d 820, 824–25 (7th Cir. 2000). The court of appeals has explained:

> The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. To prevent the synergistic effect of these errors from escaping review, courts attempt to determine whether the whole is greater than the sum of its parts. The cumulative effect analysis requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial.

*Id.* (internal citations omitted).

On the other hand, "if there was no error, or just a single error, there are no ill effects to accumulate and so a petitioner in such a case could not prevail on this theory." *Id.* at 825. Furthermore, "the Constitution entitles the petitioner to a fair trial, not a perfect one." *Id.* For the reasons fully outlined in this opinion, Mr. Skeens has not demonstrated that he is entitled to habeas relief with respect to any one error that occurred at trial, so his claim of "cumulative" error has no traction. *See Bryant v. Brown*, 873 F.3d 988, 992 (7th Cir. 2017) (summarily rejecting habeas petitioner's "cumulative error" claim where none of his individual claims had merit). This claim is denied.

H.   *Certificate of Appealability*.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make

a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons fully explained, Mr. Skeens' claims are not cognizable on federal habeas review, procedurally defaulted, or without merit under AEDPA standards. The court finds no basis to conclude that reasonable jurists would debate the outcome of the petition or find a reason to encourage Mr. Skeens to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

CONCLUSION

For these reasons, the court DENIES the petition (ECF 7), a certificate of appealability, as well as the petitioner's motions (ECF 10 and ECF 13), and now DIRECTS the clerk to close this case.

SO ORDERED.

May 4, 2022                                   *s/ Damon R. Leichty*
                                              Judge, United States District Court